UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MBIA INSURANCE CORPORATION,

Plaintiff,

v.

INDYMAC BANK, F.S.B. and FEDERAL
DEPOSIT INSURANCE CORPORATION
(as receiver of INDYMAC BANK, F.S.B.),

Defendant.

Case No. 09-CV-1011-JR

Hon. James Robertson

**MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF FDIC RECEIVER'S MOTION TO DISMISS**

Of Counsel:

John Warshawsky, D.C. Bar No. 417170
Counsel, Commercial Litigation Unit
Federal Deposit Insurance Corporation
3501 Fairfax Drive, Room VS-D-7066
Arlington, VA 22226

William R. Stein, D.C. Bar No. 304048
Scott H. Christensen, D.C. Bar No. 476439
Jason S. Cohen, D.C. Bar No. 501834
Hughes Hubbard & Reed LLP
1775 I Street, N.W., Suite 600
Washington, D.C. 20006-2401
Telephone: (202) 721-4600
Facsimile: (202) 721-4646

*Attorneys for Defendant Federal Deposit
Insurance Corporation, in its Capacity as
Receiver for IndyMac Bank, F.S.B.*

September 2, 2009

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................ iii

INTRODUCTION ............................................................................................................... 1

BACKGROUND AND SUMMARY OF ALLEGATIONS ............................................... 3

    A. Background ............................................................................................................ 3

    B. The IndyMac Transactions ................................................................................... 5

    C. IndyMac's Representations .................................................................................. 9

    D. The Insurance Agreements ................................................................................. 11

    E. The Loan Breach Remedy Provisions ................................................................ 12

    F. The IndyMac Receivership and MBIA's Administrative Claims ....................... 13

    G. The Complaint .................................................................................................... 14

          1. Counts I, II, III, and V (Contract Claims) ................................................. 14

          2. Count IV (Implied Covenant of Good Faith and Fair Dealing) ................. 15

          3. Count VI (Equitable Indemnification) ...................................................... 16

          4. Count VII (Negligent Misrepresentation) ................................................. 16

          5. Count VIII (Fraud) ..................................................................................... 17

ARGUMENT ..................................................................................................................... 17

I.     MBIA'S EXTRA-CONTRACTUAL CLAIMS FAIL TO STATE
       INDEPENDENT CLAIMS FOR RELIEF UNDER NEW YORK LAW ..................... 18

      A.     MBIA's Extra-Contractual Claims Should Be Dismissed Because
             They Merely Duplicate MBIA's Contract Claims. ................................................. 19

          1.     Count IV ..................................................................................... 19

          2.     Count VI ..................................................................................... 21

          3.     Count VII .................................................................................... 23

## TABLE OF CONTENTS
(continued)

Page

B.    MBIA's Extra-Contractual Claims Should Be Dismissed Because
MBIA's Remedies Are Expressly Limited By Contract.........................................24

C.    MBIA's Extra-Contractual Claims Should Be Dismissed Because
They Fail To Allege Damages Beyond Contract Damages...................................27

D.    Count VII Should Be Dismissed Because MBIA Fails To State A
Claim For Negligent Misrepresentation..................................................................30

II.   MBIA'S EXTRA-CONTRACTUAL CLAIMS ARE NOT
ENFORCEABLE AGAINST THE FDIC RECEIVER UNDER 12 U.S.C.
§ 1823(e) ...............................................................................................................................33

A.    Section 1823(e) Precludes Claims Based On Alleged Duties,
Covenants, Representations, Or Warranties Not Contained In A
Written Agreement Meeting Specific Statutory Requirements ...........................34

B.    Counts IV And VI Should Be Dismissed Because Claims Based On
Implied Obligations Are Barred By Section 1823(e) ...........................................35

C.    Counts VII And VIII Should Be Dismissed Because MBIA Does Not
Allege Any Representations Made Prior To The Formation Of The
Contracts That Are Enforceable Against FDIC Receiver......................................37

III.  COUNT VIII FAILS TO MEET THE REQUIREMENTS OF RULE 9(b).....................41

IV.   INDYMAC BANK SHOULD BE DISMISSED...............................................................44

CONCLUSION...........................................................................................................................45

# TABLE OF AUTHORITIES

Page(s)

# CASES

Adams v. Fountains Senior Props. of N.Y., Inc., 834 N.Y.S.2d 208 (2d Dep't 2007) ................. 25

Adams v. Madison Realty & Dev., Inc., 937 F.2d 845 (3d Cir. 1991) .......................................... 37

American Farm Bureau v. EPA, 121 F. Supp. 2d 84 (D.D.C. 2000) ................................................. 3

Ashcroft v. Iqbal, 129 S.Ct. 1937 (2009) ...................................................................................... 17

Atherton v. District of Columbia Office of Mayor, 567 F.3d 672 (D.C. Cir. 2009) .................... 17

Balta v. Ayco Co., ___ F. Supp. 2d ____, Civ. Nos. 04-6164, 04-6165, 2009 WL
    1449031 (W.D.N.Y. May 20, 2009) ...................................................................................... 18

Banque Arabe Et Internationale D'Investissement v. Maryland Nat'l Bank, 57 F.3d 146
    (2d Cir. 1995) .................................................................................................................. 31, 33

Batas v. Prudential Ins. Co. of America, 724 N.Y.S.2d 3 (1st Dep't 2001) ................................. 30

Bates v. Northwestern Human Servs., Inc., 466 F. Supp. 2d 69 (D.D.C. 2006) ..................... 42, 44

Beal Bank, SSB v. Pittorino, 177 F.3d 65 (1st Cir. 1999) ............................................................ 33

Bell Atlantic Co. v. Twombly, 550 U.S. 544 (2007) ..................................................................... 17

Blue Cross and Blue Shield of N.J., Inc. v. Philip Morris USA, Inc., 818 N.E.2d 1140
    (N.Y. 2004) ............................................................................................................................ 22

Bronxville Knolls, Inc. v. Webster Town Ctr. P'ship, 634 N.Y.S.2d 62 (1st Dep't 1995) .......... 25

Brown Leasing Co. v. Cosmopolitan Bancorp, Inc., 42 F.3d 1112 (7th Cir. 1994) .................... 44

Broyhill Furniture Indus., Inc. v. Hudson Furniture Galleries, 877 N.Y.S.2d 72 (1st Dep't
    2009) ...................................................................................................................................... 21

Buczowski v. FDIC, 415 F.3d 594 (7th Cir. 2005) ....................................................................... 44

Bufman Org. v. FDIC, 82 F.3d 1020 (11th Cir. 1996) ............................................................ 34, 36

Carvel Corp. v. Noonan, 350 F.3d 6 (2d Cir. 2003) .................................................................... 18

Cherny v. Emigrant Bank, 604 F. Supp. 2d 605 (S.D.N.Y. 2009) ............................................... 29

## TABLE OF AUTHORITIES
(continued)

Page(s)

Clark-Fitzpatrick, Inc. v. Long Island R. R. Co., 516 N.E.2d 190 (N.Y. 1987) ......... 19, 23, 24, 28

Condit v. Dunne, 317 F. Supp. 2d 344 (S.D.N.Y. 2004) ................................................................ 4

Deer Park Enter., LLC v. Ail Sys., Inc., 870 N.Y.S.2d 89 (2nd Dep't 2008) ........................ 19, 20

Deutsche Bank Secs., Inc. v. Rhodes, 578 F. Supp. 2d 652 (S.D.N.Y. 2008) ............................... 20

DynCorp v. GTE Corp., 215 F. Supp. 2d 308, 317 (S.D.N.Y. 2002) .............................. 25, 26, 31

Ellipso, Inc. v. Mann, 460 F. Supp. 2d 99 (D.D.C. 2006) ......................................................... 42

FDIC v. Bathgate, 27 F.3d 850 (3d Cir. 1994) ........................................................................... 36

FDIC v. Bell, 892 F.2d 64 (10th Cir. 1989) ................................................................................ 38

FDIC v. Giammettei, 34 F.3d 51 (2d Cir. 1994) ........................................................................ 36

FDIC v. LeBlanc, 85 F.3d 815 (1st Cir. 1996) ................................................................ 34, 37, 39

FDIC v. Oldenburg, 34 F.3d 1529 (10th Cir. 1994) ....................................................... 35, 38, 39

FDIC v. Suna Assocs., Inc., 80 F.3d 681 (2d Cir. 1996) ....................................................... 34, 37

Gibraltar Mgmt. Co. v. Grand Entrance Gates, Ltd., 848 N.Y.S.2d 684 (2nd Dep't 2007) ......... 19

Great Am. Ins. Co. v. United States, 575 F.2d 1031 (2d Cir. 1978) ...................................... 22, 23

Gupta Realty Corp. v. Gross, 674 N.Y.S.2d 741 (2d Dep't 1998) ............................................... 25

Hanson v. FDIC, 13 F.3d 1247 (8th Cir. 1994) ......................................................................... 35

Harris v. Provident Life & Acc. Ins. Co., 310 F.3d 73 (2d Cir. 2002) ........................................ 19

Heffez v. L&G Gen. Const., Inc., 867 N.Y.S.2d 198 (2nd Dep't 2008) .......................... 18, 24, 29

Heliotrope Gen., Inc. v. Ford Motor Co., 189 F.3d 971 (9th Cir. 1999) ....................................... 4

Highland Capital Mgmt., L.P. v. Schneider, 533 F. Supp. 2d 345 (S.D.N.Y. 2008) ............. 21, 36

Honeywell, Inc. v. J.P. Maguire Co., Civ. No. 93-5253, 1999 WL 102762 (S.D.N.Y. Feb. 24, 1999) ................................................................................................................................. 21

Hydro Investors, Inc. v. Trafalgar Power, Inc., 227 F.3d 8 (2d Cir. 2000) ................................. 29

In re Community Bank of N. Va., 418 F.3d 277 (3d Cir. 2005) ................................................... 44

## TABLE OF AUTHORITIES
(continued)

Page(s)

In re Countrywide Fin. Corp. Sec. Litig., 588 F. Supp. 2d 1132 (C.D. Cal. 2008) ...................... 7

In re Sealed Case No. 99-3091, 192 F.3d 995 (D.C. Cir. 1999) ..................................................... 4

In re TOUSA, Inc., ___ B.R. ____, No. 08-10928, 2009 WL 2152436 (Bankr. S.D. Fla.
    July 9, 2009) ............................................................................................................................... 21

In re XM Satellite Radio Holdings Sec. Litig., 479 F. Supp. 2d 165 (D.D.C. 2007) ................ 5, 7

J.A.O. Acquisition Corp. v. Stavitsky, 863 N.E.2d 585 (N.Y. 2007) ............................................. 30

JPMorgan Chase Bank v. Winnick, 350 F. Supp. 2d 393 (S.D.N.Y. 2004) ..................... 30, 32, 33

Kramer v. Time Warner, Inc., 937 F.2d 767 (2d Cir. 1991) ............................................................. 5

Langley v. FDIC, 484 U.S. 86 (1987) ................................................................................. 37, 40, 41

LaSalle Bank Nat'l Assoc. v. Citicorp Real Estate, Inc., Civ. No. 02-7868, 2003 WL
    1461483 (S.D.N.Y. Mar. 21, 2003) ............................................................................. 31, 32, 33

Linea Nuova, S.A. v. Slowchowsky, 877 N.Y.S.2d 891 (1st Dep't 2009) .................................... 27

Logan Advisors, LLC v. Patriarch Partners, LLC, 879 N.Y.S.2d 463 (1st Dep't 2009) .............. 20

Madison Capital Co., LLC v. Alasia, LLC, 615 F. Supp. 2d 233 (S.D.N.Y. 2009) ............... passim

Makastchian v. Oxford Health Plans, Inc., 704 N.Y.S.2d 44 (1st Dep't 2000) ............................ 27

Manas v. VMS Assocs., 863 N.Y.S.2d 4 (1st Dep't 2008) ............................................................. 27

Manhattan Motorcars, Inc. v. Automobili Lamborghini, S.p.A., 244 F.R.D. 204
    (S.D.N.Y. 2007) ........................................................................................................................ 29

Marshall v. Honeywell Tech. Solutions, Inc., 536 F. Supp. 2d 59 (D.D.C. 2008) .................... 6, 8

MBIA Ins. Co. v. Spiegel Holdings, Inc., Civ. No. 03-10097, 2004 WL 1944452
    (S.D.N.Y. Aug. 31, 2004) ......................................................................................................... 26

McCullough v. FDIC, 987 F.2d 870 (1st Cir. 1993) ...................................................................... 38

McGlothlin v. RTC, 913 F. Supp. 15 (D.D.C. 1996) ..................................................................... 38

McMahan & Co. v. Bass, 673 N.Y.S.2d 19 (2d Dep't 1998) ............................................. 18, 24, 25

Metropolitan Life Ins. Co. v. Noble Lowndes Int'l, Inc., 643 N.E.2d 504 (N.Y. 1994) .............. 25

# TABLE OF AUTHORITIES
(continued)

Page(s)

Minebea Co. v. Papst, 377 F. Supp. 2d 34 (D.D.C. 2005)............................................. 18

Muller-Paisner v. TAA, 289 Fed. Appx. 461 (2d Cir. 2008)......................................... 5

Murphy v. FDIC, 61 F.3d 34 (D.C. Cir. 1995) ............................................................ 34

Niagara Falls Water Bd. v. City of Niagara Falls, 881 N.Y.S.2d 763 (4th Dep't 2009) .............. 21

NYP Holdings, Inc. v. McClier Corp., 881 N.Y.S.2d 407 (1st Dep't 2009) ............................... 23

O'Melveny & Myers v. FDIC, 512 U.S. 79 (1994) ....................................................... 44

Oran v. Stafford, 226 F.3d 275 (3d Cir. 2000) .......................................................... 5

Orlando v. Novurania of America, 162 F. Supp. 2d 220 (S.D.N.Y. 2001) ......................... 29

Paylor v. Winter, 600 F. Supp. 2d 11 (D.D.C. 2009) .................................................... 3

Peabody v. Weider Publ'ns, Inc., 260 Fed. Appx. 380 (2d Cir. 2008) ............................... 20

Phipps v. FDIC, 417 F.3d 1006 (8th Cir. 2005) ......................................................... 44

Presbyterian Church of Sudan v. Talisman Energy, Inc., 244 F. Supp. 2d 289 (S.D.N.Y. 2003).................................................................... 3

R.H. Damon & Co. v. Softkey Software Prods., 811 F. Supp. 986 (S.D.N.Y. 1993) ........... 27, 29

Rivas v. Amerimed USA, Inc., 824 N.Y.S.2d 41 (1st Dep't 2006)................................... 30

RTC v. BVS Dev., Inc., 42 F.3d 1206 (9th Cir. 1994) .................................................. 41

RTC v. Key Fin. Servs., 280 F.3d 12 (1st Cir. 2002) ................................................. 25, 26

Service Sign Erectors Co., Inc. v. Allied Outdoor Advertising, Inc., 573 N.Y.S.2d 513 (1st Dep't 1991).................................................................... 22

Solutia Inc. v. FMC Corp., 456 F. Supp. 2d 429 (S.D.N.Y. 2006)................................ 31, 32

Southland Sec. Corp. v. INSpire Ins. Solutions, Inc., 365 F.3d 353 (5th Cir. 2004).................... 43

Stecher v. 85th Estates Co., 843 N.Y.S.2d 6 (1st Dep't 2007) ...................................... 19

Teachers' Retirement Sys. of La. v. Hunter, 477 F.3d 162 (4th Cir. 2007) ..................... 43

Towantic Energy, LLC v. Gen. Elec. Co., Civ. No. 04-00446, 2004 WL 1737254 (N.D. Cal. Aug. 2, 2004)............................................................................................... 5

## TABLE OF AUTHORITIES
(continued)

Page(s)

Town House Stock LLC v. Coby Housing Corp., 828 N.Y.S.2d 366 (1st Dep't 2007).............. 27

U.S. ex rel. Williams v. Martin-Baker Aircraft Co., Ltd., 389 F.3d 1251 (D.C. Cir. 2004)........ 42

Vasapolli v. Rostoff, 39 F.3d 27 (1st Cir. 1994)......................................................... 37

Village of Oakwood v. State Bank and Trust Co., 481 F.3d 364 (6th Cir. 2007) ....................... 45

Washington Props. Ltd. P'ship v. RTC, 796 F. Supp. 542 (D.D.C. 1992) ........................... 36, 38

Wright v. Selle, 811 N.Y.S.2d 525 (4th Dep't 2006) ................................................... 30

Yeomalakis v. FDIC, 562 F.3d 56 (1st Cir. 2009)...................................................... 44

## STATUTES

12 U.S.C. § 1821(d)(10)(A)............................................................................. 13

12 U.S.C. § 1821(d)(13)(D)............................................................................. 13

12 U.S.C. § 1821(d)(2) .............................................................................. 13, 44

12 U.S.C. § 1821(d)(3) .................................................................................. 13

12 U.S.C. § 1821(d)(9)(A)......................................................................... 2, 34, 35

N.Y. INS. LAW. § 6901(a)(1)............................................................................. 1

## OTHER AUTHORITIES

Restatement (First) of Restitution § 76 (2009) ......................................................... 22

## INTRODUCTION

MBIA Insurance Corporation ("MBIA") brings this action against the Federal Deposit Insurance Corporation in its capacity as Receiver for IndyMac Bank, F.S.B. ("FDIC Receiver"). MBIA is "a New York stock insurance corporation" in the business of providing financial guaranty insurance to enhance the credit of asset-backed securities and other structured financial transactions.[1]  Complaint ("Compl.") ¶ 7.  MBIA's claims arise from its agreement to provide insurance in connection with three residential mortgage loan securitizations sponsored and serviced by IndyMac Bank, F.S.B. ("IndyMac") in December 2006 and in February and March 2007 (the "IndyMac Transactions").

The core allegation of MBIA's Complaint is that a number of IndyMac's representations and warranties regarding the nature and quality of the mortgage loans included in the IndyMac Transactions were materially false.  MBIA claims that, as a result, the mortgage loans defaulted at a higher rate than MBIA expected, requiring MBIA to make payments to insured investors. MBIA asserts eight causes of action against FDIC Receiver.

Counts I, II, III, and V (the "Contract Claims") are for express breach of contract, and are largely premised on alleged breaches by IndyMac of its express representations and warranties regarding the underlying mortgage loans, including the underwriting standards used to originate the loans.  The Contract Claims seek to enforce MBIA's rights under the complex remedial provisions of the contracts – remedies that were expressly intended to be MBIA's sole recourse

---

[1]   Financial guaranty insurance is the unconditional promise of an insurer to pay principal and interest to investors in the event of default on a financial instrument.  Compl. ¶ 18; see N.Y. INS. LAW. § 6901(a)(1) (2005) (defining "financial guaranty insurance").

in the event of a breach of those representations and warranties. FDIC Receiver is not moving to dismiss MBIA's Contract Claims, and is instead filing an answer to these claims.

By contrast, Counts IV, VI, VII, and VIII (the "Extra-Contractual Claims") all assert claims against IndyMac based on theories other than express breach of contract, despite arising from the same alleged representations and warranties, and asserting the same kinds of damages, that form the basis for the Contract Claims.

FDIC Receiver moves under Federal Rule of Civil Procedure 12(b)(6) to dismiss Counts IV, VI, VII, and VIII, which fail to state an actionable claim as a matter of both state and federal law. Under New York law, Counts IV, VI, VII, and VIII should be dismissed as merely duplicative of its Contract Claims, because (1) MBIA has no independently actionable legal claim for relief beyond IndyMac's contractual obligations, and alleges no injuries beyond the kinds of losses recoverable under the contract, and (2) MBIA is limited to its negotiated contractual remedies and may not expand those remedies by artfully pleading extra-contractual theories of recovery. Under federal law, Counts IV, VI, VII, and VIII should be dismissed because they do not meet the requirements of 12 U.S.C. § 1823(e) and are thus unenforceable against FDIC Receiver under 12 U.S.C. § 1821(d)(9)(A). In addition, MBIA's claim for fraud in Count VIII fails to meet the pleading requirement of Federal Rule of Civil Procedure 9(b). Finally, because FDIC Receiver is IndyMac's successor-in-interest and is solely responsible for paying valid claims against IndyMac from the assets of the IndyMac receivership estate in accordance with the requirements and limitations of federal law, IndyMac should be dismissed under Federal Rule of Civil Procedure 25(c) as an inappropriate and unnecessary party.

## BACKGROUND AND SUMMARY OF ALLEGATIONS[2]

**A.    Background – The Mortgage Securitization Market In 2006-2007[3]**

By 2006, the explosion in the growth of residential mortgage-backed securitizations had

transformed the mortgage market, creating a trillion-dollar annual industry dominated by large,

sophisticated financial institutions like IndyMac and MBIA.  But trouble was brewing.  For

months before MBIA agreed to provide insurance for the first of the IndyMac Transactions,

federal regulators, among others, had been sounding warnings about the quality of the mortgage

loans underlying these kinds of securitizations, due to the increasing use of loans issued on non-

traditional financing terms to a widening pool of borrowers with marginal credit.[4]  The regulators

cautioned that the low-cost mortgage products predominantly used in these securitizations –

interest-only and option adjustable-rate mortgages requiring little or no money down, with easy

---

[2]    In evaluating a motion under Rule 12(b)(6), the Court may consider "facts alleged in the complaint, any documents attached to or incorporated in the complaint, matters of which the court may take judicial notice, and matters of public record."  Paylor v. Winter, 600 F. Supp. 2d 117, 123 (D.D.C. 2009).  The documents cited below in support of FDIC Receiver's motion to dismiss are attached as exhibits to the Declaration of Jason S. Cohen (the "Cohen Declaration") submitted herewith.  When citing these materials, the notation "Ex. ___" refers to the corresponding exhibit attached to the Cohen Declaration.

[3]    FDIC Receiver offers Section A for the limited purpose of helping the Court understand the background and context of the litigation.  See, e.g., Presbyterian Church of Sudan v. Talisman Energy, Inc., 244 F. Supp. 2d 289, 296-97 n. 4 & n. 6 (S.D.N.Y. 2003) (taking judicial notice of information on motion to dismiss "solely for background purposes . . . to place the allegations set forth in the [complaint] in context").

[4]    Most notably, the Office of the Comptroller of the Currency, the Board of Governors of the Federal Reserve System, the Office of Thrift Supervision, the National Credit Union Administration, and the Federal Deposit Insurance Corporation issued joint guidance to the financial industry out of concern that such products "expose[d] financial institutions [and consumers] to increased risk relative to traditional mortgage loans."  Ex. 14, Interagency Guidance on Nontraditional Mortgage Product Risks, 71 Fed. Reg. 58,609, 58,613 (Oct. 4, 2006) ("Interagency Guidance").  See American Farm Bureau v. EPA, 121 F. Supp. 2d 84, 106 (D.D.C. 2000) (taking judicial notice on motion to dismiss of agency guidance documents published in Federal Register).

approval terms, reduced documentation and underwriting requirements, and minimal or even

negative amortization, often combined with simultaneous second-lien loans or home equity lines

of credit[5] – were a recent and untested innovation; they warned that the lack of historical data for

these mortgage loans made the performance of the securities difficult to predict, particularly in

periods of economic stress.[6] Industry publications were raising similar alarms, and noting an

upward trend in delinquencies and defaults.[7]

     Long before the IndyMac Transactions, MBIA had been a significant participant in the

residential mortgage-backed securitization market, and had extensive experience insuring and

---

[5]  See Ex. 14, Interagency Guidance at 58,613 ("Many of these nontraditional mortgage loans are underwritten with less stringent or no income and asset verification requirements and are increasingly combined with simultaneous second-lien loans.").

[6]  For example, a Federal Reserve Bank of Chicago report assessing these types of loans described a member of the Federal Reserve Board of Governors as stating that "the upsurge in securitization may be contributing to lax underwriting standards and other risky practices, 'taking the market into uncharted territory.'" Ex. 15, *Developments and innovations in real estate markets: A conference summary*, 231a CHI. FED LETTER 1, 3 (Oct. 1, 2006), available at 2006 WLNR 17116596. Days later, the Interagency Guidance stated that "institutions should recognize that the[] limited performance history [of] these products, particularly in a stressed environment, increases performance uncertainty," and recommended "an allowance for loan and lease losses that reflects the collectibility of the portfolio." Ex. 14, Interagency Guidance, 71 Fed. Reg. at 58,613, 58,616.

[7]  See, e.g., Ex. 16, *The Rise of Private Label*, MORTGAGE BANKING 70 (Oct. 1, 2006), available at 2006 WLNR 19476829 ("There are a lot of unanswered questions about the future performance of these loans. . . . Delinquencies and defaults, already rising this year . . ., are expected to rise even more."); Ex. 17, *2006 HE ABS vintage: the worst ever?*, ASSET SECURITIZATION REP. (Nov. 27, 2006), available at 2006 WLNR 20507119 ("Slowing home price appreciation and weakened underwriting standards are creating dramatically poor performance across a wide swath of 2006 mortgages."). The Court may take judicial notice of information submitted for the purpose of demonstrating widespread news coverage or public knowledge. See In re Sealed Case No. 99-3091, 192 F.3d 995, 1004 (D.C. Cir. 1999); see also, e.g., Heliotrope Gen., Inc. v. Ford Motor Co., 189 F.3d 971, 981 n.18 (9th Cir. 1999); Condit v. Dunne, 317 F. Supp. 2d 344, 357-58 (S.D.N.Y. 2004) (taking judicial notice of news articles "to place [the case] in the broader social context" and to provide evidence of "widespread publicity and speculation").

monitoring mortgage-backed securitizations.  As MBIA's 2005 and 2006 Form 10-Ks described, the company had a sophisticated organizational structure for managing risk and analyzing "those aspects of credit quality important for each category of obligations considered for insurance."[8] In just the two years leading up to the IndyMac Transactions, MBIA alone had insured over $19 billion in residential mortgage-backed securities.[9]  Drawing on this expertise and experience, MBIA recognized in those Form 10-Ks, issued prior to the IndyMac Transactions, that "[t]here can be no assurance . . . that [MBIA] will not incur material losses if the economic stress and increased defaults in certain sectors . . . [are] more severe than [MBIA] currently foresees."[10]

## B.      The IndyMac Transactions

As MBIA acknowledges, the IndyMac Transactions were typical mortgage-backed securitization transactions.  Compl. ¶ 15.  In the prospectuses for the IndyMac Transactions, IndyMac made clear the high-risk nature of the underlying mortgage loans, warning that "the rates of delinquencies, foreclosures, and losses could be higher than those now generally

---

[8]   Ex. 13, MBIA, Inc. 2006 Form 10-K (3/1/07) ("MBIA 2006 Form 10-K") at 7; see id. at 6-9; Ex. 12, MBIA, Inc. 2005 Form 10-K (3/8/06) ("MBIA 2005 Form 10-K") at 8-10.  The Court may take "judicial notice of the contents of relevant public disclosure documents required to be filed with the SEC."  Kramer v. Time Warner, Inc., 937 F.2d 767, 774 (2d Cir. 1991); accord, e.g., In re XM Satellite Radio Holdings Sec. Litig., 479 F. Supp. 2d 165, 174 n.8 (D.D.C. 2007); Oran v. Stafford, 226 F.3d 275, 289 (3d Cir. 2000) (collecting cases). MBIA's website similarly notes that its "surveillance team is the largest and most experienced in the industry and carefully monitors all insured obligations[,] . . . from the earliest phases of implementation through the final maturity of a transaction."  See http://www.mbia.com/pubfin/pubfin.html.  The Court may take judicial notice of a party's website on a motion to dismiss.  See, e.g., Muller-Paisner v. TAA, 289 Fed. Appx. 461, 466 n.5 (2d Cir. 2008); Towantic Energy, LLC v. Gen. Elec. Co., Civ. No. 04-00446, 2004 WL 1737254, at *1 n.1 (N.D. Cal. Aug. 2, 2004).

[9]   Ex. 13, MBIA 2006 Form 10-K at 5-6.

[10]   Id. at 25; Ex. 12, MBIA 2005 Form 10-K at 31.

experienced in the mortgage lending industry."[11]  The prospectuses disclosed that the IndyMac

Transactions contain a large number of second-lien mortgages or home equity lines of credit,

which have a greater risk of delinquency or default than first-lien mortgages,[12] and that virtually

all of the loans had a combined loan-to-value ratio of greater than 80 percent, which "may

present a greater risk of loss than mortgage loans with [smaller] combined loan-to-value

ratios."[13]  Moreover, the prospectuses noted that the majority of the loans were newly originated,

and "may experience higher rates of default than if the mortgage loans had been outstanding for

a longer period of time."[14]  The materials also disclosed that two-thirds of the loans in the two

2007 IndyMac Transactions were originated under IndyMac's "Piggyback Program," which used

"sub-prime underwriting standards" for which "the rates of delinquency, bankruptcy, and

---

[11]  Ex. 1, IndyMac December 11, 2006 Prospectus ("Base Prospectus") at 16, 26; see also Ex. 2, IndyMac Series 2006-H4 Prospectus Supplement, December 11, 2006 ("2006-H4 Prospectus Supplement") at S-33; Ex. 3, IndyMac Series INDS 2007-1 Prospectus Supplement, February 13, 2007 ("2007-1 Prospectus Supplement") at 13; Ex. 4, IndyMac Series INDS 2007-2 Prospectus Supplement, March 21, 2007 ("2007-2 Prospectus Supplement") at 11-12.  These prospectuses were included within the defined "Transaction Documents" that comprise the securitizations (see p. 8 below), and, as such, were expressly incorporated by reference into MBIA's agreements to provide financial guaranty insurance for the IndyMac Transactions and referred to in the Complaint.  See Compl. ¶¶ 33-35.  Accordingly, the Court may take judicial notice of their contents.  See Marshall v. Honeywell Tech. Solutions, Inc., 536 F. Supp. 2d 59, 65 (D.D.C. 2008).

[12]  See Ex. 2, 2006-H4 Prospectus Supplement at S-14; Ex. 3, 2007-1 Prospectus Supplement at 11; Ex. 4, 2007-2 Prospectus Supplement at 11.  As MBIA disclosed in SEC filings as early as March 2006, it was aware that that securitizations of home equity loans had "experienced increased delinquencies and defaults in the underlying pools of loans" in 2005 and 2006.  Ex. 12, MBIA 2005 Form 10-K at 31; see also Ex. 13, MBIA 2006 Form 10-K at 25.

[13]  Ex. 3, 2007-1 Prospectus Supplement at 12; see Ex. 2, 2006-H4 Prospectus Supplement at S-7; Ex. 4, 2007-2 Prospectus Supplement at 11-12.

[14]  Ex. 3, 2007-1 Prospectus Supplement at 12 ("Defaults on mortgage loans tend to occur at higher rates during the early years of the mortgage loans."); see Ex. 2, 2006-H4 Prospectus Supplement at S-7; Ex. 4, 2007-2 Prospectus Supplement at 12.

foreclosure for those mortgage loans could be . . . substantially higher" than for mortgage loans underwritten in conformance with Fannie Mae and Freddie Mac standards.[15] And the prospectus supplement for the March 2007 IndyMac Transaction stated that "[d]elinquencies and losses with respect to residential mortgage loans generally have increased in recent months and may continue to increase," while "housing prices and appraisal values . . . have declined or stopped appreciating."[16] These prospectuses were all issued and on file with the SEC before MBIA entered into each respective insurance agreement with IndyMac.[17]

Notwithstanding the risks, MBIA agreed to provide financial guaranty insurance for the three IndyMac Transactions: (1) the IndyMac Home Equity Mortgage Loan Asset-Backed Trust, Series INDS 2006-H4 (the "2006-H4 Transaction"), issued on December 21, 2006; (2) the IndyMac Home Equity Mortgage Loan Asset-Backed Trust, Series INDS 2007-1 (the "2007-1 Transaction"), issued on February 14, 2007; and (3) the IndyMac Home Equity Mortgage Loan Asset-Backed Trust, Series INDS 2007-2 (the "2007-2 Transaction"), issued on March 22, 2007. Compl. ¶¶ 24-26.

---

[15]  Ex. 3, 2007-1 Prospectus Supplement at 12, 25 ("The Piggyback Program generally does not require that the borrower demonstrate sufficient funds in reserve to make principal and interest payments."); Ex. 4, 2007-2 Prospectus Supplement at 12, 25.  The prospectuses also indicated that approximately 97 percent of the loans included in the 2007 IndyMac Transactions contain "balloon" payments, which "pose a special payment risk." Ex. 3, 2007-1 Prospectus Supplement at 11; Ex. 4, 2007-2 Prospectus Supplement at 11; see Ex. 1, Base Prospectus at 7.

[16]  Ex. 4, 2007-2 Prospectus Supplement at 12 ("A continued decline or an extended flattening of those values may result in additional increases in delinquencies and losses on residential mortgage loans.").

[17]  See In re Countrywide Fin. Corp. Sec. Litig., 588 F. Supp. 2d 1132, 1159-60 (C.D. Cal. 2008) (taking judicial notice of "prospectuses . . . contain[ing] some statistics of varying specificity about the underlying mortgages," which were on file with the SEC); XM Satellite Radio, 479 F. Supp. 2d at 174 n.8.

Each of these transactions is governed by interrelated "Transaction Documents," which constitute the legal obligations of each of the contracting parties, and which set forth the terms by which the underlying mortgage loan portfolios were to be serviced, securitized, insured, and ultimately sold to investors.[18]  For the 2006-H4 Transaction, the Transaction Documents included, among other items, the Mortgage Loan Purchase Agreement (the "2006-H4 Purchase Agreement"), the Sale and Servicing Agreement (the "2006-H4 SSA"), the related Offering Documents – specifically, the December 11, 2006 Prospectus (the "Base Prospectus") and the December 20, 2006 Prospectus Supplement (the "2006-H4 Prospectus Supplement") – and the Insurance and Indemnity Agreement (the "2006-H4 Insurance Agreement").  Ex. 9, 2006-H4 Insurance Agreement at 5; see also Compl. ¶ 34.  For the 2007-1 and 2007-2 Transactions, the Transaction Documents included, among other items, the Pooling and Servicing Agreements (the "2007-1 PSA" and the "2007-2 PSA"), the related Offering Documents – specifically, the Base Prospectus and the February 13, 2007 and March 12, 2007 Prospectus Supplements (the "2007-1 Prospectus Supplement" and the "2007-2 Prospectus Supplement") – and the Insurance and Indemnity Agreements (the "2007-1 Insurance Agreement" and the "2007-2 Insurance Agreement").  Ex. 10, 2007-1 Insurance Agreement at 4; Ex. 11, 2007-2 Insurance Agreement at 4; see also Compl. ¶ 35.  The Transaction Documents were interdependent, frequently cross-referencing other Transaction Documents and expressly incorporating their terms.  See Compl. ¶¶ 33-37.

---

[18]  Of course, because the Transaction Documents are "referred to in the complaint and . . . central to the plaintiff's claim," the Court may consider their terms without converting this motion into one for summary judgment.  Marshall, 536 F. Supp. 2d at 65.  Copies of the Transaction Documents cited herein are attached as Exhibits 1 through 11 to the Cohen Declaration.

Each of the Insurance Agreements to which MBIA and IndyMac were parties thus constituted an essential and integrated element of a complex transaction involving the creation and sale of securities backed by a trust holding portfolios of residential mortgage loans. Compl. ¶¶ 15-18. IndyMac originated or acquired the underlying mortgage loans and effected the transfer of the loan portfolios to a trust created for the transaction. Id. ¶ 15. IndyMac also was responsible for servicing the loans, i.e., (1) collecting mortgage payments and remitting the payments to the trust, and (2) determining when a loan was in default and pursuing remedies on defaulted loans. Id. ¶¶ 16-17. The trust, in turn, divided the portfolios into several tranches, each representing different interests in various cash flows of principal, interest, and fees from the mortgages. Id. ¶ 15. The trust then issued different classes of securities based on these tranches, each of which entitled investors to periodic disbursements from the cash flow available to the trust from the payments made on the underlying mortgages, as allocable to the tranche on which that class of security is based. Id. MBIA provided insurance against shortfalls in the trust's ability to make these cash disbursements. Id. ¶ 18.

## C.     IndyMac's Representations

MBIA alleges that, in furtherance of each of the IndyMac Transactions, IndyMac made certain "representations regarding the quality and character of the underlying mortgage loans and the underwriting standards used to underwrite the mortgage loans." Compl. ¶ 19. According to MBIA, IndyMac communicated its representations regarding the underlying mortgage loans in two ways. First, IndyMac made representations and warranties in the Transaction Documents,[19]

---

[19]   Among the contractual representations and warranties regarding the underlying mortgage loans, IndyMac represented that: (1) the loans had been underwritten and serviced in compliance with its guidelines, see Compl. ¶ 37(a); (2) the loans had been originated in

(Footnote continued on next page)

9

on which MBIA purportedly relied in making its decision to provide credit insurance.  See id. ¶¶

33, 37-40; see also Ex. 5, 2006-H4 Purchase Agreement § 3.01; Ex. 6, 2006-H4 SSA § 2.04; Ex.

7, 2007-1 PSA § 2.03, Schedule III; Ex. 8, 2007-2 PSA § 2.03, Schedule III.  Second, IndyMac

provided MBIA with "data tapes demonstrating various statistical attributes of the mortgage

loans," including "credit scores statistics for individual mortgage loans and averages of the

metrics for each IndyMac Transaction."  Compl. ¶ 29; see id. ¶ 30 (alleging that these tapes were

provided to MBIA via e-mail on nine occasions).  MBIA alleges that it relied upon this

information when deciding whether to insure a mortgage-backed securitization, because "it is

neither practical nor feasible for [it] to review the many thousands of mortgage loans in the loan

portfolios."  Id. ¶ 20; see also id. ¶ 21 (alleging that such representations are generally contained

in "schedules and due diligence tapes that set forth general financial characteristics of the

mortgage loans").

      MBIA alleges that its decision to provide insurance also was based upon so-called

"shadow ratings," created by rating agencies to project the "expected loan level default and loss

assumptions" for the mortgage loans comprising each securitization.  Id. ¶ 21.  MBIA asserts that

IndyMac provided information about the mortgage loans to the rating agencies, which "relied on

this information to issue shadow ratings for the IndyMac Transactions."  Id. ¶ 29.

---

(Footnote continued from previous page)

compliance with applicable law, see id. ¶ 37(b); and (3) the selection of loans for inclusion in
the portfolio was not intended to adversely affect the interests of the insurer, see id. ¶ 37(c).
As discussed further below, each of these representations forms the basis of one or more of
MBIA's Contract Claims.

## D.   The Insurance Agreements

Under the terms of the Insurance Agreements (and the related Policies issued to investors), MBIA promised to guarantee the distribution of principal and interest payments to insured investors in the event of shortfalls to the trust cash flow. Id. ¶ 18; see also, e.g., Ex. 9, 2006-H4 Insurance Agreement § 3.01; Ex. 7, 2007-1 PSA, Ex. T (Certificate Guaranty Insurance Policy) at 1-2.  In consideration of this guaranty, MBIA received monthly premium payments from the trust (which payments had a higher priority than distributions of principal and interest to the insured investors), as well as monthly reimbursement, with interest, of any payments made by MBIA on insurance claims under the policies. See, e.g., Ex. 9, 2006-H4 Insurance Agreement §§ 3.02(b), 3.03(a); Ex. 6, 2006-H4 SSA §5.01(a); see also Ex. 10, 2007-1 Insurance Agreement §§ 3.02(b), 3.03(a); Ex. 11, 2007-2 Insurance Agreement §§ 3.02(b), 3.03(a); Ex. 7, 2007-1 PSA § 4.02(a); Ex. 8, 2007-2 PSA § 4.02(a).  Such consideration was to be paid at the same time that investors received their own distributions. See, e.g., Ex. 6, 2006-H4 SSA § 5.01(a).

In the Insurance Agreements, IndyMac made representations and warranties to MBIA regarding the performance of its obligations as seller and servicer of the underlying mortgage loans. See, e.g., Ex. 9, 2006-H4 Insurance Agreement §§ 2.01, 2.10.  IndyMac also warranted the truth of, and incorporated by reference, all representations and warranties it made in other Transaction Documents, including those concerning the underlying loans that MBIA allegedly relied upon in agreeing to provide insurance. See, e.g., id. § 2.01(k); see also Compl. ¶ 37.

IndyMac agreed generally to indemnify MBIA for any costs it incurred as a result of any breach by IndyMac of its representations and warranties. See, e.g., Ex. 9, 2006-H4 Insurance Agreement § 3.04(a).  However, the general indemnification provisions, by their terms, do not apply to breaches of representations and warranties regarding the nature and quality of the

underlying mortgage loans. <u>See</u> <u>id.</u> §§ 2.01(k), 3.03(b), 3.04(a)(iv). Instead, the Transaction Documents set forth a specific and exclusive remedial scheme (the "Loan Breach Remedy Provisions") available to MBIA in the event that IndyMac's representations or warranties about the mortgage loans proved to be untrue. <u>See</u> Compl. ¶¶ 53-55.

**E.     The Loan Breach Remedy Provisions**

The remedial mechanism in the 2006-H4 Transaction Documents is representative of each of the IndyMac Transactions. The Insurance Agreement provides that "the remedy for any breach of a representation and warranty of IndyMac" made under the Transaction Document provisions relating to the characteristics of the underlying mortgage loans "<u>shall be limited to the remedies specified</u> in the related Transaction Document." Ex. 9, 2006-H4 Insurance Agreement § 2.01(k) (emphasis added); <u>see</u> Ex. 10, 2007-1 Insurance Agreement § 2.01(k); Ex. 11, 2007-2 Insurance Agreement § 2.01(k).

Section 2.04 of the Sales and Servicing Agreement sets forth the "sole remedy" against IndyMac for any breach of a representation or warranty "which materially and adversely affects the value of the related Mortgage Loan or the interests of the Trust . . . or the Insurer in the related Mortgage Loan." Ex. 6, 2006-H4 SSA § 2.04(c). If IndyMac cannot cure the problem within 90 days, it must, subject to the specific terms of the Agreement, (1) repurchase the defective loan from the Trust or substitute it with a different "eligible" loan under the terms of the agreement, and (2) reimburse MBIA for any expenses it has incurred as a result of the defect. <u>See</u> <u>id.</u> ("the obligation of the Seller to substitute or purchase any Mortgage Loan as to which a breach has occurred and is continuing shall constitute the sole remedy against the Seller respecting such breach available to . . . the Insurer"); <u>see also</u> Ex. 7, 2007-1 PSA § 2.03(c); Ex. 8, 2007-2 PSA § 2.03(c). If IndyMac fails to comply with its obligation to repurchase or substitute the defective mortgage loan, it must (again, subject to the specific terms of the

12

Agreement) reimburse MBIA for payments made to insured investors under the Policy as a result of this failure, with interest at a specified "Late Payment Rate." Ex. 9, 2006-H4 Insurance Agreement § 3.03(b); see Ex. 10, 2007-1 Insurance Agreement § 3.03(b); Ex. 11, 2007-2 Insurance Agreement § 3.03(b); Compl. ¶¶ 53-55.

Consistent with these specific remedies, the Insurance Agreement excludes from its general indemnification clause any costs incurred by MBIA as a result of "the breach by IndyMac . . . [of] a representation in respect of the Mortgage Loans." Ex. 9, 2006-H4 Insurance Agreement § 3.04(a)(iv); see Ex. 10, 2007-1 Insurance Agreement § 3.04(a)(iv); Ex. 11, 2007-2 Insurance Agreement § 3.04(a)(iv). Further, the Insurance Agreement makes clear that a breach of a representation or warranty regarding the mortgage loans does not constitute an "Event of Default," the occurrence of which would entitle MBIA to "take whatever action at law or in equity as may appear necessary or desirable . . . to collect the amounts, if any, then due under the Transaction Documents." Ex. 9, 2006-H4 Insurance Agreement § 5.02(a)(iii); see also, e.g., id. § 5.01(a).

## F.    The IndyMac Receivership And MBIA's Administrative Claims

On July 11, 2008, the Office of Thrift Supervision closed IndyMac and appointed the FDIC as its Receiver.  See OTS Order No. 2008-24 (July 11, 2008); Compl. ¶ 50.  FDIC Receiver thus succeeded to all the rights, titles, powers, privileges, and operations of IndyMac – and of IndyMac's shareholders, directors, and officers – with respect to the bank, its assets, and its valid obligations. 12 U.S.C. § 1821(d)(2).  The powers and duties of FDIC Receiver also include the resolution and payment, from the receivership estate, of all outstanding claims against IndyMac.  See id. §§ 1821(d)(3), 1821(d)(10)(A), 1821(d)(13)(D).

MBIA initially submitted the claims asserted here to FDIC Receiver through its administrative process, as required by law.  Compl. ¶ 51, Ex. A.  On April 1, 2009, FDIC Receiver disallowed those claims.  Id. ¶ 51, Ex. B.  On May 29, 2009, MBIA filed its Complaint.

## G.    The Complaint

This action is predicated on MBIA's assertion that "[c]ontrary to IndyMac's representations and warranties, the portfolios of mortgage loans that IndyMac included in the IndyMac Transactions were of a fundamentally inferior quality and character."  Compl. ¶ 5.  Because "the risks inherent in the portfolios were significantly higher than what IndyMac represented to MBIA," MBIA contends that it "has incurred . . . significant losses in connection with its obligations under the Policies to insure certain shortfalls in payments to investors in the IndyMac Transactions."  Id. ¶¶ 5, 49.  Specifically, MBIA alleges that "substantial" mortgage loan delinquencies and defaults have required it to make payments "in excess of $411,000,000" to insured investors under the terms of its policies.  Id. ¶ 41.  MBIA also alleges that IndyMac failed to perform certain other contractual obligations.  Id. ¶¶ 42-49.  Seeking unspecified money damages, MBIA brings eight claims against FDIC Receiver.

### 1.    Counts I, II, III, and V (Breach of Contract)

The Contract Claims – Counts I, II, III, and V – assert claims based on IndyMac's alleged breach of its contractual representations and warranties, as well as IndyMac's failure to perform its contractual obligations.  In Count I ("Breach of Loan Remedy Procedure"), MBIA alleges that IndyMac, having breached its representations and warranties regarding the mortgage loans, did not comply with its contractual obligations under the exclusive Loan Breach Remedy Provisions described in the Transaction Documents.  Compl. ¶¶ 53-59.  In Counts II ("Servicing – INDS 2007-1") and III ("Servicing"), MBIA alleges that IndyMac, having breached its representation and warranties regarding the mortgage loans, failed properly to service the delinquent mortgage

14

loans as required by the Transaction Documents. Id. ¶¶ 81-82, 89-93. In Count V (Breach of Contract – Access to Documentation), MBIA alleges that IndyMac failed to provide it with reasonable access to information about the mortgage loans, as required by the Transaction Documents. Id. ¶ 112-15. In each of the Contract Claims, MBIA alleges that it has been required to make payments to insured investors and has incurred other damages as a result of the breaches, and asserts that IndyMac has failed to indemnify it for its losses as required by the Insurance Agreements. Id. ¶¶ 60-63, 82-85, 93-95, 112-18.

The remaining four Extra-Contractual Claims – Counts IV, VI, VII, and VII – assert claims relying on grounds other than express breach of contract, but are based on the same allegations as the Contract Claims.

### 2.   **Count IV (Implied Covenant of Good Faith and Fair Dealing)**

In Count IV, MBIA alleges that IndyMac violated "the covenant or duty of good faith and fair dealing that is implied in all contracts" by making false representations and warranties in connection with the IndyMac Transactions. Compl. ¶ 98. MBIA contends that IndyMac violated this implied duty when it (1) "contributed mortgage loans to the mortgage loan pools underlying the IndyMac Transactions that IndyMac knew breached one or more of IndyMac's representations and warranties," id. ¶ 101; (2) "fail[ed] to properly charge-off mortgage loans where appropriate to do so," id. ¶ 103; and (3) "denied MBIA reasonable access to information necessary to enforce MBIA's contractual rights," id. Each of these allegations is based upon the same alleged facts as, and is substantively identical to, MBIA's Contract Claims. See, e.g., id. ¶ 57 (Count I – failed to comply with reps and warranties with respect to mortgage loans and underwriting guidelines); id. ¶ 92 (Count III – failed to properly charge-off delinquent mortgage loans); id. ¶ 93 (Count III – made unreasonable determinations "in bad faith" with respect to mortgage loans); id. ¶¶ 112-15 (Count V – failed to provide access to information).

3.    **Count VI (Equitable Indemnification)**

In Count VI, MBIA claims that it is entitled to equitable indemnification from FDIC Receiver for the costs it has incurred as the result of its contractual duties under the Policies. Compl. ¶¶ 124-27.  MBIA asserts that IndyMac made false representations and warranties that "have caused the mortgage loans . . . to default at a severe and unexpected rate . . . [and] increased the severity of losses related to those deficiencies, thereby increasing the amount of the claims under the Policies." Id. ¶¶ 121-22.  MBIA contends that its duty to pay insurance claims under the Policies "should in equity and good conscience have been discharged by IndyMac," id. ¶¶ 126-27.  MBIA therefore believes it is entitled to recover from FDIC Receiver "all losses incurred by MBIA [under the Policies,] whether or not such losses relate directly to non-compliant mortgage loans." Id. ¶ 127.

4.    **Count VII (Negligent Misrepresentation)**

In Count VII, MBIA alleges that IndyMac had a "duty to communicate accurate and complete information to MBIA," which it negligently breached by making false representations and warranties in connection with the IndyMac Transactions.  Compl. ¶ 130.  According to MBIA, "IndyMac's representations regarding its underwriting policies and procedures, as well as the information . . . contained in the loan tapes . . . and the shadow ratings, misrepresented the quality of the mortgage loans contributed to the IndyMac Transactions." Id. ¶ 131.  MBIA asserts that it would not have issued the Policies "[h]ad [it] known about IndyMac's significant and substantial breaches of its representations and warranties." Id. ¶ 136.  MBIA does not seek to rescind the Insurance Agreements, but seeks unspecified damages arising from its payment of "sizable insurance claims" under the Policies. Id. ¶¶ 136-37.

### 5.   Count VIII (Fraud)

In Count VIII, MBIA claims that IndyMac had a "duty to communicate accurate and complete information to MBIA," which it intentionally and fraudulently breached by making false representations and warranties abut "the mortgage loans that were contributed to the mortgage loan pools," including, among other things, that "the mortgage loans in the IndyMac Transactions were underwritten in substantial compliance with its Underwriting Guidelines." Compl. ¶ 144; see id. ¶¶ 141-45.  MBIA asserts that it would not have issued the Policies "[h]ad [it] known about IndyMac's significant and substantial breaches of its representations and warranties." Id. ¶ 146.  Again, MBIA does not seek rescission, but rather demands damages arising from its payment of "sizable insurance claims" under the Policies.  Id. ¶¶ 147-48.

## ARGUMENT

To survive a motion to dismiss, a complaint must contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009).  The plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Atherton v. District of Columbia Office of Mayor, 567 F.3d 672, 681 (D.C. Cir. 2009) (quoting Iqbal, 129 S. Ct. at 1949).  "When ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." Id. (quoting Erickson v. Pardus, 551 U.S. 89, 94 (2007)).  However, courts "are not bound to accept as true a legal conclusion couched as a factual allegation," and neither "[t]hreadbare recitals of the elements of a cause of action" nor "naked assertions devoid of further factual enhancement" will be "entitled to the assumption of truth." Iqbal, 129 S.Ct. at 1949-50, 1951; see also Bell Atlantic Co. v. Twombly, 550 U.S. 544, 555 (2007).

17

I.   **MBIA'S EXTRA-CONTRACTUAL CLAIMS FAIL TO STATE INDEPENDENT CLAIMS FOR RELIEF UNDER NEW YORK LAW.**

New York law is clear that a non-contractual cause of action alleging tortious or inequitable conduct "does not lie where it is duplicative of a claim sounding in contract."[20] Balta v. Ayco Co., ___ F. Supp. 2d ____, Civ. Nos. 04-6164, 04-6165, 2009 WL 1449031, at *10 (W.D.N.Y. May 20, 2009) (internal quotation marks and citation omitted).  If a plaintiff cannot "prove that the defendant breached a duty 'independent' of its duties under the contract[,] . . . [the] plaintiff is limited to an action in contract."  Carvel Corp. v. Noonan, 350 F.3d 6, 16 (2d Cir. 2003).  The legal duty that forms the basis of a viable tort claim "must spring from circumstances extraneous to, and not constituting elements of, the contract, although it may be dependent on the contract."  Heffez v. L&G Gen. Const., Inc., 867 N.Y.S.2d 198, 199 (2nd Dep't 2008) (internal quotation marks and citation omitted) (emphasis added).  Where "the alleged tortious conduct is innate to the performance of the contract," the tort claim is duplicative of a breach of contract claim and should be dismissed.  McMahan & Co. v. Bass, 673 N.Y.S.2d 19, 22 (2d Dep't 1998).  Likewise, where a claim for equitable relief is "merely a restatement, albeit in slightly different language, of the 'implied' contractual obligations asserted in the cause of action for breach of contract," such a claim is duplicative and should be dismissed.  Clark-

---

[20]   The Insurance Agreements and other Transaction Documents all provide that the agreements and "the obligations, rights, and remedies of the parties thereunder," are to be construed in accordance with New York law. See, e.g., Ex. 9, 2006-H4 Insurance Agreement § 6.04; Ex. 10, 2007-1 Insurance Agreement § 6.04; Ex. 11, 2007-2 Insurance Agreement § 6.04; Ex. 6, 2006-H4 SSA § 10.04; Ex. 7, 2007-1 PSA § 10.03; Ex. 8, 2007-2 PSA § 10.03.  Therefore, New York law also applies to MBIA's Extra-Contractual Claims, all of which are related to, and derivative of, those agreements or their negotiation.  See Minebea Co. v. Papst, 377 F. Supp. 2d 34, 38 (D.D.C. 2005) ("[C]ontractual defenses based on improper behavior in connection with contract negotiations – such as . . . fraud in the inducement or misrepresentation – are governed by the parties' choice of law with regard to the contract.").

Fitzpatrick, Inc. v. Long Island R. R. Co., 516 N.E.2d 190, 194 (N.Y. 1987); see also Stecher v. 85th Estates Co., 843 N.Y.S.2d 6, 11 (1st Dep't 2007) (same).

The allegations of inequitable, tortious, and bad faith conduct in Counts IV, VI, VII, and VIII of MBIA's complaint arise from the same contractual representations and warranties, and the same conduct, that form the basis for the breaches alleged in MBIA's Contract Claims. Moreover, these counts allege the same types of damages, and seek the same kind of relief, as are described in MBIA's Contract Claims and as are expressly contemplated by the remedial provisions of the Insurance Agreements. In short, MBIA's Extra-Contractual Claims do not articulate any independent basis for recovery other than a claim for breach under the express terms of the written contracts. Accordingly, because none of the Extra-Contractual Claims are "sufficiently distinct from the breach of contract cause of action to constitute a separate cause of action" under New York law, Counts IV, VI, VII, and VIII should be dismissed. Gibraltar Mgmt. Co. v. Grand Entrance Gates, Ltd., 848 N.Y.S.2d 684, 687 (2nd Dep't 2007). See, e.g., Deer Park Enter., LLC v. Ail Sys., Inc., 870 N.Y.S.2d 89, 90 (2nd Dep't 2008) (dismissing extra-contractual claim where "the conduct and resulting injury alleged . . . are identical to those alleged in the [breach of contract] causes of action").

## A. MBIA's Extra-Contractual Claims Should Be Dismissed Because They Merely Duplicate MBIA's Contract Claims.

### 1. Count IV (Implied Covenant of Good Faith and Fair Dealing)

Count IV should be dismissed as duplicative because it is predicated on the same factual allegations as MBIA's Contract Claims. "New York law . . . does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled." Harris v. Provident Life & Acc. Ins. Co., 310 F.3d 73, 81 (2d Cir. 2002); see also, e.g., Madison Capital Co., LLC v. Alasia, LLC,

615 F. Supp. 2d 233, 239 (S.D.N.Y. 2009) (dismissing claim for breach of implied covenant as duplicative of breach of contract); <u>Logan Advisors, LLC v. Patriarch Partners, LLC</u>, 879 N.Y.S.2d 463, 466-67 (1st Dep't 2009) (same); <u>Peabody v. Weider Publ'ns, Inc.</u>, 260 Fed. Appx. 380, 383 (2d Cir. 2008) (same). Nor can "[a] cause of action to recover damages for breach of the implied covenant of good faith and fair dealing . . . be maintained where the alleged breach is 'intrinsically tied to the damages allegedly resulting from a breach of the contract.'" <u>Deer Park</u>, 870 N.Y.S.2d at 90 (citation omitted). As a result, "a party may maintain a claim for breach of the implied covenant only if the breach is based on allegations different from the allegations underlying the accompanying breach of contract claim." <u>DeutscheBank Secs., Inc. v. Rhodes</u>, 578 F. Supp. 2d 652, 664 (S.D.N.Y. 2008).[21]

Here, as discussed above, the facts underpinning MBIA's claim for violation of the implied covenant of good faith and fair dealing is indistinguishable from the alleged express contractual breaches that form the basis of MBIA's Contract Claims. Likewise, the damages MBIA seeks under Count IV are indistinguishable from the damages it seeks under the Contract Claims. <u>Compare</u> Compl. ¶¶ 98-103 <u>with</u> <u>id.</u> ¶¶ 57, 92-93, 112-15. Because Count IV is predicated on the same alleged facts and injury as the Contract Claims, it does not offer an independent basis for recovery and should be dismissed.

---

[21] The caption for Count IV reads "Breach of Contract – Good Faith and Fair Dealing." Compl. at 33. MBIA thus acknowledges that "under New York law, breach of the implied duty of good faith is considered a breach of the underlying contract." <u>Deutsche Bank</u>, 578 F. Supp. 2d at 664. As a result, unless Count IV is "premised on a different set of facts from those underlying a claim for breach of contract," <u>id.</u>, which it is not, it is duplicative of MBIA's express Contract Claims and should be dismissed.

2.      **Count VI (Equitable Indemnification)**

In Count VI, MBIA contends that, as a result of IndyMac's allegedly false

representations and warranties regarding the quality of the mortgage loans, IndyMac had (and,

by operation of law, FDIC Receiver now has) an equitable duty to indemnify MBIA for all losses

suffered by MBIA in discharging its contractual obligations under the Policies, regardless of any

limitations in the remedial provision of the Insurance Agreements.  See Compl. ¶¶ 122-27.  This

claim also should be dismissed as duplicative of MBIA's Contract Claims.

New York law provides that "indemnity arises out of a contract, either expressly or

impliedly, in order 'to prevent a result which is regarded as unjust or unsatisfactory.'" Highland

Capital Mgmt., L.P. v. Schneider, 533 F. Supp. 2d 345, 353 (S.D.N.Y. 2008).  In limited

circumstances "[i]n the absence of an express agreement to indemnify, an obligation to

indemnify may be implied to prevent unjust enrichment." Broyhill Furniture Indus., Inc. v.

Hudson Furniture Galleries, 877 N.Y.S.2d 72, 75 (1st Dep't 2009).  But "[t]he burden of

establishing an implied in fact agreement to indemnify is a heavy one, especially in business

relationships where parties are free to negotiate for express indemnification clauses." Highland,

533 F. Supp. 2d at 353-54.  Where contracting parties have bargained for an express

indemnification provision, claims for implied indemnification will be barred as duplicative.  See

Niagara Falls Water Bd. v. City of Niagara Falls, 881 N.Y.S.2d 763, 765 (4th Dep't 2009)

(dismissing implied indemnification claim as "duplicative of the breach of contract cause of

action"); In re TOUSA, Inc., ___ B.R. ____, No. 08-10928, 2009 WL 2152436, at *5 n.6 (Bankr.

S.D. Fla. July 9, 2009) (courts should not imply a duty to indemnify "[i]n the presence of clear

indemnification provisions") (applying New York law); Honeywell, Inc. v. J.P. Maguire Co.,

Civ. No. 93-5253, 1999 WL 102762, at *6 (S.D.N.Y. Feb. 24, 1999) (no implied indemnification

where "the contract expressly addresses the issue of indemnity"); <u>Service Sign Erectors Co., Inc.</u>

<u>v. Allied Outdoor Advertising, Inc.</u>, 573 N.Y.S.2d 513, 514 (1st Dep't 1991) (same).

     Indeed, under New York law this principle is strictly applied against insurance carriers,

which categorically are not entitled to implied indemnification for payments made under the

terms of their policies. "The insurance carrier's relationship with [its] insured . . . is a

contractual relationship in which the carrier has deliberately accepted a risk for a fee . . ., [and]

the metes and bounds of [its] indemnification are properly fixed by the terms of [its] contract."

<u>Great Am. Ins. Co. v. United States</u>, 575 F.2d 1031, 1035 (2d Cir. 1978).  As the New York

Court of Appeals has recently observed:

> There is not a single reported case in American jurisprudence
> which holds that upon an insurance carrier's payment to its
> insured, the insurer becomes vested with a claim arising out of an
> implied contract of indemnity with the tortfeasor who caused the
> damage necessitating payment by the carrier to the insured.

<u>Blue Cross and Blue Shield of N.J., Inc. v. Philip Morris USA, Inc.</u>, 818 N.E.2d 1140, 1144

(N.Y. 2004) (internal quotation marks and citation omitted); <u>see</u> <u>also</u> Restatement (First) of

Restitution § 76, comment b (2009) ("The rule [of implied indemnification] does not apply to a

payment by a person who guarantees or insures another against a payment for which the

guarantor or insurer is not himself liable.").

     Here, MBIA's right to indemnity is "fixed by the contract of insurance." <u>Great Am. Ins.</u>

<u>Co.</u>, 575 F.2d at 1034.  The Insurance Agreements between MBIA and IndyMac contain express

indemnification provisions, which encompass all of the conduct alleged in support of MBIA's

equitable indemnification claim. <u>See, e.g.</u>, Ex. 9, 2006-H4 Insurance Agreement § 3.04.

Moreover, MBIA's Contract Claims specifically seek indemnification, under those very

contractual provisions, for IndyMac's alleged breaches of its representations and warranties. <u>See</u>

Compl. ¶¶ 61-63 (Count I), 84-85 (Count II), 94-95 (Count III), 117-18 (Count IV).

22

Accordingly, Count VI is "merely a restatement, albeit in slightly different language," of the right to indemnification asserted in the Contract Claims.  Clark-Fitzpatrick, 516 N.E.2d at 194. Because "that right is expressed in the contract, there is no reason for any court to imply a contract of indemnity in favor of the insurer."  Great Am. Ins. Co., 575 F.2d at 1034.  Count VI should thus be dismissed.[22]

### 3.    Count VII (Negligent Misrepresentation)

As with Counts IV and VI, the allegations in support of MBIA's negligent misrepresentation claim merely duplicate the allegations underpinning its breach of contract claims.  For this reason, Count VII warrants dismissal as well.

MBIA's negligent misrepresentation claim is predicated on the allegation that "IndyMac's representations regarding its underwriting policies and procedures . . . misrepresented the quality of the mortgage loans contributed to the IndyMac Transactions." Compl. ¶ 131.  This allegation describes conduct that constitutes a contractual breach under the Insurance Agreements.  See, e.g., Ex. 6, 2006-H4 SSA § 2.04(a)(xxxiv) (representing that "[a]ll of the Mortgage Loans were originated in all material respects in accordance with the applicable Originator's underwriting criteria"); Compl. ¶ 37 (admitting that IndyMac incorporated "general representations and warranties regarding the underwriting of the mortgage loans" into its

---

[22]    Although an insurer is able in certain circumstances to recover "losses sustained by its insured that were occasioned by a wrongdoer" under the doctrine of equitable subrogation, NYP Holdings, Inc. v. McClier Corp., 881 N.Y.S.2d 407, 410 (1st Dep't 2009), in this case, MBIA does not, and cannot, bring a subrogation claim.  "The insurer's right to recovery in subrogation is premised, not on a legal fabrication, such as an insurer's implied contract of indemnity with the tortfeasor, but, rather, by virtue of its succession to the position previously held by its insured."  Id. (noting that "the insurer stands in the shoes of the insured" when bringing a subrogation claim).  MBIA has made no showing that IndyMac would be liable in tort to any of the investors in the securitization transactions, or that, if so, MBIA would have the right to succeed to the investors' position vis-á-vis IndyMac.

Insurance Agreements with MBIA).  Moreover, the allegation precisely mirrors MBIA's claim, in support of Count I of its complaint, that "IndyMac breached its representations and warranties . . . by contributing mortgage loans to the mortgage loan pools that failed to comply with IndyMac's [underwriting guidelines]."  Compl. ¶ 53; see also id. ¶ 45 (alleging that IndyMac "breached its representation and warranty that the mortgage loans were underwritten in substantial compliance with the Underwriting Guidelines").  "[E]mploying language familiar to tort law . . . does not, without more, transform a simple breach of contract into a tort claim." Clark-Fitzpatrick, 516 N.E.2d at 194.  Because the tortious conduct alleged in MBIA's negligent misrepresentation claim "is innate to the performance of the contract," Count VII of the complaint should be dismissed as duplicative.  McMahan, 673 N.Y.S.2d at 22; see Heffez, 867 N.Y.S.2d at 199 (dismissing negligent misrepresentation claim as duplicative); Madison Capital, 615 F. Supp. 2d at 240 (same).

**B.     MBIA's Extra-Contractual Claims Should Be Dismissed Because MBIA's Remedies Are Expressly Limited By Contract.**

Counts IV, VI, VII, and VIII should be dismissed for the separate reason that MBIA's right to relief in connection with these claims is expressly limited to agreed-upon contractual remedies.  Each of MBIA's Extra-Contractual Claims seeks recovery of damages based on the alleged falsity in IndyMac's representations and warranties relating to "the quality of the mortgage loans contributed to the IndyMac Transactions."  Compl. ¶ 131; see also id. ¶¶ 101, 121, 144.  As described above (pp. 12-13), any such breach falls within the scope of the Loan Breach Remedy Provisions, a specific and exclusive remedial scheme agreed upon by IndyMac and MBIA in the Insurance Agreements.  See, e.g., Ex. 9, 2006-H4 Insurance Agreement §§ 2.01(k), 3.03(b), 3.04(a)(iv); Ex. 5, 2006-H4 Purchase Agreement § 3.01; Ex. 6, 2006-H4 SSA § 2.04(c).

"Under New York law, sophisticated parties with equal bargaining power can agree to limit the liability that the other may recover . . . [through] detailed, bargained-for contractual provisions." DynCorp v. GTE Corp., 215 F. Supp. 2d 308, 317, 322 (S.D.N.Y. 2002). These provisions "represent the parties' [a]greement on the allocation of the risk of economic loss . . ., which the courts should honor." Metropolitan Life Ins. Co. v. Noble Lowndes Int'l, Inc., 643 N.E.2d 504, 507 (N.Y. 1994); see also RTC v. Key Fin. Servs., 280 F.3d 12, 18 (1st Cir. 2002) (applying New York law). Moreover, New York courts have consistently held that clauses specifying a party's "sole remedy" in the event of breach operate to "clearly and unequivocally preclude[] any recovery" outside of the contract's remedial procedure. Adams v. Fountains Senior Props. of N.Y., Inc., 834 N.Y.S.2d 208, 210 (2d Dep't 2007); accord Gupta Realty Corp. v. Gross, 674 N.Y.S.2d 741, 742 (2d Dep't 1998); McMahan, 673 N.Y.S.2d at 21; Bronxville Knolls, Inc. v. Webster Town Ctr. P'ship, 634 N.Y.S.2d 62, 63 (1st Dep't 1995). Therefore, to the extent that a contract's remedial scheme specifically describes the avenue by which a party may seek recovery of damages, extra-contractual claims based on actions within the scope of that remedial scheme should be dismissed as duplicative.

The procedures in Sections 2.01(k) and 3.03(b) of the three Insurance Agreements – and in the related Transaction Document provisions, which the Insurance Agreements expressly incorporate – delineate the exclusive remedy in the event of any breach of representations and warranties relating to the mortgage loans, and "unambiguously provide[] the limit of [MBIA's] recovery" should IndyMac not comply with its remedial obligations. DynCorp, 215 F. Supp. 2d at 318; see, e.g., Ex. 6, 2006-H4 SSA § 2.04(c) (describing IndyMac's obligation "to cure, substitute, or purchase any Mortgage Loan as to which a breach has occurred"); Ex. 9, 2006-H4 Insurance Agreement § 3.03(b) (providing that IndyMac must "reimburse the Insurer . . . for

payments made under the Policy arising as a result of IndyMac's failure to substitute [or repurchase] . . . any defective mortgage loan"). The Transaction Documents make it clear that these procedures "shall constitute the sole remedy against [IndyMac] . . . available to the Insurer" with respect to defective mortgage loans as to which such a breach has allegedly occurred. Ex. 6, 2006-H4 SSA § 2.04(c); see also, e.g., Ex. 9, 2006-H4 Insurance Agreement §§ 2.01(k).

IndyMac and MBIA, "two sophisticated parties, negotiated how the risks and costs of this transaction would be distributed, and resolved the issue by drafting [these provisions]." Key Fin. Servs., 280 F.3d at 18. Moreover, as a "sophisticated commercial insurer who is in the business of providing financial guaranty insurance to issuers of asset-backed securitizations," MBIA "evaluates risk and charges premiums accordingly." MBIA Ins. Co. v. Spiegel Holdings, Inc., Civ. No. 03-10097, 2004 WL 1944452, at *6 (S.D.N.Y. Aug. 31, 2004) (internal quotation marks and citation oitted). That MBIA, having "elected to participate in this transaction and sign the various agreements documenting it," now "find[s] itself in the position of having to make disbursements on policies, precisely because of the occurrence of events whose contemplation prompted people to seek insurance in the first place," does not entitle it to seek relief outside the scope of the specific procedures described in the contract. Id. If IndyMac does not fulfill its contractual obligations pursuant to the Loan Breach Remedy Provisions, MBIA's appropriate (and only) recourse is to bring a breach of contract action seeking the agreed-upon damages, which MBIA has done through its Contract Claims. See, e.g., Compl. ¶ 59 (alleging that "IndyMac failed to comply with the Loan Breach Remedy Procedure with respect to the mortgage loans identified in the Remedy Notices"). MBIA may not avoid the path it has chosen by recasting its breach of contract claim under other legal rubrics. See DynCorp, 215 F. Supp. 2d at 318. For this reason, Counts IV, VI, VII, and VIII of the complaint should be dismissed.

**C.    MBIA's Extra-Contractual Claims Should Be Dismissed Because They Fail To Allege Damages Beyond Contract Damages.**

Counts IV, VI, VII, and VIII should be dismissed as duplicative for another, independent reason: these claims seek recovery of the same damages alleged in the Contract Claims.

It is well-settled under New York law that extra-contractual claims must "seek compensation distinct from that sought under [a] claim for breach of contract." Makastchian v. Oxford Health Plans, Inc., 704 N.Y.S.2d 44, 46 (1st Dep't 2000); see, e.g., Linea Nuova, S.A. v. Slowchowsky, 877 N.Y.S.2d 891, 891 (1st Dep't 2009); Town House Stock LLC v. Coby Housing Corp., 828 N.Y.S.2d 366, 367 (1st Dep't 2007); Madison Capital, 615 F. Supp. 2d at 240; R.H. Damon & Co. v. Softkey Software Prods., 811 F. Supp. 986, 992 (S.D.N.Y. 1993). Where a plaintiff fails to allege that it "sustained any damages that would not be recoverable under [its] breach of contract cause[s] of action," its extra-contractual claims should be dismissed as duplicative. Manas v. VMS Assocs., 863 N.Y.S.2d 4, 7 (1st Dep't 2008). Here, the type of damages sought in MBIA's Extra-Contractual Claims are indistinguishable from those sought in its Contract Claims. Compare id. ¶¶ 60-63, 83-85, 94-95, 116-18 (damages asserted under Contract Claims) with id. ¶¶ 104-07, 126-27, 137-38, 147-48 (damages asserted under Extra-Contractual Claims).

In Counts I, II, III, and V, MBIA contends that it is entitled to all "damages it has incurred as a result of IndyMac's failure to comply with IndyMac's [contractual] obligations." Compl. ¶ 63; see id. ¶¶ 83-85, 92-95. Included among these claimed damages are payments made under the Policies "for certain shortfalls in cash flows to investors when, in fact, such shortfalls should be properly paid by IndyMac." Id. ¶ 83. Recovery of such amounts, as well as certain breach-related fees and expenses, is "clearly within the contemplation of" the indemnification provisions of the three Insurance Agreements, as well as the other Transaction

Documents. <u>Clark-Fitzpatrick</u>, 516 N.E.2d at 194. <u>See</u>, <u>e.g.</u>, Ex. 9, 2006-H4 Insurance

Agreement §§ 3.03(a), (b), 3.04(a)(iv); Ex. 6, 2006-H4 SSA §§ 2.04(c), 5.01(a).

The damages sought by MBIA in Counts IV, VI, VII, and VIII, however, are also, at

bottom, claims for recovery of payments made to insured investors under the terms of the

Policies, as well as expenses incurred in connection with IndyMac's alleged breaches of its

contractual representations and warranties.[23] Thus, despite MBIA's contention that "IndyMac is

responsible for all losses incurred by MBIA, whether or not such losses relate directly to non-

compliant mortgage loans," Compl. ¶¶ 105, 127, the only losses actually alleged in MBIA's

Extra-Contractual Claims are no different from those alleged in its Contract Claims.

The fact that MBIA asserts negligent misrepresentation and fraudulent inducement claims

in Counts VII and VIII does not affect this conclusion. Although MBIA contends that it is

entitled to damages as a result of "negligent and fraudulent misrepresentations [made by

IndyMac] in order to induce MBIA to issue the Policies," Compl. ¶ 3, it does not allege any facts

that distinguish the scope of its loss allegedly due to IndyMac's pre-contractual representations

from the damages it seeks to recover against IndyMac in its breach of contract claims. "To

defeat a motion to dismiss common law fraud and misrepresentation claims, . . . a plaintiff must

---

[23]   In Count IV, MBIA alleges that "IndyMac's breaches of the implied covenant or duty of
good faith and fair dealing . . . compell[ed] MBIA to make payments on insurance claims
that would not have arisen but for IndyMac's bad faith conduct." Compl. ¶ 104. In Count
VI, MBIA alleges that it is entitled to recovery of "all insurance claims made in connection
with the IndyMac Transactions pursuant to the terms of the Policies[,] . . . because the
Policies were procured based on IndyMac's providing MBIA materially false information,
representations and warranties." <u>Id.</u> ¶¶ 125-26. And in Counts VII and VIII, MBIA alleges
that IndyMac's representations prior to the issuance of the Policies "requir[ed] MBIA to pay,
to its substantial detriment, sizable insurance claims and to incur even greater future
liabilities." <u>Id.</u> ¶¶ 137, 147.

allege that [it] sustained damages in addition to those they could have anticipated in the event of a breach." Softkey, 811 F. Supp. at 992 (emphasis added).  MBIA's negligent misrepresentation and fraudulent inducement claims cannot survive, because they are not premised on loss caused by representations made prior to the issuance of the Policies, as distinct from loss caused by IndyMac's alleged contractual breaches and recoverable under the contract.

Further, Count VII – the negligent misrepresentation claim – faces the additional obstacle of New York's economic loss rule, under which "a plaintiff asserting a claim of negligent misrepresentation who has not suffered any personal or property damage is limited to an action in contract." Cherny v. Emigrant Bank, 604 F. Supp. 2d 605, 609 (S.D.N.Y. 2009); see Manhattan Motorcars, Inc. v. Automobili Lamborghini, S.p.A., 244 F.R.D. 204, 220 (S.D.N.Y. 2007) (economic loss rule "presents a second, distinct barrier" to negligent misrepresentation claim, even where claim is not duplicative of breach of contract).  MBIA seeks only damages for alleged monetary losses.  Nowhere in the complaint does MBIA allege that it "suffered anything other than economic loss" from IndyMac's alleged misrepresentations.  Orlando v. Novurania of America, 162 F. Supp. 2d 220, 226 (S.D.N.Y. 2001).  Because MBIA claims to have "suffer[ed] purely financial losses[,] [it] is restricted to an action in contract for the benefit of its bargain," and may not assert a claim for negligent misrepresentation. Hydro Investors, Inc. v. Trafalgar Power, Inc., 227 F.3d 8, 16 (2d Cir. 2000); see also Heffez, 867 N.Y.S.2d at 199-200.

In sum, the damages asserted in MBIA's four Extra-Contractual claims mirror those for which recovery is sought in its four Contract Claims, are contemplated by the remedial provisions of the Insurance Agreements, and are based only on economic loss.  Therefore, Counts IV, VI, VII, and VIII should be dismissed.

**D.   Count VII Should Be Dismissed Because MBIA Fails To State A Claim for Negligent Misrepresentation.**

In addition to being impermissibly duplicative and precluded by the economic loss rule, MBIA's negligent misrepresentation claim in Count VII should be dismissed for failure to state a claim under New York law, because MBIA does not allege the requisite special relationship of confidence and trust with IndyMac.

To bring a claim for negligent misrepresentation under New York law, a plaintiff must demonstrate, among other things, "the existence of a special or privity-like relationship imposing a duty on the defendant to impart correct information to the plaintiff." J.A.O. Acquisition Corp. v. Stavitsky, 863 N.E.2d 585, 587 (N.Y. 2007).  Such a duty may be "imposed only on those persons who possess unique or specialized experience, or who are in a special position of confidence and trust with the injured party." JPMorgan Chase Bank v. Winnick, 350 F. Supp. 2d 393, 400 (S.D.N.Y. 2004) (quoting Kimmell v. Schaefer, 675 N.E.2d 450, 453 (N.Y. 1996)); accord Rivas v. Amerimed USA, Inc., 824 N.Y.S.2d 41, 43 (1st Dep't 2006).  "The special relationship requires a closer degree of trust than . . . an ordinary business relationship." Wright v. Selle, 811 N.Y.S.2d 525, 527 (4th Dep't 2006).  Moreover, "[i]f the duty between the parties arose out of a contract, such that the contract required a correct representation, then any misrepresentation must be pled as a breach of contract, not as a tort claim for negligent misrepresentation." Madison Capital, 615 F. Supp. 2d at 240; see Batas v. Prudential Ins. Co. of America, 724 N.Y.S.2d 3, 7 (1st Dep't 2001) ("[A] cause of action sounding in tort . . . cannot depend upon a fiduciary or other character of the relationship created by the contract alone, for no such relationship exists.").

Here, MBIA has not – and cannot – allege any facts indicating that its decision to provide insurance for the IndyMac Transactions conferred upon IndyMac the "special position of

confidence and trust" sufficient to sustain a claim for negligent misrepresentation. Winnick, 350 F. Supp. 2d at 400. The fact that the alleged misrepresentations arose entirely in connection with the parties' contractual relationship – and, indeed, themselves constituted an alleged breach of IndyMac's express contractual representations and warranties – precludes any conclusion that the necessary "special relationship" existed. See id. at 401 (dismissing negligent misrepresentation claim where, "if not for the existence of the contract, [the defendants] would have had no relationship to the [plaintiffs] whatsoever").

Nor can MBIA claim that a special relationship somehow existed between MBIA and IndyMac prior to the formation of the contracts. See Compl. ¶ 131. The Second Circuit has held that "[i]n the case of arm's length negotiations or transactions between sophisticated financial institutions, no extra-contractual duty of disclosure exists" under New York law that will give rise to an actionable claim for negligent misrepresentation. Banque Arabe Et Internationale D'Investissement v. Maryland Nat'l Bank, 57 F.3d 146, 158 (2d Cir. 1995); see also LaSalle Bank Nat'l Assoc. v. Citicorp Real Estate, Inc., Civ. No. 02-7868, 2003 WL 1461483, at *5 (S.D.N.Y. Mar. 21, 2003) (same); DynCorp, 215 F. Supp. 2d at 329 (same). MBIA and IndyMac are "sophisticated parties, represented by experienced corporate counsel," and their business relationship was negotiated at arm's length. Solutia Inc. v. FMC Corp., 456 F. Supp. 2d 429, 447 (S.D.N.Y. 2006); see generally Compl. ¶¶ 22-27, 31-33; pp. 8-9, 11-13, supra. Accordingly, IndyMac's duty to MBIA is "defined entirely by their contractual relationship," and MBIA's negligent misrepresentation claim must fail. DynCorp, 215 F. Supp. 2d at 324.

MBIA's bare assertion that IndyMac had "superior knowledge" about the quality of the mortgage loans (Compl. ¶ 31) is insufficient to give rise to an independent duty of disclosure in the course of a business transaction between sophisticated financial institutions. "[T]he more

sophisticated the buyer, the less accessible the information must be to be considered within the seller's peculiar knowledge." Solutia, 456 F. Supp. 2d at 448 (internal quotation marks and citation omitted). MBIA alleges only that it would have been "impractical and infeasible for [it] to review the actual mortgage loan files," not that it was denied access to those files prior to issuing the Policies or that it would not have understood the information contained within those files if it had taken the time to do so. Compl. ¶ 20. And, in fact, the Transaction Documents gave MBIA full access to whatever loan files or other documents it wished to review before agreeing to provide insurance for the IndyMac Transactions. See, e.g., Ex. 5, 2006-H4 Purchase Agreement § 6.07 ("The Purchaser, or its designees, will have the right to review the Mortgage Loans and the related Mortgage Files to determine the characteristics of the Mortgage Loans"); Ex. 6, 2006-H4 SSA § 3.12 ("The Servicer shall provide to . . . the Insurer . . . access to the documentation regarding the Mortgage loans"). Although mortgage sellers like IndyMac "will almost always have 'specialized' knowledge of the particulars of their business[]," it is equally true that financial guaranty insurers like MBIA are "in the business of assessing . . . risks posed by potential [insurance policies]," and possess "sophisticated means of assessing those risks that cut across industries and areas of technical expertise." Winnick, 350 F. Supp. 2d at 402. Indeed, MBIA touted its capabilities and expertise in assessing risks in the residential mortgage-backed securities market. See p. 5, supra. As a result, IndyMac cannot be said to have "unique and specialized expertise" giving rise to an extra-contractual duty to disclose. Id. at 400.

The facts of Madison Capital, Winnick, and Citicorp are instructively similar to those at issue here. Each of these cases involved complex financial transactions between sophisticated business entities. In each case, the plaintiff was a lender or mortgage purchaser that asserted parallel claims of breach of contract and negligent misrepresentation against a borrower or

mortgage loan seller for allegedly inducing the plaintiff into entering the contract by violating its

duty to communicate accurate and complete information about the underlying transactions.  And

in each case, the federal court, applying New York law, dismissed the negligent

misrepresentation claim, rejecting the plaintiff's argument that an independent duty to disclose

existed outside the defendant's contractual obligations.  See Madison Capital, 615 F. Supp. 2d at

240 (representations by defendants to induce plaintiff to enter into loan agreements "[did] not

impose a legal duty . . . separate and apart from the obligations arising out of the contract");

Winnick, 350 F. Supp. 2d at 404 ( "[p]laintiffs have failed to allege either a relationship that is in

any way distinct from that between a plain vanilla borrower and lender, or a duty of care arising

from any source external to the Credit Agreement"); Citicorp, 2003 WL 1461483, at *3, *5

(mortgage loan seller had no "duty, separate and distinct from its contractual one, to impart

correct information, based on [its] unique knowledge or access to information about the

[mortgage loan].").

    Accordingly, MBIA's contention (Compl ¶ 13) that "IndyMac had a duty to

communicate accurate and complete information to MBIA" prior to the execution of (or

independent from) the Insurance Agreements is wholly unsupported under New York law, and

Count VII should be dismissed for failure to state a claim.  See Banque Arabe, 57 F.3d at 158.

## II.    MBIA'S EXTRA-CONTRACTUAL CLAIMS ARE NOT ENFORCEABLE AGAINST FDIC RECEIVER UNDER 12 U.S.C. § 1823(e).

    Federal law protects FDIC Receiver from claims against a failed bank arising from "any

'agreement' that is not in writing and is not properly recorded in the records of the bank" in

accordance with specific statutory requirements.  Beal Bank, SSB v. Pittorino, 177 F.3d 65, 68

(1st Cir. 1999); see 12 U.S.C. §§ 1821(d)(9)(A), 1823(e).  Under these statutes, an "agreement"

is broadly construed to mean any contract, duty, covenant, representation, warranty, or

communication giving rise to a purported obligation of the failed bank. See Bufman Org. v. FDIC, 82 F.3d 1020, 1024 (11th Cir. 1996). If such an "agreement" is not expressly set forth in a written document meeting the requirements of 12 U.S.C. § 1823(e), it is unenforceable against FDIC Receiver. See 12 U.S.C. § 1821(d)(9)(A); see also Murphy v. FDIC, 61 F.3d 34, 36 (D.C. Cir. 1995). Because MBIA's Extra-Contractual Claims are based on "agreements" that do not comply with Section 1823(e), they cannot be enforced against FDIC Receiver. See FDIC v. LeBlanc, 85 F.3d 815, 821 (1st Cir. 1996) ("[Section 1823(e)] embraces both affirmative claims and defenses and extends to arguments asserted in terms of contract or tort."). Accordingly, Counts IV, VI, VII, and VIII should be dismissed.

A.   **Section 1823(e) Precludes Claims Based On Alleged Duties, Covenants, Representations, Or Warranties Not Contained In A Written Agreement Meeting Specific Statutory Requirements.**

Sections 1821(d)(9)(A) and 1823(e) together bar any claim that seeks to enforce against FDIC Receiver some alleged promise or obligation of the failed bank arising prior to the receivership, and that does not satisfy statutory requirements intended to ensure that bank obligations are properly approved and recorded (and thus subject to examination by bank regulators). See FDIC v. Suna Assocs., Inc., 80 F.3d 681, 684 (2d Cir. 1996) (Section 1823(e) intended to prevent reliance "upon unrecorded promises or schemes that purport to impose obligations other than those appearing in the bank's records") (internal quotation marks and citation omitted).

The statute provides, in relevant part, that

> No agreement which tends to diminish or defeat the interest of the [FDIC] in any asset acquired by it . . . as receiver of any insured depository institution[] shall be valid against the [FDIC] unless such agreement (A) is in writing; (B) was executed by the depository institution and any person claiming an adverse interest thereunder . . . contemporaneously with the acquisition of the asset by the depository institution; (C) was approved by the board of

> directors of the depository institution or its loan committee, which
> approval shall be reflected in the minutes of said board or
> committee; and (D) has been, continuously, from the time of its
> execution, an official record of the depository institution.

12 U.S.C. § 1823(e)(1).  In turn, 12 U.S.C. § 1821(d)(9)(A) provides that "any agreement which

does not meet the requirements set forth in [S]ection 1823(e) . . . shall not form the basis of, or

substantially comprise, a claim against the [FDIC]."  These two provisions operate to "bar any

claim [against the FDIC] that . . . is based upon an agreement that is either unwritten or, if in

writing, does not meet the stringent requirements of §§ 1823(e)(1)(B)-(D).  Murphy, 61 F.3d at

36 (emphasis omitted).

"When determining whether [Section 1823(e)] bars a claim, a court must first determine

whether the wrongdoings underlying the claim are based upon an agreement [within the meaning

of Section 1823(e)]."  Hanson v. FDIC, 13 F.3d 1247, 1251 (8th Cir. 1994).  Once a court has

concluded that the claims at issue relate to such an "agreement," it is the burden of the party

asserting the claim to demonstrate that "[each] applicable agreement satisfies the requirements of

section 1823(e)."  FDIC v. Oldenburg, 34 F.3d 1529, 1551 (10th Cir. 1994).  As demonstrated

below, all of MBIA's Extra-Contractual Claims are based on alleged duties, covenants,

representations, or warranties that constitute "agreements" under Section 1823(e).  Therefore,

those claims are only permitted to the extent that MBIA is able to show that these "agreements"

have been reduced to writing in a manner that satisfies Section 1823(e).  As a matter of law,

however, these "agreements" cannot satisfy Section 1823(e).

**B.    Counts IV And VI Should Be Dismissed Because Claims Based On
       Implied Obligations Are Barred By Section 1823(e).**

MBIA's claims for breach of the implied covenant of good faith and fair dealing (Count

IV) and equitable indemnification (Count VI) each are predicated on the existence of an

unwritten obligation allegedly owed by IndyMac to MBIA, which MBIA seeks to enforce

35

against FDIC Receiver.  See Compl. ¶¶ 98-99, 126-127.  Because Section 1823(e) bars the

enforcement against FDIC Receiver of "any obligation not specifically memorialized in a written

document such that the agency would be aware of the obligation when conducting an

examination of the institution's records," Counts IV and VI should be dismissed in their entirety.

Bufman, 82 F.3d at 1024 (internal quotation marks and citation omitted).

In Count IV, MBIA alleges that "IndyMac agreed to act in good faith with respect to its

contribution of mortgage loans to the mortgage loan pools" as a result of "the covenant or duty

of good faith and fair dealing that is implied in all contracts."  Compl. ¶¶ 98-99.  According to

MBIA, IndyMac thus assumed an unwritten obligation to limit its actions in certain ways (and

liability for breach of that unwritten obligation).  Such implied obligations constitute

"agreements" within the meaning of Section 1823(e).  See, e.g., FDIC v. Giammettei, 34 F.3d

51, 58 (2d Cir. 1994); Washington Props. Ltd. P'ship v. RTC, 796 F. Supp. 542, 546 (D.D.C.

1992).  Any claim "based on breach of an implied covenant of good faith and fair dealing . . .

must fail unless the implied covenant meets the requirements of § 1823(e)."  Giammettei, 34

F.3d at 59.  Because MBIA has not, and cannot, demonstrate that IndyMac's purported

"agree[ment] to act in good faith" has been memorialized in writing in compliance with

Section 1823(e), Count IV is unenforceable against FDIC Receiver and should be dismissed.

See, e.g., FDIC v. Bathgate, 27 F.3d 850, 868-70 (3d Cir. 1994) (Section 1823(e) bars assertion

of counterclaim based on breach of implied covenant of good faith and fair dealing).

In Count VI, MBIA contends that IndyMac has an implied obligation to indemnify MBIA

for losses incurred under the Policies.  As discussed above, "[u]nder New York law, indemnity

arises out of a contract, either expressly or impliedly."  Highland, 533 F. Supp. 2d at 353.

Implied contracts are not enforceable against FDIC Receiver unless they satisfy the

Section 1823(e) requirements.  See Suna Assocs., 80 F.3d at 684.  Because MBIA has not, and

cannot, make any showing that IndyMac's purported implied obligation to indemnify MBIA was

contained in a document formally executed between IndyMac and MBIA in compliance with

Section 1823(e) – as contrasted with the express indemnification provisions in the executed

Insurance Agreements – its equitable indemnification claim in Count VI is unenforceable against

FDIC Receiver and should be dismissed.

**C.      Counts VII And VIII Should Be Dismissed Because MBIA Does Not
         Allege Any Representations Made Prior To The Formation Of The
         Contracts That Are Enforceable Against FDIC Receiver.**

MBIA's claims of negligent misrepresentation (Count VII) and fraudulent inducement

(Count VIII) also must be dismissed as unenforceable against FDIC Receiver.  The Supreme

Court has made it clear that any representation or warranty made and relied upon prior to the

execution of a contract constitutes an "agreement" within the meaning of Section 1823(e).

Langley v. FDIC, 484 U.S. 86, 93 (1987);[24] see Adams v. Madison Realty & Dev., Inc., 937 F.2d

845, 853 (3d Cir. 1991) ("[A]ny warranty on which the performance of a party is conditioned is

an 'agreement' within the meaning of [Section] 1823(e).").  Thus, Section 1823(e) necessarily

applies to any claims of negligent misrepresentation or fraudulent inducement "relating to the

formation of an agreement with the bank."  Vasapolli v. Rostoff, 39 F.3d 27, 35 (1st Cir. 1994);

see, e.g., LeBlanc, 85 F.3d at 821 ("The scope of agreements precluded by [Section 1823(e)] . . .

---

[24]  In Langley, the petitioners "alleged that the notes [at issue] had been procured by the bank's
misrepresentations" regarding the property being conveyed.  Langley, 484 U.S. at 89.
Finding that "the essence of petitioners' [claim] . . . is that the bank made certain warranties
. . ., the truthfulness of which was a condition to performance of their obligation," the
Supreme Court held that "the truth of an express warranty[] is part of the 'agreement' to
which the writing, approval, and filing requirements of 12 U.S.C. § 1823(e) attach."  Id.
at 90-91, 96.

includes fraudulent misrepresentations or warranties"); Oldenburg, 34 F.3d at 1551; McGlothlin

v. RTC, 913 F. Supp. 15, 17-18 (D.D.C. 1996).  This is true whether the alleged

misrepresentation constitutes an affirmative statement or a non-disclosure of material fact.  See

McCullough v. FDIC, 987 F.2d 870, 874 (1st Cir. 1993); FDIC v. Bell, 892 F.2d 64, 66 (10th

Cir. 1989), cert. dismissed, 496 U.S. 913 (1990); Wash. Props., 796 F. Supp. at 545.

 MBIA alleges that various representations made by IndyMac prior to the execution of the

Insurance Agreements caused MBIA to be negligently or fraudulently induced to agree to issue

Policies for the IndyMac Transactions.  See, e.g., Compl. ¶¶ 28-29, 46, 131-33.  Each of the

alleged express or implied representations made prior to the execution of the Insurance

Agreements between IndyMac and MBIA, the warranted truth of which allegedly induced MBIA

to execute the Agreements and issue the Policies, are "agreements" subject to scrutiny under

Section 1823(e).  MBIA has not alleged, let alone demonstrated, that any of those "agreements"

were executed in writing in compliance with Section 1823(e)'s requirements; thus, they cannot

be used as the basis for MBIA's claims against FDIC Receiver.

 MBIA asserts that it was negligently or fraudulently induced to enter into the Insurance

Agreements in reliance upon "IndyMac's representations regarding its underwriting policies and

procedures" and other express representations contained within the 2006-H4 SSA and the 2007-1

and 2007-2 PSAs.  Compl. ¶ 131; see id. ¶¶ 131-36, 144-46.  All representations and warranties

made by IndyMac in those Transaction Documents, including the representations that form the

basis of MBIA's negligent misrepresentation and fraudulent inducement claims, were expressly

incorporated by reference into the Insurance Agreements executed by IndyMac and MBIA.  Ex.

9, 2006-H4 Insurance Agreement § 2.01(k); Ex. 10, 2007-1 Insurance Agreement § 2.01(k); Ex.

11, 2007-2 Insurance Agreement § 2.01(k); see Compl. ¶ 37.  According to MBIA, "[t]he

incorporation by reference of the Transaction Documents into the Insurance Agreements was intended to allow MBIA to itself rely upon any representation and warranty that IndyMac made . . . in connection with each of the IndyMac Transactions." Compl. ¶ 33.

These express representations, which are plainly "agreements" within the meaning of Section 1823(e),[25] are enforceable by MBIA against FDIC Receiver <u>only</u> to the extent they are in a written agreement executed by MBIA and IndyMac and otherwise in compliance with Section 1823(e)'s requirements.  In other words, as between MBIA and FDIC Receiver, these express representations are enforceable, at best, only insofar as they are part of the executed Insurance Agreements, as MBIA has not identified any other written agreement between itself and IndyMac as the basis for its claims.[26]  Any claim that IndyMac negligently or fraudulently induced MBIA to enter into those Insurance Agreements, however, <u>necessarily</u> requires reliance on – and, hence, enforcement of – representations that were made and in existence <u>prior</u> to the formation of the Insurance Agreements.[27]  But negligent misrepresentation or fraudulent inducement claims predicated on representations made prior to the formation of the Insurance Agreements are not enforceable against FDIC Receiver, because such pre-formation representations do not comply with the requirements of Section 1823(e).[28]  And while the

---

[25]   <u>See</u>, <u>e.g.</u>, <u>LeBlanc</u>, 85 F.3d at 821.

[26]   It will be MBIA's burden to prove that the Insurance Agreements in fact meet the requirements of Section 1823(e).  <u>See</u> <u>Oldenburg</u>, 34 F.3d at 1551.

[27]   Clearly, a party cannot be induced into entering into a contract by virtue of representations contained within the contract itself.  The inducement must, perforce, occur before the contract is signed.

[28]   This is so even if the representations are contained in drafts of the Insurance Agreements or in agreements executed by parties other than MBIA.  Draft documents do not meet the execution and approval requirements of the statute, <u>see</u> 12 U.S.C. § 1823(e)(1)(B) & (C), and agreements executed by other parties do not meet the requirement that the agreement be

(Footnote continued on next page)

Insurance Agreements – and the express representations contained or incorporated therein – are at least conceivably compliant with Section 1823(e), they did not become so until the Agreements were executed by the parties and approved by IndyMac's board of directors or loan committee, i.e., until the representations were post-formation representations.  In short, in these circumstances, only claims based on IndyMac's post-formation representations are potentially enforceable against FDIC Receiver – but, of course, post-formation representations cannot be the basis for pre-formation inducement claims.

MBIA also alleges that it relied on information provided to it by IndyMac in "schedules and due diligence tapes that set forth general characteristics of the mortgage loans" – as well as on "shadow ratings provided by rating agencies, which are based on the same [information]" – when deciding to enter into its contractual agreements with IndyMac.  Compl. ¶ 21; see also id. ¶¶ 29-30, 46-48.  To the extent that MBIA's decision to issue the Policies was conditioned on the truth of the representations made in schedules, data tapes, and the like – or on shadow ratings – such representations must be considered "part of the 'agreement' to which the writing, approval, and filing requirements of 12 U.S.C. § 1823(e) attach." Langley, 484 U.S. at 96; see Compl. ¶¶ 131-33 (alleging that "information provided by IndyMac contained in the loan tapes . . . and the shadow ratings . . . were essential and material to MBIA's decision to issue the Policies").  MBIA has not alleged – and cannot demonstrate – that any such schedules, tapes, or shadow

---

(Footnote continued from previous page)

executed by the bank and the "person claiming an adverse interest thereunder," id. § 1823(e)(1)(B).

ratings were formally executed by IndyMac and MBIA, approved by IndyMac's board of directors or loan committee, and otherwise in compliance with Section 1823(e).

In addition, MBIA alleges that "IndyMac provided information to [third-party] rating agencies with respect to the mortgage loans contributed to the IndyMac transactions." Compl. ¶ 29. To the extent that MBIA relied on the truth of IndyMac's representations to the rating agencies (or any other third party) as an inducement to enter into its contract with IndyMac, those representations also must be considered "part of the 'agreement' to which the writing, approval, and filing requirements of 12 U.S.C. § 1823(e) attach." Langley, 484 U.S. at 96; see Compl. ¶ 46. Representations made to third parties fail the essential requirement under Section 1823(e) that the agreement in question be "executed by the depository institution and any person claiming an adverse interest thereunder." 12 U.S.C. § 1823(e)(1)(B).[29]

For all of these reasons, Counts VII and VIII should be dismissed as unenforceable against FDIC Receiver under Sections 1821(d)(9)(A) and 1823(e).

## III.   COUNT VIII FAILS TO MEET THE REQUIREMENTS OF RULE OF 9(b).

Finally, Count VIII should be dismissed for the independent reason that MBIA has failed to plead it with the specificity required by Rule 9(b) of the Federal Rules of Civil Procedure.

---

[29]   It is not clear whether any of the allegedly false representations on which MBIA premises its negligent misrepresentation and fraudulent inducement claims were made orally, rather than communicated through written documents. See Compl. ¶¶ 131-32, 142-44. Oral representations plainly fail to satisfy the requirement that agreements subject to the strictures of Section 1823(e) be made "in writing." 12 U.S.C. § 1823(e)(1)(A); see RTC v. BVS Dev., Inc., 42 F.3d 1206, 1213-14 (9th Cir. 1994) ("[§ 1823(e)] generally invalidates any rights based on alleged oral discussions . . . that are not documented in the financial institution's records").

Rule 9(b) provides that plaintiffs "alleging fraud . . . must state with particularity the circumstances constituting [that] fraud." Fed. R. Civ. P. 9(b).  In this Circuit, this means that a complaint asserting a claim of fraud must, among other things, "identify with specificity who precisely was involved in the fraudulent activity" in order to meet the heightened pleading standards of Rule 9(b).  U.S. ex rel. Williams v. Martin-Baker Aircraft Co., Ltd., 389 F.3d 1251, 1257 (D.C. Cir. 2004); see Ellipso, Inc. v. Mann, 460 F. Supp. 2d 99, 105-06 (D.D.C. 2006) (Rule 9(b) "requires the claimant to allege at a minimum the identity of the person who made the fraudulent statement, the time, place, and content of the misrepresentation, the resulting injury, and the method by which the misrepresentation was communicated.") (internal quotation marks and citation omitted).  If a plaintiff fails to allege each element of fraud with the requisite particularity, including the identity of each individual allegedly responsible for the fraudulent conduct, the complaint will be dismissed for failure to state a claim.  See, e.g., Martin-Baker, 389 F.3d at 1257 (dismissing fraud claim under Rule 9(b) where "[t]he complaint repeatedly refer[red] generally to 'management' and provide[d] a long list of names without ever explaining the role these individuals played in the alleged fraud"); Bates v. Northwestern Human Servs., Inc., 466 F. Supp. 2d 69, 92 (D.D.C. 2006).

Here, MBIA's complaint does not identify a single individual responsible for making allegedly fraudulent representations, nor does it "ever explain[] the role [any] indviduals played in the alleged fraud." Martin-Baker, 389 F.3d at 1256.  MBIA does not allege who was responsible for compiling the allegedly "materially false and misleading information regarding the mortgage loans" that was contained on the data tapes, let alone who decided to provide those

data tapes to MBIA.[30]  Compl. ¶ 30.  Nor does MBIA state with any specificity which

individuals at IndyMac "made numerous representations and warranties to MBIA" to induce

MBIA to provide insurance, id. ¶ 28, or provide any information as to who at IndyMac was

responsible for "includ[ing] [those] representations and warranties in the Insurance Agreements,

id. ¶ 33.  MBIA does not even name the specific individuals at IndyMac who purportedly

"rebuffed" MBIA's request for access to documentation regarding the mortgage loans.  Id. ¶ 42.

Instead, the Complaint treats IndyMac as a single, undifferentiated unit capable of "act[ing]

knowingly in making the materially false representations to MBIA," and "intend[ing] to defraud

MBIA into issuing the Policies . . . so that it could earn . . . proceeds on the securitization and

sale of the mortgage loans."  Id. ¶¶ 143-44.  But, of course, corporate entities cannot "act

knowingly" or "intend to defraud" – only individuals can.  See Teachers' Retirement Sys. of La.

v. Hunter, 477 F.3d 162, 184 (4th Cir. 2007) ("[T]he plaintiff must allege facts . . . with respect

to at least one authorized agent of the corporation, since corporate liability derives from the

actions of its agents."); Southland Sec. Corp. v. INSpire Ins. Solutions, Inc., 365 F.3d 353, 367

(5th Cir. 2004) ("The knowledge necessary to form the requisite fraudulent intent must be

possessed by at least one agent[,] . . . [as a] corporation can be held to have a particular state of

mind only when that state of mind is possessed by a single individual.") (internal quotation

marks and citations omitted).  Vague generalities about the identity of the perpetrators of the

---

[30]  The closest MBIA comes to referring to or identifying any individual in the Complaint is its
statements that unnamed "employees of Lehman Brothers [and UBS AG], IndyMac's
agent[s] in connection with the [IndyMac Transactions]," provided the data tapes by e-mail
to individuals at MBIA.  Compl. ¶ 31.  Of course, MBIA does not allege that these
employees are the individuals wholly, or even partially, responsible for the alleged fraud, and
its failure to identify the individuals by name would be fatal to its fraud claim in any event.

alleged fraud are plainly deficient under Rule 9(b).  See Bates, 466 F. Supp. 2d at 92 ("Rule 9(b) demands that the pleader specify who made the allegedly fraudulent statements.") (internal quotation marks and citation omitted).  Accordingly, Count VIII does not state a claim for fraud with the requisite particularity, and must be dismissed.

## IV.    INDYMAC BANK SHOULD BE DISMISSED.

In addition to naming FDIC Receiver as a defendant, MBIA also named IndyMac as a defendant.  It was inappropriate to do so.  As receiver of IndyMac and by express operation of law, FDIC Receiver assumed all the rights, titles, powers, privileges, and operations of IndyMac – and of IndyMac's shareholders, directors, and officers – with respect to the bank, its assets, and the duty to pay the bank's valid obligations in accordance with the prescriptions and limitations of the Federal Deposit Insurance Act.  See 12 U.S.C. § 1821(d)(2).  Thus, FDIC Receiver now stands fully in IndyMac's shoes and operates as its successor-in-interest, with full power to dispose of its assets and pay its liabilities.  See 12 U.S.C. § 1821(d)(2)(B); see also O'Melveny & Myers v. FDIC, 512 U.S. 79, 86 (1994) ("The FDIC as receiver steps into the shoes of the failed [financial institution].").

For this reason, FDIC Receiver is routinely substituted for the failed bank in litigation involving claims against the bank.  See, e.g., Yeomalakis v. FDIC, 562 F.3d 56, 59 (1st Cir. 2009) (granting FDIC's "motion to substitute for [the failed bank] as the successor in interest"); Buczowski v. FDIC, 415 F.3d 594, 597 (7th Cir. 2005) (same); In re Community Bank of N. Va., 418 F.3d 277, 293 (3d Cir. 2005) (same); Phipps v. FDIC, 417 F.3d 1006, 1009 n.2 (8th Cir. 2005) (same); Brown Leasing Co. v. Cosmopolitan Bancorp, Inc., 42 F.3d 1112, 1115 (7th Cir. 1994) (same).

Here, substitution is not appropriate, because FDIC Receiver is already a party.  But for the same reasons courts grant substitution – i.e., because FDIC Receiver is IndyMac's successor-in-interest, and is solely responsible for paying valid claims against IndyMac (in accordance with the rules and limitations of federal law) – there is no reason to include IndyMac itself as a party.  See Village of Oakwood v. State Bank and Trust Co., 481 F.3d 364, 368 (6th Cir. 2007) (appointment of FDIC as receiver "transform[s] the plaintiffs' claim to one against the FDIC").  Thus, IndyMac should be dismissed as a party pursuant to Federal Rule of Civil Procedure 25(c).

## CONCLUSION

For the foregoing reasons, FDIC Receiver's motion should be granted.  Counts IV, VI, VII, and VIII of MBIA's complaint should be dismissed entirely with prejudice, and IndyMac should be dismissed as a party.

Dated:  September 2, 2009

Respectfully submitted,

_____
William R. Stein, D.C. Bar No. 304048
Scott H. Christensen, D.C. Bar No. 476439
Jason S. Cohen, D.C. Bar No. 501834
Hughes Hubbard & Reed LLP
1775 I Street, N.W., Suite 600
Washington, D.C. 20006-2401
Telephone:  (202) 721-4600
Facsimile:  (202) 721-4646

Of Counsel:

John Warshawsky, D.C. Bar No. 417170
Counsel, Commercial Litigation Unit
Federal Deposit Insurance Corporation
3501 Fairfax Drive, Room VS-D-7066
Arlington, VA 22226

*Attorneys for Federal Deposit Insurance Corporation as Receiver for IndyMac Bank, F.S.B.*

45