UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MBIA INSURANCE CORPORATION<br>113 King Street<br>Armonk, NY 10504,<br><br>                                        Plaintiff,<br><br>                    -against-<br><br>FEDERAL DEPOSIT INSURANCE CORPORATION,<br>(in its corporate capacity and as conservator and receiver of<br>INYDMAC FEDERAL BANK, F.S.B.)<br>550 17th Street, N.W.<br>Washington, D.C. 20429,<br><br>                                        Defendant. | Case No. 1:09-cv-01011<br><br>Hon. James Robertson<br><br>**FIRST AMENDED<br>COMPLAINT** |

Plaintiff MBIA Insurance Corporation ("MBIA") for its First Amended Complaint against defendant Federal Deposit Insurance Corporation ("FDIC"), in its corporate capacity ("FDIC-Corporate"), and as conservator and receiver of IndyMac Federal Bank, F.S.B. ("IndyMac Federal"), alleges, on information and belief as to all facts other than as to itself, as follows:

**NATURE OF THE ACTION**

1.      This action against the FDIC in its corporate capacity, and as conservator, and later receiver, of IndyMac Federal, arises from a series of breaches of contracts by IndyMac Federal, as well as the FDIC's unlawful disposition of IndyMac Federal's assets in connection with the FDIC's resolution of IndyMac Bank, F.S.B., ("IndyMac Bank"), a failed financial institution and mortgage lender for which the FDIC was appointed receiver on July 11, 2008.

2.      After IndyMac Bank failed and the FDIC was appointed receiver of IndyMac Bank on July 11, 2008, the FDIC chartered IndyMac Federal and acted as conservator of IndyMac Federal.

3.      Plaintiff MBIA provided credit enhancement in the form of financial guaranty insurance (each a "Policy" and, collectively, the "Policies") in connection with three securitization transactions backed by residential mortgages either originated or otherwise owned by IndyMac Bank:  IndyMac Home Equity Mortgage Loan Asset-Backed Trust, Series INDS 2006-H4 ("INDS 2006-H4"), IndyMac Home Equity Mortgage Loan Asset-Backed Trust, Series INDS 2007-1 ("INDS 2007-1") and IndyMac Home Equity Mortgage Loan Asset-Backed Trust, Series INDS 2007-2 ("INDS 2007-2") (collectively, the "IndyMac Transactions").  The IndyMac Transactions are "Qualified Financial Contracts" as that term is defined by the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA").  As described in greater detail below, MBIA is required under the Policies to unconditionally and irrevocably guarantee certain payments with respect to current interest and the ultimate collection of principal for the benefit of the investors who purchased securities issued in connection with the IndyMac Transactions.  As a result of the credit enhancement MBIA agreed to provide under the Policies, when individual borrowers missed payments or defaulted on mortgage loans contributed to one of the IndyMac Transactions, MBIA suffered losses by paying insurance claims for the shortfall in the cash flows resulting from the borrowers' breaches.

4.      When it became receiver of IndyMac Bank and conservator of IndyMac Federal on July 11, 2008, the FDIC could have immediately repudiated the IndyMac Transactions.  But it did not.  Instead, the FDIC approved the IndyMac Transactions as that term is used in 12 U.S.C. § 1821(d)(20).  The FDIC and IndyMac Federal assumed IndyMac Bank's obligations in connection with the IndyMac Transactions.

5.      By approving the transaction documents for the IndyMac Transactions, IndyMac Federal and the FDIC assumed the obligations to act as seller and servicer for the IndyMac Transactions.   A servicer is critical to a mortgage-backed securitization transaction like the IndyMac Transactions.   As servicer, IndyMac Federal was responsible for handling all administrative duties under the securitization agreements, including collecting mortgage payments and determining whether a mortgage loan is in default of the obligations established by the transaction documents.  Consequently, as servicer of the IndyMac Transactions, the FDIC-controlled IndyMac Federal was supposed to deal directly with borrowers, ensuring that they were making payments in a timely manner.  When the FDIC approved the IndyMac Transactions for IndyMac Federal, IndyMac Federal became entitled to what were once IndyMac Bank's rights arising from the IndyMac Transactions, including the right to fees and other revenue from the IndyMac Transactions for servicing the securitized mortgage loan pools.  The FDIC and IndyMac Federal assumed IndyMac Bank's contractual obligations in connection with the securitization transactions in order to receive valuable revenues for servicing the securitization transactions.

6.      By approving the IndyMac Transactions in its capacity as conservator of IndyMac Federal, the FDIC also assumed for IndyMac Federal responsibility for complying with the loan breach remedy or so-called "put back" process set forth in the transaction documents.  Under this process, MBIA was entitled to identify mortgage loans that were improperly included in the securitizations in breach of certain representations or warranties made by IndyMac Bank as seller.  Specifically, when it entered the IndyMac Transactions, to induce MBIA to provide credit enhancement in the form of the Policies, IndyMac Bank made representations concerning the quality of the mortgage loans underlying the securitizations, as well as express representations that the mortgage loans were underwritten in accordance with its then-applicable underwriting

guidelines and policies.  Among other things, in making these representations and warranties, IndyMac Bank had assured MBIA (and the investors) that, for each individual mortgage loan, there was a reasonable expectation that the borrower would be able to repay the mortgage debt. To the extent the mortgage loans did not comply with IndyMac's representations and warranties, the IndyMac Transaction Documents provided MBIA with a remedy: IndyMac Bank, as seller, was contractually obligated to, among other things, repurchase non-compliant mortgage loans identified by MBIA, or, in certain circumstances, substitute the non-compliant mortgage loans "put back" by MBIA with mortgage loans that complied with IndyMac Bank's representations and warranties.

7.    IndyMac Federal and the FDIC failed to comply with their contractual obligations as seller and servicer in connection with the securitization transactions.  In particular, IndyMac Federal and the FDIC failed to satisfy their obligations to service the mortgage loans in accordance with the Transaction Documents and the servicing industry's standards.  Among other things, IndyMac Federal, while under the control of the FDIC, (a) improperly charged-off – that is, wrote down the value of – mortgage loans, thus causing claims to be submitted to MBIA, when, in fact, IndyMac Federal and the FDIC were responsible for advancing payments with respect to such charged-off mortgage loans; (b) failed to properly charge-off other mortgage loans, for which a charge-off was proper, thereby allowing IndyMac Federal to continue to receive servicing fees for such non-charged-off mortgage loans; (c) improperly converted servicing proceeds; and (d) otherwise failed to take steps to interact with borrowers in accordance with the Transaction Documents and the servicing industry's standards in a manner that would increase borrower compliance with their loan obligations, and minimize cash short falls to the trust that MBIA would have to cover as insurance claims.

8.      Further, IndyMac Federal and the FDIC refused to comply with their contractual obligation as seller for the IndyMac Transactions to repurchase mortgage loans that failed to comply with the contractual representations and warranties set forth in the various agreements memorializing the IndyMac Transactions and otherwise undertook actions in breach of FIRREA that, on information and belief, had the effect of maximizing returns to the FDIC at the expense of MBIA and other claimants.  Specifically, after MBIA submitted valid claims in accordance with the "put back" remedy provisions of the IndyMac Transaction Documents, the FDIC failed to remedy the material breaches for the non-compliant mortgage loans identified by MBIA.  To the contrary, the FDIC advised MBIA that IndyMac Federal would not engage in the "put back" remedy process at all.  IndyMac Federal and the FDIC also refused to give MBIA access to additional mortgage loan-related documentation that would have allowed MBIA to identify additional mortgage loans in the IndyMac Transactions that did not comply with the representations and warranties in the IndyMac Transaction Documents.

9.      IndyMac Federal's and the FDIC's failure to fulfill their contractual obligations to MBIA between July 11, 2008, the date of the imposition of the FDIC receivership of IndyMac Bank, and March 19, 2009, the date when the assets of IndyMac Federal, including the contractual obligations in connection with the IndyMac Transactions were sold, caused MBIA to suffer as much as $244,057,367 in losses, an average of $30,507,171 in claims submitted per month.  To give a sense of the magnitude of the damage caused by the breaches of the servicing obligations, on June 30, 2008, the last day of the month before the FDIC-controlled IndyMac Federal took responsibility for servicing, MBIA's average monthly claims for the IndyMac Transactions were $4,235,308.  By September 30, 2008, three months into IndyMac Federal's tenure as servicer, MBIA's average monthly claims increased to $9,559,087.

10.     Through a series of unlawful actions taken under the guise of FIRREA, the FDIC has sought to effectively immunize IndyMac Federal from liability that accrued under the FDIC's watch by frustrating MBIA's rights to recover for losses caused by IndyMac Federal's repeated breach of its contractual obligations.

11.     The FDIC is not entitled to approve contracts for IndyMac Federal, as it did here, and then allow IndyMac Federal to accept the benefits of those contracts, without also ensuring that IndyMac Federal fulfilled its reciprocal contractual obligations under those very same contracts.  The FDIC is not entitled to disregard the provisions of FIRREA that require it to make MBIA whole on a priority basis for IndyMac Federal's breaches of those contracts.  In particular, the FDIC is not entitled to override FIRREA by replenishing FDIC-Corporate's coffers without regard to MBIA's lawful share of the proceeds from IndyMac Federal's sale of its assets.

12.     MBIA submitted three separate proofs of claims to the FDIC in connection with the administrative process that it created for claims related to IndyMac Bank and IndyMac Federal Bank.  Two proofs of claim were submitted to the FDIC in its capacity as conservator and receiver of IndyMac Federal related to the breaches of contract described above and detailed below.  On December 28, 2009, MBIA received a notice dated December 10, 2009, from the FDIC as receiver for IndyMac Federal, advising MBIA that the FDIC had refused to review MBIA's two outstanding proofs of claim, which effectively disallowed MBIA's proofs of claims and caused MBIA's claims set forth herein to be ripe for this Court's review.  MBIA also submitted a third proof of claim to the FDIC in its capacity as receiver of IndyMac Bank in connection with actions undertaken by IndyMac Bank prior to the imposition of the FDIC receivership on July 11, 2008.  Though MBIA believes the claims set forth in that proof of claim were meritorious, the FDIC has advised MBIA that insufficient assets exist in the receivership of

IndyMac Bank to make any distributions on such claims and, based on the FDIC's determination, MBIA has determined not to set forth those claims herein.

13.     Remarkably, the December 10 Notice reflected that the FDIC erroneously treated all of MBIA's claims solely as general creditor claims, and not as "administrative expense" claims under FIRREA.  Like any claim based on contractual obligations that the FDIC approved after becoming conservator of IndyMac Federal, MBIA's breach of contract claims constitute "administrative expenses" that are to be satisfied before depositor claims and other general creditor claims under FIRREA.

14.     Moreover, the FDIC, in its capacity as conservator of IndyMac Federal, exceeded its statutory authority under FIRREA when it disposed of IndyMac Federal's assets, including the $1.5 billion that it received from the sale of its assets to OneWest Bank, F.S.B. ("OneWest"), without regard for MBIA's rights.  In particular, in connection with disposing of the OneWest proceeds and other assets, IndyMac Federal disbursed funds and directed valuable assets to FDIC-Corporate, but failed to reserve sufficient funds to satisfy its administrative expense obligations to MBIA.  The FDIC was obligated to treat MBIA's claims and the obligations to FDIC-Corporate equally and distribute payment on a pro rata basis if there were insufficient funds to cover both MBIA's claims and the FDIC-Corporate obligations.  Because the FDIC acted outside its statutory authority in diverting IndyMac Federal's assets to FDIC-Corporate without regard for MBIA's rights, this Court should order FDIC-Corporate to return those assets to IndyMac Federal so that the FDIC, as receiver of IndyMac Federal, may dispose of them in accordance with the priorities set forth in FIRREA.

## PARTIES AND RELEVANT INTERESTED NON-PARTIES

15.     Plaintiff MBIA Insurance Corporation is a New York insurance corporation with its principal place of business in Armonk, New York.

16.     Defendant Federal Deposit Insurance Corporation is an independent agency of the United States responsible for insuring deposits in banks and thrift institutions; identifying, monitoring, and addressing risks to FDIC deposit insurance funds; and limiting the effect on the economy and the financial system when a bank or thrift institution fails.

17.     The FDIC is a defendant in this action both in its capacity as conservator and receiver of IndyMac Federal, and in its corporate capacity.

18.     IndyMac Bank, F.S.B. ("IndyMac Bank") is a failed financial institution.  The failure of IndyMac Bank was the fourth largest bank failure in United States history, and the second largest failure of a regulated thrift.  Before its failure, IndyMac Bank was the largest savings and loan association in the Los Angeles area and the seventh largest mortgage originator in the United States.  On or about July 11, 2008, IndyMac Bank was closed by the Office of Thrift Supervision ("OTS"), and the FDIC was named its receiver.

19.     IndyMac Federal Bank, F.S.B. was a federal savings bank chartered by the FDIC as of July 11, 2008, pursuant to OTS Order No. 2008-24.  The FDIC transferred all non-brokered insured deposit accounts and substantially all of the assets of IndyMac Bank to IndyMac Federal, which was to serve as a bridge depository institution or "bridge bank" that operated a certain portion of the business of IndyMac Bank between the date of the imposition of the FDIC receivership of IndyMac Bank on July 11, 2008 and the FDIC's final disposition of the assets of IndyMac Federal.

## JURISDICTION AND VENUE

20.     This Court has jurisdiction over this action pursuant to 12 U.S.C. § 1821(d)(6)(A), 28 U.S.C. §§ 1331, 1346 and 5 U.S.C. § 701 *et seq.* (the "Administrative Procedures Act").

21.     MBIA filed the claims set forth herein through the FDIC's administrative process on June 17, 2009 and August 26, 2009.  True and correct copies of MBIA's Proof of Claim

submissions are attached hereto as Exhibits A and B.  On or about December 10, 2009, the FDIC

disallowed MBIA's Proofs of Claim against IndyMac Federal.  A true and correct copy of the

FDIC's disallowance of MBIA's Proofs of Claim is attached hereto as Exhibit C.

22.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1391, 1402, 12 U.S.C. §§

1821(d)(4) and 5 U.S.C. § 703.

**FACTUAL ALLEGATIONS**

**A.     Background**

23.     IndyMac Bank was a mortgage lender that offered mortgage loans to homebuyers

and owners, including those with limited income or credit history.  IndyMac Bank offered loans

to home buyers and owners based on internet advertising, website traffic, affinity relationships,

company referral programs, realtors and through its Southern California retail banking branches.

IndyMac Bank was also in the business of acquiring mortgages that had been originated by other

entities, including mortgage brokers, mortgage bankers, financial institutions and homebuilders.

24.     IndyMac Bank's practice was to sell, by means of securitization transactions,

mortgage loans that it had originated or had acquired from others.  From 1993 to its collapse in

2008, IndyMac Bank sponsored securitization transactions backed by residential mortgage loans.

During the years 2002-2006, IndyMac Bank sponsored mortgage loan securitizations with an the

approximate value of $98.6 billion.

**B.     The Securitization of Residential Mortgage Loans**

25.     Securitization is the act of using a financial asset, such as a mortgage loan, as

security for another instrument.  Acquirers and originators of mortgage loans may sponsor

securitization transactions to sell mortgage loans, and to enable them to acquire or originate

additional mortgage loans using the proceeds from the securitization.

26.     Securitizations can take various forms.  The most common form used for mortgage loans involves the creation of a trust, to which the sponsoring entity sells a portfolio of mortgage loans.  The trust will then divide the cash flows from the mortgage loans into various pieces or tranches and issue securities, which are sold to investors.  Those pieces or tranches underlying the securities have different economic rights to principal and interest, among other things, and have different attributes of repayment risk.

27.     Because the mortgage loans, and their underlying cash flows, are sold to an entity, such as a trust, in connection with the securitization, the appointment of a servicer is also necessary.  The servicer is responsible for handling all administrative duties under the securitization agreements, including collecting mortgage payments and determining whether a mortgage loan is in default of the obligations established by the transaction documents.  The servicer remits proceeds from the mortgage loans to the trustee of the trust.  The trustee is responsible for administering the funds of the trust, determining the adequacy of the trust's funds to satisfy the trust's obligations in connection with the securities issued by the trust and making payments to the investors.

28.     The financial viability of an investment in a securitization is based on the quality of the underlying mortgage loans.  If, for instance, the lender that originated the mortgage loans employed substandard underwriting practices, risk increases.  This risk manifests itself through delinquencies on mortgage loan payments eventually leading to defaults on the mortgage loans.  After a mortgage loan is in default, if a servicer of a mortgage loan determines that net recoveries to be achieved by foreclosing upon or comparably converting the mortgage loan are unlikely to equal or exceed the outstanding principal balance of the delinquent mortgage loan (plus certain costs and expenses related thereto), the servicer will charge-off such delinquent mortgage loan, meaning that the servicer will write down or recognize the outstanding principal balance of such

mortgage loan as zero, without a corresponding payment or receipt of principal.   These delinquencies, defaults and charge-offs result in a shortfall of anticipated cash flows to the trust and, consequently, a shortfall in cash flows payable to the investors.

29.     To increase marketability, lower interest costs and mitigate the risk to the investors of a potential shortfall in anticipated cash flows to the trust, many securitizations include the purchase of a financial guaranty insurance policy from a financial guaranty insurer, such as MBIA.   Such a financial guaranty insurance policy is a form of credit enhancement. Under the terms of such a policy, a financial guaranty insurer, in consideration of a premium (and subject to the terms and conditions of the policy), will unconditionally and irrevocably guarantee to the investors that, in the event there is a shortfall in cash flows to the trust, the financial guaranty insurer will insure certain payments with respect to current interest and ultimate collection of principal to the trustee for the benefit of the investors.   In this way, the risk to the investors of a shortfall in the anticipated cash flows to the trust is mitigated, thus increasing the marketability and pricing of the securities.

30.     To satisfy both the investors and the financial guaranty insurer as to the quality of the particular portfolio of mortgage loans, the sponsor of a securitization typically makes disclosures and representations regarding the quality and character of the underlying mortgage loans, as well as the underwriting standards used to underwrite the mortgage loans.

## C.     The IndyMac Transactions and the Policies

31.     IndyMac Bank was engaged in the business of originating and acquiring residential mortgage loans that it sold by means of securitization transactions, including the IndyMac Transactions, as well as servicing residential mortgage loans.

32.     Starting in approximately September 2006, IndyMac Bank contacted MBIA to provide financial guaranty insurance policies with respect to three securitizations sponsored by IndyMac Bank: INDS 2006-H4, INDS 2007-1 and INDS 2007-2.

33.     INDS 2006-H4 is a securitization that was issued on December 21, 2006 with an approximate initial principal mortgage loan balance of $650,000,000.  The INDS 2006-H4 mortgage loan pool consists primarily of a pool of certain adjustable rate first and second lien revolving home equity lines of credit and, as of October 31, 2006, contained 10,305 mortgage loans.

34.     INDS 2007-1 is a securitization that was issued on February 14, 2007 with an approximate initial principal mortgage loan balance of $449,550,000.  The INDS 2007-1 mortgage loan pool consists primarily of fixed-rate mortgage loans secured by second liens on one- to- four family residential properties and, as of February 1, 2007, contained 6,970 mortgage loans.

35.     INDS 2007-2 is a securitization that was issued on March 22, 2007 with an approximate initial principal mortgage loan balance of $245,625,000.  The INDS 2007-2 mortgage loan pool consists primarily of fixed-rate mortgage loans secured by second liens on one- to- four family residential properties and, as of March 1, 2007, contained 3,956 mortgage loans.

36.     In connection with each of the IndyMac Transactions, MBIA and IndyMac Bank entered into Insurance and Indemnity Agreements pursuant to which MBIA issued an insurance policy (the "Policy") for each IndyMac Transaction.  These agreements are (1) an Insurance and Indemnity Agreement, dated as of December 21, 2006 (the "INDS 2006-H4 Insurance Agreement"), (2) an Insurance and Indemnity Agreement, dated as of February 14, 2007 (the "INDS 2007-1 Insurance Agreement") and (3) an Insurance and Indemnity Agreement, dated as

of March 22, 2007 (the "INDS 2007-2 Insurance Agreement") (collectively, the "Insurance Agreements").

37.     MBIA issued the Policies on behalf of IndyMac Bank in favor of the trustee for the related IndyMac Transaction for the benefit of the owners of the securities issued in connection with the IndyMac Transactions.  While individual provisions may vary slightly, the Insurance Agreements and the Policies are substantially similar, except with respect to the Pool Policy for INDS 2007-1 (as described more fully, *infra*, at paragraphs 131-151).

38.     The Policies and Insurance Agreements provided credit enhancement.   In particular, the Policies increased the marketability of the securities by mitigating the risk to potential investors of any shortfalls in anticipated cash flows, which allowed for better pricing of the securities for IndyMac Bank.  Consequently, the Policies and Insurance Agreements were "Qualified Financial Contracts" as that term is defined by FIRREA.

**D.     Representations Made To MBIA In Connection With The IndyMac Transactions**

39.     In connection with issuing the Policies, IndyMac Bank made numerous representations and warranties to MBIA.  Specifically, prior to, and in connection with each IndyMac Transaction, IndyMac Bank made representations to MBIA regarding the quality of IndyMac Bank's underwriting guidelines and practices.  IndyMac Bank provided MBIA with, among other things, information regarding IndyMac's underwriting guidelines and practices, information regarding the mortgage loans that were to be contributed to the mortgage loan pools and data tapes demonstrating various statistical attributes of the mortgage loans for each of the IndyMac Transactions – such as debt-to-income ("DTI") and combined loan-to-value ("CLTV") ratios and Fair Isaac & Co. ("FICO") credit scores statistics for individual mortgage loans and averages of the metrics for each IndyMac Transaction.

40.     MBIA and IndyMac Bank also included certain representations and warranties in the Insurance Agreements.   In connection with each IndyMac Transaction, the Insurance Agreements incorporated by reference, for the benefit of MBIA, the representations and warranties contained in the "Transaction Documents," as that term is defined in the Insurance Agreements.  For INDS 2006-H4, the "Transaction Documents" include a Master Loan Purchase Agreement ("Purchase Agreement") and a Sale and Servicing Agreement ("Sale and Servicing Agreement").   For INDS 2007-1 and INDS 2007-2, the "Transaction Documents" include, among others, Pooling and Servicing Agreements.  MBIA is an express third-party beneficiary of each Pooling and Servicing Agreement.   The Pooling and Servicing Agreements, and the Purchase Agreement and the Sale and Servicing Agreement are referred to herein as the "IndyMac PSAs" or "PSAs."   The Transaction Documents for the IndyMac Transactions, including, among others, the Insurance Agreements, are "Qualified Financial Contracts" as that term is defined by FIRREA.  See 12 U.S.C. §1821(e)(8)(D).

41.     By incorporating in the Insurance Agreements the representations and warranties in the Transaction Documents, IndyMac Bank incorporated the following general representations and warranties regarding the underwriting of the mortgage loans contributed to the IndyMac Transactions, which were stated in the PSAs, for the benefit of MBIA:

(a)     **Compliance With Underwriting Guidelines:** Each Mortgage Loan has been underwritten and serviced substantially in accordance with IndyMac's guidelines (the "Underwriting Guidelines"), subject to variances as reflected on the Mortgage Loan Schedule or that the Seller has approved.  (INDS 2007-1 PSA, Schedule III, § (gg); INDS 2007-2 PSA, Schedule III, § (ff); Sale and Servicing Agreement, § 2.04(a)(xxxiv)).

(b)     **Compliance With Law:** Each Mortgage Loan and prepayment penalty associated with the Mortgage Loan at origination complied in all material respects with applicable federal, state and local laws, including usury, equal credit opportunity, real estate settlement procedures, truth-in-

lending, Home Ownership and Equity Protection Act of 1994, applicable predatory and abusive lending and disclosure laws, or any noncompliance does not have a material adverse effect on the value of the related Mortgage Loan. (INDS 2007-1 PSA, Schedule III, § (i); INDS 2007-2 PSA, Schedule III, § (i); Sale and Servicing Agreement, § 2.0(a)(xiii)).

(c) **Mortgage Loan Selection Was Not Adverse To MBIA And Investors:** Each Mortgage Loan was selected from among the outstanding one- to four-family mortgage loans in IndyMac's mortgage portfolio as to which the representations and warranties made with respect to the Mortgage Loans in this Schedule III can be made. No such selection was made in a manner intended to adversely affect the interests of the Certificateholders or the Certificate Insurer. (INDS 2007-1 PSA, Schedule III, § (y); INDS 2007-2 PSA, Schedule III, § (x); Sale & Servicing Agreement, § 2.04(a)(xxxv)).

(d) **High Cost Loans and Points and Fees:** No Mortgage Loan is a High Cost Loan or Covered Mortgage Loan, as applicable as such terms are defined by Standard & Poor's or any other similarly designated loan as defined under any state, local or federal law, as defined by applicable predatory and abusive lending laws. Moreover, points and fees for the mortgage loans did not exceed the caps represented by IndyMac and were fully disclosed to the borrowers. (INDS 2007-1 PSA, Schedule III, § (cc), (dd), (ee), (qq), (rr); INDS 2007-2 PSA, Schedule III, § (bb), (cc), (dd), (pp), (qq); Sale and Servicing Agreement, § 2.04(a)(xiv), (xiii).

(e) **Objective Methodology:** The methodology used in underwriting the extension of credit for each mortgage loan employed objective mathematical principles regarding the borrower's income, assets and liabilities to the proposed payment and such underwriting methodology did not rely on the extent of the borrower's equity in the collateral as the principal determining factor in approving such credit extension. Such underwriting methodology confirmed that at the time of origination (application/approval) the borrower had a reasonable ability to make timely payments on the mortgage loan. (INDS 2007-1 PSA, Schedule III, § (pp); INDS 2007-2 PSA, Schedule III, § (oo)). This provision is not present in the Sale and Servicing Agreement for INDS 2006-H4.

(f) **No Fraud:** To the best of IndyMac's knowledge, there was no fraud in the origination of any Mortgage Loan by the mortgagee or by the Mortgagor, any appraiser or any other party involved in the origination of the Mortgage Loan. (INDS 2007-1 PSA, Schedule III, § (ss); INDS 2007-2 PSA, Schedule III, § (rr); Sale and Servicing Agreement, § 2.04(a)(xvii)).

42.     These representations and warranties set forth the standards governing each mortgage loan contributed to the IndyMac Transactions, including, significantly, the standard that each mortgage loan had been underwritten in substantial compliance with IndyMac Bank's Underwriting Guidelines.

43.     IndyMac Bank's Underwriting Guidelines, in turn, specified criteria that the mortgage loans must meet depending upon the individual loan program and circumstances of each mortgage loan.  In general, the Underwriting Guidelines stipulated what documentation was required to be included in the loan files for each loan product (which may include, depending upon the loan product, verifications of income, assets, closing funds and payment histories, among others) and criteria for eligibility, including tests for CLTV, DTI and FICO score credit scores.  Any exceptions to the Underwriting Guidelines were required to meet specific criteria.

44.     Under IndyMac's Underwriting Guidelines, a borrower could apply for a loan by providing "full documentation" or could apply through other reduced documentation programs that required only "stated income."   The Underwriting Guidelines required, however, that a borrower's stated income must have been reasonable for the borrower's type of employment, line of work and assets.  Further, the stated income must have been reasonable in relation to other factors such as occupation/source of income, tenure, savings pattern/asset base, and credit usage and history.  IndyMac Bank also was required to review the reasonableness of the stated income for mortgage loans it originated or acquired.

45.     MBIA's review of a selection of delinquent loans for INDS 2007-1 and INDS 2007-2 has revealed startling and previously unknown facts about the quality of the mortgage loans contributed to the IndyMac Transactions.  Of the 6,970 loans included in the mortgage pool for INDS 2007-1, 4,127 loans, constituting approximately 59.2% of the original mortgage loan count, were delinquent or liquidated as of December 31, 2009.  Similarly, of the 3,956 loans

included in the mortgage pool for INDS 2007-2, 2,569 loans, constituting approximately 64.9% of the original mortgage loan count, were delinquent or liquidated as of December 31, 2009. Of 418 delinquent or liquidated loans for INDS 2007-1 that were reviewed by MBIA, only 17 loans – less than 5% of the loans reviewed – were originated or acquired in material compliance with the representations and warranties with respect to IndyMac's underwriting guidelines and policies. Even worse, of 297 loans for INDS 2007-2 that were reviewed by MBIA, only 3 loans – less than 1% of the loans reviewed – were originated or acquired in material compliance with IndyMac Bank's representations and warranties with respect to its underwriting guidelines and policies.

**THE FDIC APPROVES INDYMAC FEDERAL'S
ASSUMPTION OF THE INDYMAC TRANSACTIONS**

**E.     The FDIC's Resolution Of IndyMac Bank And Chartering Of IndyMac Federal**

46.     On July 11, 2008, the Director of OTS determined that IndyMac Bank was likely to be unable to pay its obligations or meet its depositors' demands in the normal course of business, was in an unsafe and unsound condition to transact business and was undercapitalized with no reasonable prospect of becoming capitalized. On this basis, the OTS appointed the FDIC as receiver of IndyMac Bank.

47.     At the same time, and by means of the same OTS Order, the OTS appointed the FDIC as conservator of a newly chartered bank – defendant IndyMac Federal – and permitted the FDIC to transfer such assets and liabilities of IndyMac Bank to its successor, IndyMac Federal, as the FDIC determined was appropriate to carry out its statutory rights and obligations.

48.     To effectuate the "pass-through receivership" of IndyMac Bank, the FDIC executed an Amended and Restated Insured Deposit Purchase and Assumption Agreement, dated

as of July 11, 2008 (the "July 2008 P&A Agreement").  The July 2008 P&A Agreement is attached hereto as Exhibit D.

49.     Pursuant to the July 2008 P&A Agreement, the FDIC transferred certain assets and liabilities from IndyMac Bank to defendant IndyMac Federal, including (1) "liabilities, if any with respect to Qualified Financial Contracts" and (2) "duties and obligations under any contract to which [IndyMac Bank] provides mortgage servicing for others . . . ."  See July 2008 P&A Agreement, §§ 2.1(j), (k).

50.     The FDIC also caused defendant IndyMac Federal to purchase IndyMac Bank's "Qualified Financial Contracts" and "mortgage servicing rights and related contracts," including the PSAs and Insurance Agreements related to the IndyMac Transactions.  See July 2008 P&A Agreement, §§ 3.1(t), (u).

51.     The FDIC, as receiver of IndyMac Bank and as conservator of IndyMac Federal, could have repudiated all of the PSAs and the Insurance Agreements for the IndyMac Transactions.  It chose not to do so.  Instead, it approved those agreements for IndyMac Federal to assume.

**F.      Specific Contractual Rights And Obligations Approved By the FDIC In Connection With IndyMac Federal's Acquisition Of Agreements Related to the IndyMac Transactions**

52.     After succeeding to the PSAs and Insurance Agreements, IndyMac Federal (like its predecessor) was contractually obligated to act as the servicer.  Having approved the PSAs and Insurance Agreements from its predecessor with the FDIC's approval, IndyMac Federal also became obligated under the Transaction Documents to participate in the "put back" process which the parties had agreed would be used in the event that MBIA discovered mortgage loans in the pools established for the IndyMac Transactions that did not comply with IndyMac Bank's

Underwriting Guidelines (and thus IndyMac Bank's representations in the Transaction Documents).

**1.      IndyMac Federal's Contractual Rights and Obligations Associated With Servicing**

53.      IndyMac Federal and the FDIC were contractually obligated to service the IndyMac Transactions from July 11, 2008 to March 19, 2009.

54.      The PSAs set forth the terms whereby IndyMac Federal was to service the mortgage loans in accordance with the Transaction Documents and generally accepted servicing practices.

55.      As servicer, IndyMac Federal was responsible for collecting mortgage payments and determining whether a mortgage loan is in default of the obligations established by the Transaction Documents.  IndyMac Federal was responsible for remitting proceeds from the mortgage loans to the trustee of the trust.

56.      In connection with performing its obligations, IndyMac Federal was supposed to interact with borrowers to maximize the borrowers' compliance with their obligations, and thus cash flows to the trusts established in connection with the securitizations.

57.      As consideration for servicing the mortgage loans, IndyMac Federal received servicing fees from the securitization transactions.

**2.      IndyMac Federal's Contractual Obligation to Participate in the Loan Breach "Put Back" Remedy Process**

58.      In accordance with the PSAs that IndyMac Federal acquired with the FDIC's approval, IndyMac Federal was contractually obligated to participate in the loan breach remedy procedure or so-called "put back" process (the "Put Back Process").  The Put Back Process was an agreed-upon mechanism whereby MBIA could give notice that certain mortgage loans did not

comply with the representations and warranties made in the Transaction Documents, and "put back" any such non-compliant loans to the seller (or its successor) as a remedy.

59.     In particular, pursuant to Section 2.03 of the IndyMac PSAs, MBIA was entitled to give notice to IndyMac Federal of the presence of a non-compliant mortgage loan, and IndyMac Federal would have 90 days to cure the breach.  If IndyMac Federal failed to cure the breach within the 90-day period, it was contractually obligated to repurchase the non-compliant mortgage loan from the mortgage loan pool or, if substitution could be completed within two years of the respective closing dates of the IndyMac Transactions, IndyMac Federal could substitute a performing, compliant mortgage loan to the mortgage loan pools.

**G.     IndyMac Federal's Breaches of Its Contractual Obligations**

60.     MBIA brings this action for damages resulting from IndyMac Federal's and the FDIC's breaches of their contractual obligations in connection with the IndyMac Transactions after the date of the imposition of the receivership of IndyMac Bank.   The FDIC never repudiated the Insurance Agreements, the Purchase Agreement, the Sale and Servicing Agreement and the INDS 2007-2 PSA.   Instead, IndyMac Federal and FDIC approved such agreements, and therefore are responsible for all breaches of such agreements after July 11, 2008.  Moreover, IndyMac Federal and the FDIC approved the INDS 2007-1 PSA until the date of its purported repudiation on March 19, 2009, and are therefore responsible for all breaches of the INDS 2007-1 PSA through that date.   Because of IndyMac Federal's egregious and pervasive breaches of its contractual obligations, MBIA has incurred significant losses in connection with its obligations under the Policies to insure certain shortfalls in payments to investors.

61.     IndyMac Federal and the FDIC failed to satisfy their obligations to service the mortgage loans in accordance with the Transaction Documents and the servicing industry's standards.   Among other things, IndyMac Federal, while under the control of the FDIC,

(a) improperly charged-off – that is, wrote down the value of – mortgage loans, thus causing claims to be submitted to MBIA, when, in fact, IndyMac Federal and the FDIC were responsible for advancing payments with respect to such charged-off mortgage loans; (b) failed to properly charge-off other mortgage loans, for which a charge-off was proper, thereby allowing IndyMac Federal to continue to receive servicing fees for such non-charged-off mortgage loans; (c) improperly converted servicing proceeds; and (d) otherwise failed to take steps to interact with borrowers in accordance with the Transaction Documents and the servicing industry's standards in a manner that would increase borrower compliance with their loan obligations, and minimize cash short falls to the trust that MBIA would have to cover as insurance claims.

62.     Notwithstanding IndyMac Federal's and the FDIC's failure to perform their contractual servicing obligations as described herein, IndyMac Federal and the FDIC continued to receive servicing revenues for servicing the mortgage loans for the IndyMac Transactions. Specifically, from July 11, 2008 through March 19, 2009, IndyMac Federal and the FDIC earned approximately $3,300,000 in servicing fees for the IndyMac Transactions.  IndyMac Federal and the FDIC used the servicing rights, as well as the servicing revenues, to increase the value of IndyMac Federal for eventual sale.

63.     IndyMac Federal and the FDIC also failed to engage in the Put Back Process as required by the Transaction Documents, i.e., they refused to comply with their obligations pursuant to the PSAs to cure, repurchase or substitute for non-compliant mortgage loans for the IndyMac Transactions.

64.     IndyMac Federal and the FDIC informed MBIA after the imposition of the FDIC's receivership of IndyMac Bank that IndyMac Federal and the FDIC would not engage in the Put Back Process with respect to the IndyMac Transactions.

65.     IndyMac Federal also failed to provide MBIA with documentation that MBIA requested, and was entitled to receive, in accordance with the Transaction Documents.  MBIA required such documentation to enforce its rights in connection with the IndyMac Transactions. Without such documentation, MBIA cannot determine the full magnitude of IndyMac Bank's breaches of its representation and warranties, or identify all of the loans that IndyMac Federal and the FDIC are contractually obligated to repurchase as part of the Put Back Process.

66.     Since the FDIC approved IndyMac Federal's assumption of the operative agreements underlying the IndyMac Transactions, MBIA's losses incurred on the IndyMac Transactions have been extremely large and well in excess of similar losses for securities of this nature.  Delinquencies and defaults for mortgage loans on the IndyMac Transactions have been substantial, diminishing cash flow to the trusts, which has required and will continue to require MBIA to satisfy its obligations under the Insurance Agreements and the Policies by making payments to cover these shortfalls.  As of December 31, 2009, MBIA has paid in excess of $548 million in claims in connection with the IndyMac Transactions.

67.     MBIA is entitled to payment of any damages caused by IndyMac Federal's and the FDIC's breaches of approved contracts as administrative expenses of IndyMac Federal and the FDIC pursuant to 12 U.S.C. §§ 1821(d)(20), 1821(e)(7)(B).

**H.     The FDIC Arranges For OneWest To Purchase IndyMac Federal's Assets**

68.     On or about December 31, 2008, the FDIC received a letter of intent to purchase IndyMac Federal from IMB HoldCo LLC, an entity formed by a consortium of private equity and hedge funds, including among others, Dune Capital Management LP, J.C. Flowers & Co. LLC and Paulson & Co., Inc.

69.     On or about March 19, 2009, the FDIC completed the sale of assets of IndyMac Federal to a newly chartered institution, OneWest, which would be owned by IMB HoldCo LLC.

70.     In connection with the sale of assets to OneWest, the FDIC issued a press release that stated, among other things: "As of January 31, 2009, IndyMac Federal had total assets of $23.5 billion and total deposits of $6.4 billion. OneWest has agreed to purchase all deposits and approximately $20.7 billion in assets at a discount of $4.7 billion.  The FDIC will retain the remaining assets for later disposition."

71.     According to published press reports, OneWest paid IndyMac Federal $1.5 billion for the assets and liabilities that it acquired.

72.     As noted above, on March 19, 2009, the FDIC, as receiver of IndyMac Federal, purported to repudiate the PSA relating to the INDS 2007-1 transaction as of July 11, 2008.  A true and correct copy of the FDIC notice is attached hereto as Exhibit E.

73.     The FDIC never informed MBIA of the status of IndyMac Federal's contractual obligations in connection with the other two IndyMac Transactions in light of the sale of IndyMac Federal's assets to OneWest.   However, a Servicing Business Asset Purchase Agreement ("Servicing APA"), by and between the FDIC and OneWest, dated as of March 19, 2009, purported to transfer to OneWest only the servicing rights and obligations in connection with the INDS 2006-H4 transaction and the INDS 2007-2 transaction.  The Servicing APA does not purport to transfer "any liabilities or obligations imposed on the seller of loans under the Servicing Agreements . . . including, without limitation, any repurchase obligations for breaches of loan level representations, any indemnities relating to origination activities or securities laws or any seller indemnity."

**I.      The FDIC Unlawfully Causes IndyMac Federal's Assets To Be Disposed Of In A Manner That Is Inconsistent With FIRREA And In Violation Of MBIA's Rights**

74.     Pursuant to FIRREA, the FDIC, "in any case involving the liquidation or winding up of the affairs of a closed depository institution, shall [] promptly publish a notice to the

depository institution's creditors to present their claims" and shall "determine whether to allow or disallow the claim and shall notify the claimant of any determination with respect to such claim." 12 U.S.C. §§ 1821(d)(3)-(5).

75.     Further, "amounts realized from the liquidation or resolution of an insured depository institution by any receiver . . . shall be distributed to pay claims . . . in the following order of priority: (i) Administrative expenses of the receiver[,] (ii) Any deposit liability of the institution[,] (iii) Any other general or senior liability of the institution . . . (iv) Any obligations subordinated to depositors or general creditors . . . (v) Any obligation to shareholders or members . . . ." 12 U.S.C. § 1821(d)(11)(A).

76.     FIRREA makes clear that administrative expenses include liabilities arising from "the breach of an agreement executed or approved by such receiver or conservator after the date of its appointment." 12 U.S.C. §1821(d)(20).

77.     On November 12, 2009, the FDIC's Board of Directors announced that:  "On March 19, 2009, IndyMac Federal was placed in receivership and substantially all of its assets were sold.  The amount realized from the resolution of IndyMac Federal is insufficient to pay all of its liabilities, and therefore there will be no amount to pay to the IndyMac Bank receivership." The FDIC's Board of Directors further determined that: "the assets of IndyMac Federal are insufficient to make any distribution on general unsecured claims and therefore, such claims, asserted or unasserted, will recover nothing and have no value."  The FDIC did not make public any support for its determination.

78.     The FDIC Board of Directors' November 12, 2009 determination (the "FDIC Board Determination") did not address the value of claims, like MBIA's, that are administrative expense claims under FIRREA that arise out of a breach of an agreement that the FDIC approved for a bank under the conservatorship or receivership of the FDIC, like IndyMac Federal.

79.     On or about December 10, 2009, the FDIC, as receiver of IndyMac Federal, disallowed MBIA's two outstanding proofs of claims on the basis that its claims had been determined to have no value.  In particular, in the December 10, 2009 Notice, the FDIC stated:

> The purpose of this letter is to notify you that the Receiver has ceased reviewing your pending claim.  The payment of depositor claims is preferred over all other creditor claims including the non-depositor claim that you filed.  The Board of Directors of the FDIC has determined that the assets of both IndyMac Bank and IndyMac Federal, Pasadena, California are insufficient to pay claims below the depositor class and that all non-depositor creditor claims have no value. . . .  We regret that the Receiver does not have sufficient funds to make a distribution on your claim.  (emphasis removed).

80.     The FDIC's December 10, 2009 notice indicates that the FDIC reviewed MBIA's claims as general creditor claims of IndyMac Federal.  MBIA's claims, however, relate to losses incurred as a result of IndyMac Federal's and the FDIC's breaches of contractual obligations in connection with contracts approved by IndyMac Federal and the FDIC after the date of the imposition of the FDIC receivership of IndyMac Bank.  Accordingly, MBIA's claims are administrative expenses of IndyMac Federal, which are entitled to payment in priority over general creditor claims.  Thus, the FDIC's determination that insufficient assets exist to satisfy general creditor claims has no application to MBIA's entitlement to payment of its administrative expenses claims, which are higher in priority to general creditor claims.

81.     The FDIC's December 10, 2009 notice further reflects two alternatives – both of which require this Court to reject the FDIC's December 10, 2009 determination and summary disposition of MBIA's claims and order the payment of MBIA's administrative expense claims.

82.     The first alternative is that IndyMac Federal, under the FDIC's receivership, retained the $1.5 billion paid by OneWest for IndyMac Federal's assets, and has since liquidated other assets, the proceeds from which it is holding in reserve to satisfy administrative expense

claims, like MBIA's.  If that is the case, then the Court must reject the FDIC's determination to "cease to review" MBIA's claims and order that MBIA's administrative expenses claims be paid from any such assets.

83.     The second alternative, which is more likely, is that the FDIC, as conservator of IndyMac Federal, exceeded the authority afforded to it under FIRREA, and transferred or otherwise dissipated the proceeds from the OneWest sale and IndyMac Federal's other assets without regard for MBIA's administrative expense claims based on breaches of agreements the FDIC approved.

84.     To have determined on November 10, 2009 that "the assets of IndyMac Federal are insufficient to make any distribution on general unsecured claims and therefore, such claims, asserted or unasserted, will recover nothing and have no value," the FDIC, as conservator and/or receiver of IndyMac Federal must have used the funds and assets that remained after the March 19, 2009 sale to OneWest to satisfy administrative expense claims and obligations.  This is necessarily so because there were no depositor claims specifically against IndyMac Federal that could have been satisfied with the $1.5 billion received from OneWest, or the proceeds from the sale of IndyMac Federal's other remaining assets.

85.     On information and belief, the FDIC, in its capacity as conservator or receiver of IndyMac Federal, caused IndyMac Federal to transfer substantially all of the funds and assets that remained after the sale to OneWest, including the $1.5 billion paid by OneWest, to FDIC-Corporate in satisfaction of certain contractual obligations owed to FDIC-Corporate that arose in connection with the chartering of IndyMac Federal.

86.     In the event the FDIC, in its capacity as receiver or conservator of IndyMac Federal, treated IndyMac Federal's obligations to FDIC-Corporate as payment for administrative expenses, the FDIC exceeded its authority under FIRREA because FIRREA obligates the FDIC

to ensure that all parties holding administrative expense claims received a pro rata portion of whatever funds were available to satisfy such claims.

87.     In the event the FDIC, in its capacity as receiver or conservator of IndyMac Federal, treated IndyMac Federal's obligations to FDIC-Corporate as payment for anything other than an administrative expense, then the FDIC also exceeded its authority under FIRREA.  As administrative expense claims under FIRREA, MBIA's claims were to be satisfied by IndyMac Federal on a priority basis, ahead of other claims.

88.     Because the FDIC exceeded its authority under FIRREA by transferring funds and assets away from IndyMac Federal, and by accepting such funds and assets without regard to FIRREA and MBIA's rights, the Court should issue an Order requiring FDIC-Corporate to return to IndyMac Federal whatever funds that it unlawfully received so that the FDIC, as receiver of IndyMac Federal, can dispose of those assets in accordance with FIRREA, and the rights afforded to MBIA thereunder.

## CLAIM I
## BREACH OF CONTRACT – SERVICING

89.     MBIA repeats, re-alleges and incorporates each and every allegation contained in paragraphs 1 through 88.

90.     The Transaction Documents, including the IndyMac PSAs and the Sale and Servicing Agreement for INDS 2006-H4, were at all times relevant hereto valid and enforceable agreements.

91.     MBIA has fully complied with its obligations under the Transaction Documents and the Policies with respect to the IndyMac Transactions.

92.     In connection with MBIA's issuance of the Policies, IndyMac Bank agreed to the IndyMac PSAs, which imposed certain obligations on IndyMac Bank.   Under the IndyMac PSAs, IndyMac Bank, as servicer, was obligated to provide service and administration for the mortgage loans consistent with certain standards.

93.     The Sale and Servicing Agreement for INDS 2006-H4 states that the Servicer "shall service and administer the Mortgage Loans in accordance with Accepted Servicing Practices and shall have full power and authority, acting alone, to do any and all things in connection with such servicing and administration which the Servicer may deem necessary or desirable and consistent with the terms of this Agreement."   In the Sale and Servicing Agreement, "Accepted Servicing Practices" is defined as "[t]he Servicer's normal servicing practices in servicing and administering revolving home equity line of credit mortgage loans for its own account, which in general will conform to the mortgage servicing practices of prudent mortgage lending institutions which service for their own account, mortgage loans of the same type as the Mortgage Loans in the jurisdictions in which the related Mortgaged Properties are located."

94.     The INDS 2007-1 PSA and the INDS 2007-2 PSA state that the Servicer "shall service and administer the Mortgage Loans in accordance with this Agreement and the Servicing Standard."  In the INDS 2007-1 PSA and the INDS 2007-2 PSA, "Servicing Standard" is defined as "[t]hat degree of skill and care exercised by the Servicer with respect to mortgage loans comparable to the Mortgage Loans serviced by the Servicer for itself or others, including loans subject to a pool policy."

95.     As of July 11, 2008, IndyMac Federal and the FDIC replaced IndyMac Bank as servicer for the IndyMac Transactions.

96.     IndyMac Federal and the FDIC failed to service the Mortgage Loans consistently with their own standards, and the standards of the industry in breach of the IndyMac PSAs.

97.     Among other things, IndyMac Federal and the FDIC failed to utilize adequate resources necessary to service mortgage loans that require significant remediation processes, such as the mortgage loans for the IndyMac Transactions.  For example, IndyMac Federal and the FDIC lacked proper managerial, personnel and technology resources to contact delinquent borrowers in a timely manner, trace the location of delinquent borrowers and engage in attempts to remedy borrower delinquencies and defaults.

98.     In addition, IndyMac Federal and the FDIC breached their contractual obligations by making improper determinations regarding charging-off mortgage loans – that is, writing down or recognizing the outstanding principal balance of such mortgage loan as zero, without a corresponding payment or receipt of principal.

99.     For example, after a mortgage loan was 120 days delinquent, IndyMac Federal and the FDIC were required to undertake a "Final Recovery Determination," which calculates and documents whether "all Insurance Proceeds, Liquidation Proceeds and other payments or recoveries which [IndyMac Federal], in its reasonable good faith judgment, expects to be finally

recoverable" are in fact recoverable by IndyMac Federal, including, without limitation, by means of foreclosure.  In the event that IndyMac Federal reasonably determined that the mortgage loan proceeds were recoverable, IndyMac Federal was obligated to service the mortgage loans as necessary to obtain a recovery.

100.   IndyMac Federal was obligated to "maintain records of each Final Recovery Determination."  These records should document the basis for IndyMac Federal's determination and may include servicing notes, pay histories, insurance claim forms, broker price opinions and communications with borrowers, among other documents.  IndyMac Federal was required to engage in and properly document a Final Recovery Determination before it could charge off a mortgage loan.  A properly documented Final Recovery Determination is an explicit prerequisite under the PSAs to the declaration of a Realized Loss and the creation of a payment obligation on the part of MBIA.

101.   IndyMac Federal, however, made unreasonable final recovery determinations with respect to delinquent mortgage loans by determining that such mortgage loans would be recoverable, when, in fact, it was unreasonable to determine that such mortgage loans would be recoverable.

102.   IndyMac Federal and the FDIC made these determinations in bad faith in order to allow IndyMac Federal to improperly retain servicing fees for these delinquent mortgage loans. Moreover, IndyMac Federal made Advances for these mortgage loans to the securitization trusts on the relevant distribution dates.  Any such Advances, pursuant to the IndyMac PSAs, are reimbursable as a priority (according to a contractual distribution schedule known as a waterfall) from funds received by the securitization trust for the next subsequent distribution date.  By making these Advances in bad faith and potentially receiving subsequent reimbursement of these Advances, IndyMac Federal and the FDIC caused the trust to incur a further shortfall in funds

received by the trust during the subsequent distribution dates, thus causing claims to be submitted and paid by MBIA to cover such shortfalls.

103.    IndyMac Federal and the FDIC have further breached the IndyMac PSAs by improperly converting servicing proceeds payable to the trusts for the IndyMac Transactions. Specifically, IndyMac Federal and the FDIC undertook to reimburse themselves for servicing advances by converting servicing proceeds that IndyMac Federal was required to provide to the trust in breach of the IndyMac PSAs.   Moreover, as set forth above, because many of these reimbursable Advances are the result of bad faith servicing conduct by IndyMac Federal, IndyMac Federal and the FDIC are improperly converting servicing revenues for their own benefit with respect to reimbursable Advances that were themselves improper.

104.    IndyMac Federal and the FDIC have further caused MBIA to incur damages as a result of IndyMac Federal's and the FDIC's failure to follow reasonable and prudent mortgage servicing industry servicing practices.    IndyMac Federal's and the FDIC's failure has exacerbated mortgage loan delinquencies and caused MBIA to incur higher insurance claims.

105.    As a result of IndyMac Federal's and the FDIC's failure to service the mortgage loans as required by the PSAs, MBIA has suffered damages.  In addition, MBIA has incurred and will continue to incur significant fees for professional services, including attorneys' fees, to enforce IndyMac Federal's and the FDIC's obligations under the PSAs.  IndyMac Federal and the FDIC have not indemnified MBIA, pursuant to Sections 3.03 and 3.04 of the Insurance Agreements, for the damages it has incurred as a result of IndyMac Federal's failure to comply with its obligations under the PSAs, including interest, attorneys' and accountants' fees and costs and any other fees and expenses that MBIA has incurred.

106.    MBIA is entitled to damages for IndyMac Federal's and the FDIC's failure to comply with their obligations with respect to the servicing of the IndyMac Transactions after the

imposition of the FDIC receivership on July 11, 2008 in an amount to be determined at trial. MBIA is further entitled to indemnification for damages it has incurred as a result of IndyMac Federal's and the FDIC's failure to comply with their obligations, including interest, attorneys' and accountants' fees and costs and any other fees and expenses that MBIA reasonably has incurred in an amount to be determined at trial.

107.    Because these claims relate to breaches of contractual obligations approved by IndyMac Federal and the FDIC after the imposition of the FDIC receivership of IndyMac Bank on July 11, 2008, such claims are administrative expenses of IndyMac Federal and entitled to priority payment over depositors and general creditor claims pursuant to 12 U.S.C. § 1821.  The FDIC Board of Directors' November 12, 2009 worthlessness determination did not moot MBIA's administrative expense claims related to servicing.

108.    MBIA asserted this claim in its Proof of Claim submission to the FDIC in connection with the FDIC's administrative claims process on June 17, 2009 and August 26, 2009.  The FDIC notified MBIA on December 10, 2009 that the FDIC declined to review MBIA's claims.  Accordingly, this claim is ripe for determination by this Court pursuant to 12 U.S.C. § 1821(d)(6)(A).

**CLAIM II**
**BREACH OF CONTRACT AND ANTICIPATORY BREACH OF CONTRACT – PUT BACK PROCESS**

109.    MBIA repeats, re-alleges and incorporates each and every allegation contained in paragraphs 1 through 108.

110.    The Transaction Documents, including the IndyMac PSAs and the Insurance Agreements were, at all times relevant hereto valid and enforceable agreements.

111.    MBIA has fully complied with its obligations under the Transaction Documents and the financial guarantee insurance policies with respect to the IndyMac Transactions.

112.    On or about July 10, 2008, the FDIC, in its capacity as conservator of IndyMac Federal, approved the Transaction Documents, including the IndyMac PSAs for IndyMac Federal, thereby causing IndyMac Federal to assume all of what were IndyMac Bank's contractual rights and obligations related to the IndyMac Transactions, including the obligation to participate in, and comply with the Put Back Process.

113.    IndyMac Federal and the FDIC in its capacity as conservator and receiver of IndyMac Federal, breached their obligation with respect to the Put Back Process.  First, they breached their obligations to repurchase the non-compliant loans identified by MBIA in Remedy Notices that MBIA had sent to IndyMac Bank on May 23, 2008, and which IndyMac Federal and the FDIC became obligated to comply with on or about July 11, 2008.  Second, they unilaterally repudiated their obligation to participate further in the Put Back Process, thereby anticipatorily breaching their contractual obligations with respect to all of the non-compliant loans included in the IndyMac Transactions that would otherwise have been subject to the Put Back Process.

114.    Section 2.03 of the IndyMac PSAs established the Put Back Process that IndyMac Federal was obligated to follow.  Pursuant to Section 2.03, in the event that MBIA determined that mortgage loans had been contributed to the mortgage loan pools for the IndyMac Transactions that failed to comply with IndyMac Bank's representations and warranties, including its representation that only loans that complied with its underwriting guidelines had been included in the pools, MBIA was entitled to give notice to IndyMac Federal of the presence of a non-compliant mortgage loan, and IndyMac Federal had 90 days to cure the breach.  If IndyMac Federal failed to cure the breach within the 90 day period, IndyMac Federal was obligated, within such 90-day period, to repurchase the non-compliant mortgage loan from the mortgage loan pool or, if substitution could be completed within two years of the respective

closing dates of the IndyMac Transactions, IndyMac Federal could substitute a performing, compliant mortgage loan to the mortgage loan pools.

115.    Further, pursuant to Section 3.03 the Insurance Agreements, IndyMac Federal agreed to indemnify MBIA for (i) damages as a result of IndyMac Bank's failure to comply with the Transaction Documents, including, without limitation, IndyMac Bank's failure to comply with the Put Back Process, with interest, and (ii) for reasonable attorneys' and accountants' fees and expenses and any other fees and expenses that MBIA incurs, in connection with the enforcement, defense or preservation of any rights in respect of any of the Transaction Documents.

116.    On May 23, 2008, MBIA sent notices (the "Remedy Notices") to IndyMac Bank identifying numerous mortgage loans in the mortgage loan pools underlying the IndyMac Transactions that were in breach of one or more of IndyMac Bank's representations and warranties pursuant to Section 2.03 of the PSAs and such breach materially and adversely affected the interests of MBIA.  The mortgage loans identified in the Remedy Notices were among those mortgage loans included in the group of mortgage loans reviewed by MBIA that were limited to mortgage loans that were delinquent as of December 31, 2007.

117.    The mortgage loans identified in the Remedy Notices were included in the Remedy Notices because they failed to comply with one or more of IndyMac Bank's representations and warranties.  For example, many of the mortgage loans were underwritten on the basis of "stated incomes" that were clearly unreasonable for the circumstances of the individual borrower or were based on DTI or CLTV ratios that exceeded the Underwriting Guidelines based on the circumstances of the individual borrower.  In addition, the files for the mortgage loans lacked necessary documents including mortgage notes, disclosures relating to the sale of the mortgage loan, disclosures relating to the transfer of servicing for the mortgage loan,

documents confirming appropriate reserves and documents necessary for compliance with the Patriot Act.

118.    The Remedy Notices did not identify all non-compliant mortgage loans, i.e., loans that were in breach of IndyMac Bank's representations and warranties.  MBIA has also identified a significant number of other mortgage loans included in the mortgage loan pools underlying the IndyMac Transactions that fail to comply with one or more of IndyMac Bank's representations and warranties.

119.    IndyMac Bank failed to comply with the Put Back Process with respect to the mortgage loans identified in the Remedy Notices prior to its insolvency on July 11, 2008.

120.    The 90-day period for IndyMac Bank to cure, repurchase or substitute compliant mortgage loans for non-compliant mortgage loans identified in the Remedy Notices had not run by July 11, 2008.  Consequently, with the FDIC's approval, the obligation to comply with IndyMac Bank's contractual obligations in connection with the Remedy Notices passed from IndyMac Bank to IndyMac Federal as of July 11, 2008.

121.    IndyMac Federal and the FDIC failed to cure the material breaches for the non-compliant mortgage loans identified in the Remedy Notices.

122.    To the contrary, IndyMac Federal and the FDIC communicated to MBIA that IndyMac Federal and the FDIC would not engage in the Put Back Process, thereby repudiating and anticipatorily breaching their contractual obligations with respect to any other non-compliant mortgage loans in the IndyMac Transactions.  Moreover, IndyMac Federal and the FDIC refused to give MBIA access to additional mortgage loan files that would allow MBIA to even identify additional mortgage loans in the IndyMac Transactions that did not comply with the representations and warranties in the IndyMac PSAs.

123.    MBIA has incurred, and will continue to incur, damages as a result of IndyMac Federal's and FDIC's failure to comply with the Put Back Process.  MBIA has been, and will continue to be, required to make payments to investors as a result of shortfalls in cash flow to the trusts in the IndyMac Transactions.

124.    By refusing to provide information regarding the mortgage loans, as well as, peremptorily refusing to cure the defective aspects of the non-compliant mortgage loans or to repurchase or substitute those non-compliant mortgage loans, IndyMac Federal and the FDIC caused MBIA to incur payments for certain shortfalls in cash flows to investors when, in fact, such shortfalls should be properly paid by IndyMac Federal and the FDIC as a result of IndyMac Federal's and the FDIC's repurchase or substitution of non-compliant mortgage loans.

125.    Even if IndyMac Federal and the FDIC ultimately repurchase or substitute the non-compliant mortgage loans, MBIA has incurred and will continue to incur damages as a result of IndyMac Federal's and the FDIC's breaches.

126.    In addition, MBIA has incurred and will continue to incur significant fees for professional services, including attorneys' fees, to engage in, and enforce IndyMac Federal's and the FDIC's obligations with respect to the Put Back Process, for which MBIA is entitled to indemnification from IndyMac Federal and the FDIC under Section 3.03 of the Insurance Agreements.

127.    MBIA is entitled to damages with respect to all mortgage loans in the IndyMac Transactions that fail to comply with the representations and warranties set forth in the IndyMac PSAs, including, without limitation, the mortgage loans identified in the Remedy Notices, as a result of IndyMac Federal's and FDIC's failure to comply with the Put Back Process, in an amount to be determined at trial.

128.     MBIA is further entitled to indemnification for damages it has incurred as a result of IndyMac Federal's failure to comply with IndyMac's obligations under the Put Back Process, including interest, attorneys' and accountants' fees and costs and any other fees and expenses that MBIA has incurred, in an amount to be determined at trial.

129.     Because these claims relate to breaches of contractual obligations approved by IndyMac Federal and the FDIC after the imposition of the FDIC receivership of IndyMac Bank on July 11, 2008, such claims are administrative expenses of IndyMac Federal and entitled to priority payment over depositors and general creditor claims pursuant to 12 U.S.C. § 1821.  The FDIC Board of Director's November 12, 2009 worthless determination did not moot MBIA's administrative expense claims.

130.     MBIA asserted this claim in its Proof of Claim submissions to the FDIC in connection with the FDIC's administrative claims process on June 17, 2009 and August 26, 2009.  The FDIC notified MBIA on December 10, 2009 that the FDIC declined to review MBIA's claims.  Accordingly, this claim is ripe for determination by this Court pursuant to 12 U.S.C. § 1821(d)(6)(A).

## CLAIM III
## BREACH OF CONTRACT – SERVICING – INDS 2007-1

131.     MBIA repeats, re-alleges and incorporates each and every allegation contained in paragraphs 1 through 130.

132.     The Transaction Documents related to INDS 2007-1 including the Radian Pool Policy, were at all times relevant hereto valid and enforceable agreements.

133.     MBIA has fully complied with all of its obligations related to the INDS 2007-1 Transaction.

134.    In connection with the INDS 2007-1 Transaction, a private mortgage insurance company, Radian, issued separate insurance on the mortgage loans, known as the Pool Policy. That policy provided mortgage insurance protection against defaults on specifically covered mortgage loans, thereby protecting MBIA against the trust having insufficient assets to pay principal and interest to investors, which could result in claims under MBIA's Policies.  As of February 14, 2007, the covered mortgage loans constituted approximately 97.5% of the mortgage loans included in the mortgage loan pool for the INDS 2007-1 Transaction.

135.    The Pool Policy, which guaranteed mortgage payments to the INDS 2007-1 trust in the event of default of any covered mortgage loan, is separate from and different than MBIA's Policy, which insures deficiencies in payments of principal and interest to investors.

136.    Pursuant to the Pool Policy, for the covered mortgage loans, Radian undertook to insure losses to the extent that such losses exceed a deductible equal to 10.50% of the aggregate stated principal balance of the covered mortgage loans up to a policy limit of 15.25% of the aggregate stated principal balance of the covered mortgage loans, subject to certain conditions and exclusions.  When evaluating claims, Radian undertook to credit eligible claims under the Pool Policy against the deductible until reaching an amount equal to the deductible.  After that point, Radian undertook to pay claims under the Pool Policy to the trust until the amount of such claims reaches the insurance limit of 15.25% of the aggregate stated principal balance of the Covered Mortgage Loans.

137.    The Pool Policy was issued and delivered for the benefit of MBIA, and MBIA is an express third-party beneficiary of the Pool Policy.

138.    IndyMac Bank represented and warranted for the benefit of MBIA that all covered mortgage loans included under the Pool Policy are, in fact, eligible for coverage under the Pool Policy and that all of IndyMac Bank's representations and warranties in connection with

the Pool Policy were true and correct.  The purpose of these representations and warranties was, among others, to ensure that MBIA would not bear the risk of denial of claims or rescission by Radian under the Pool Policy.

139.    Pursuant to the Pool Policy, the servicer for the INDS 2007-1 Transaction, on behalf of the trust, was required to file a claim with Radian no earlier than the date at which a mortgage loan is four months in default and no later than 30 days after the date at which the mortgage loan is six months in default.  Radian is required to adjust any claims by, among other processes, determining whether the claimed Covered Mortgage Loan conforms to the representations and warranties made by IndyMac Bank in connection with the Pool Policy.

140.    If, through the adjustment process, Radian determines that a valid claim has been submitted for a covered mortgage loan, Radian undertook to pay the Claim Amount, as that term is defined in the Pool Policy, with respect to such mortgage loan to the trust if the deductible has been exhausted or, if the deductible has not been exhausted, Radian undertook to credit the Claim Amount against the deductible.  However, if Radian determines that a claim should not be paid, including, for example, because a covered mortgage loan does not comply with the representations and warranties to Radian, Radian will deny or rescind coverage for that mortgage loan.  In the event Radian denies or rescinds coverage for any mortgage loan, Radian will not pay the Claim Amount to the trust if the deductible has been exhausted or, if the deductible has not been exhausted, Radian will not credit the claim amount for any such mortgage loan toward the deductible, thereby delaying the exhaustion of the deductible under the Pool Policy.

141.    In the event that Radian denies a claim or rescinds coverage for a covered mortgage loan, the servicer, here, IndyMac Federal and the FDIC, was required to make non-reimbursable payments to the trust in the amount of the claim for which coverage has been denied or rescinded by Radian.

142.    Specifically, Section 4.01(d) of the INDS 2007-1 PSA states:

> To the extent that any claim has been denied or rescinded by the Pool Insurer in respect of any Covered Mortgage Loan on account of any breach, action or omission of the Seller or the Servicer, the Servicer shall be required to advance out of its own funds the amount of such claim, together with any accrued interest from the date that interest was last paid or advanced and include such amounts for distribution pursuant to Section 4.01 on the immediately succeeding Distribution Date after it has received notice of such denial, rejection or rescission of coverage.

143.    The servicer's obligation to make the required payments is not conditioned on a determination regarding whether Radian's denial of a claim or rescission of coverage under the Pool Policy is correct.  Further, the servicer, here, IndyMac Federal and the FDIC, was not permitted to delay payments in order to review or challenge the reasons for Radian's denial or rescission of coverage.  The servicer was neither a party to nor a third-party beneficiary of the Pool Policy.  Accordingly, the right to bring any such purported challenges in connection with the INDS 2007-1 Transaction is not provided in either the Pool Policy or any other Transaction Document and thus, any such purported challenge is a private claim between the servicer and Radian that was never intended to affect, delay or prevent payment by either Radian or the servicer in connection with the Pool Policy or the PSA.

144.    IndyMac Federal and the FDIC were responsible for complying with the obligations of the servicer in connection with the INDS 2007-1 transaction after July 11, 2008.

145.    In connection with the Pool Policy for INDS 2007-1, Radian determined that numerous mortgage loans for which claims were submitted by IndyMac Federal after July 11, 2008 failed to comply with the representations and warranties to Radian and denied coverage for these covered mortgage loans.  Accordingly, IndyMac Federal and the FDIC, as the servicer for

the INDS 2007-1 transactions, were required to advance payments for these mortgage loans to the INDS 2007-1 transaction and were not permitted to charge-off these mortgage loans.

146.    Pursuant to the INDS 2007-1 PSA, IndyMac Federal and the FDIC were required to make non-reimbursable advances with respect to mortgage loans for which Radian has denied coverage.   IndyMac Federal, however, failed to make payments for these mortgage loans. Instead, IndyMac Federal improperly charged-off these mortgage loans.   By improperly charging-off these mortgage loans, IndyMac Federal and the FDIC caused notices to be submitted to MBIA under the Policy for INDS 2007-1 that include the shortfall amounts that IndyMac Federal and FDIC were required to pay.

147.    As a result of IndyMac Federal's and the FDIC's failure to comply with their obligations under the INDS 2007-1 PSA with respect to the Pool Policy, MBIA has incurred, and will continue to incur, damages as a result of shortfalls in cash flow to the INDS 2007-1 trust.   In addition, MBIA has incurred and will continue to incur significant fees for professional services, including attorneys' fees, to enforce IndyMac Federal's and the FDIC's obligations under the INDS 2007-1 PSA and the Pool Policy.

148.    IndyMac Federal and the FDIC have not indemnified MBIA, pursuant to Sections 3.03 and 3.04 of the Insurance Agreements, for the damages it has incurred as a result of IndyMac's failure to comply with its obligations under the INDS 2007-1 PSA and the Pool Policy including interest, attorneys' and accountants' fees and costs and any other fees and expenses that MBIA reasonably has incurred.

149.    MBIA is entitled to damages for IndyMac Federal and the FDIC's failure to comply with their obligations under the INDS 2007-1 PSA in connection with the Pool Policy after the imposition of the FDIC receivership on July 11, 2008 in an amount to be determined at trial.   MBIA is further entitled to indemnification for damages it has incurred as a result of

IndyMac Federal's and the FDIC's failure to comply with its obligations, including interest, attorneys' and accountants' fees and costs and any other fees and expenses that MBIA reasonably has incurred in an amount to be determined at trial.

150.    Because these claims relate to breaches of contractual obligations approved by IndyMac Federal and the FDIC after the imposition of the FDIC receivership of IndyMac Bank on July 11, 2008, such claims are administrative expenses of IndyMac Federal and entitled to priority payment over depositors and general creditor claims pursuant to 12 U.S.C. § 1821.

151.    MBIA asserted this claim in its Proof of Claim submission to the FDIC in connection with the FDIC's administrative claims process on June 17, 2009 and August 26, 2009.   The FDIC notified MBIA on December 10, 2009 that the FDIC declined to review MBIA's claims.   Accordingly, this claim is ripe for determination by this Court pursuant to 12 U.S.C. § 1821(d)(6)(A).

## CLAIM IV
## BREACH OF CONTRACT – ACCESS TO DOCUMENTATION

152.    MBIA repeats, re-alleges and incorporates each and every allegation contained in paragraphs 1 through 151.

153.    The Transaction Documents, including the PSAs, were at all times relevant hereto valid and enforceable agreements.

154.    MBIA has fully complied with all of its obligations related to the IndyMac Transactions.

155.    On or about May 21, 2008 and May 28, 2008, MBIA requested that IndyMac Bank provide MBIA with access to additional loan documentation concerning the mortgage loans in the mortgage loan pools underlying INDS 2007-1 and INDS 2007-2, including collateral and credit files for the mortgage loans.   The additional information sought by MBIA comprised

two main categories: (1) mortgage loans that had become delinquent after December 31, 2007 until the date of the request for the INDS 2007-1 and INDS 2007-2 Transactions and (2) selected mortgage loans included in the INDS 2007-1 and INDS 2007-2 Transactions to facilitate MBIA's ability to anticipate its future exposure in light of IndyMac's fundamental, material and consistent underwriting violations.

156.    The IndyMac PSAs require the servicer, to "afford the Depositor, the Trustee, the Certificate Insurer [MBIA] and the Supplemental Interest Trust Trustee reasonable access to all records and documentation regarding the Mortgage Loans and all accounts, insurance information, and other matters relating to this Agreement, such access being afforded without charge, but only upon reasonable request and during normal business hours at the office designated by the Servicer."

157.    In early June 2008, in disregard of its obligations to afford MBIA (the Certificate Insurer as defined in the IndyMac PSAs) access to the records and documentation regarding the mortgage loans included in the mortgage loan pools underlying the IndyMac Transactions, IndyMac Bank stated that it would not provide access to MBIA to review records and documentation with respect to any additional mortgage loans.

158.    Further, despite MBIA's request, IndyMac Bank failed to inform MBIA of, or provide any information or documents with respect to (i) any Final Recovery Determinations prepared by IndyMac in connection with any charged-off mortgage loan for INDS 2007-1 and (ii) any communications between IndyMac and Radian with respect to claims submitted by IndyMac to Radian under the Pool Policy for INDS 2007-1.

159.    MBIA has also sought access to the mortgage loan files for the delinquent mortgage loans in the mortgage loan pool underlying INDS 2006-H4.  In that regard, the Sale and Servicing Agreement states "[IndyMac] shall provide to the Indenture Trustee, the Insurer

[MBIA], Noteholders that are federally insured savings and loan associations, the Office of Thrift Supervision, the FDIC and the supervisory agents and examiners of the Office of Thrift Supervision access to the documentation regarding the Mortgage Loans required by applicable regulations of the Office of Thrift Supervision and the FDIC, such access being afforded without charge but only upon reasonable request and during normal business hours at the offices of the Servicer."

160.    MBIA contacted IndyMac Bank to request access to records and documentation with respect to the mortgage loans underlying INDS 2006-H4.  By e-mail dated February 12, 2008, IndyMac Bank stated, however, that MBIA was only allowed to examine the servicing records, but not the underwriting and origination records and related mortgage loan documents with respect to the mortgage loans in the mortgage loan pools underlying INDS 2006-H4.  By letter dated March 14, 2008, MBIA, through its counsel, requested that IndyMac Bank provide MBIA access to the underwriting and origination records and related mortgage loan documents with respect to the mortgage loans in the mortgage loan pools underlying INDS 2006-H4.  By letter dated March 28, 2008 from IndyMac's former counsel, Heller Ehrman LLP, IndyMac Bank again refused to provide MBIA with access to the requested documentation with respect to INDS 2006-H4.

161.    After IndyMac's insolvency on July 11, 2008, IndyMac Federal and the FDIC also refused MBIA's request for information.  Specifically, on July 18, 2008, MBIA sent a letter to IndyMac Federal, noting that the imposition of the FDIC receivership on IndyMac Bank constituted a "Material Adverse Change," thereby giving MBIA even greater rights to inspect IndyMac's books and records pursuant to Section 2.03(e) of the Insurance Agreements. Accordingly, MBIA demanded "access to any and all records and documentation regarding each Mortgage Loan, including, without limitation, any and all collateral, credit and servicing files

and records (including, without limitation, all servicer data tapes and electronic records or reports, all servicing notes, pay histories, communications with obligors and any and all additional information or data relating to the servicing of the Mortgage Loans)."

162.   MBIA also re-iterated its previous requests to IndyMac Bank and demanded with respect to the INDS 2007-1 transaction that IndyMac Federal provide: (i) any Final Recovery Determination prepared, as required by the PSA, in connection with any Charged-Off Mortgage Loan or in connection with any mortgage loan that was 120 days delinquent as of a certain date in June 2008; (ii) with respect to each Covered Mortgage Loan for which a claim has been or may be submitted to the Pool Insurer, any and all communications between IndyMac Bank or IndyMac Federal and the Pool Insurer concerning such loan; and (iii) an accounting of any advances made by IndyMac Bank or IndyMac Federal out of its own funds with respect to any claims that were denied, rejected or rescinded by the Pool Insurer on account of any breach, action or omission, together with the amount of any accrued interest thereon from the date that interest was last paid or advanced, as required by the INDS 2007-1 PSA.

163.   IndyMac Federal and the FDIC were capable of providing MBIA with the requested documentation.  IndyMac Federal and the FDIC were further capable of providing MBIA access to the documentation with respect to mortgage loans included in INDS 2006-H4. IndyMac Federal and the FDIC, however, ignored MBIA's requests for documents, ignored the July 18 Letter and refused to provide MBIA with any of the documents that it requested and to which it is contractually entitled pursuant to the Insurance Agreements and the IndyMac PSAs.

164.   IndyMac Federal's and the FDIC's refusal to provide MBIA access to documents and records with respect to the mortgage loans was in direct breach of IndyMac's obligations under the IndyMac PSAs.

165.    As a result of IndyMac Federal's and the FDIC's failure to provide information and documentation in breach of their obligations under the IndyMac PSAs, MBIA has suffered damages.   In addition, MBIA has incurred and will continue to incur significant fees for professional services, including attorneys' and accountants' fees, to enforce IndyMac Federal's and the FDIC's obligations under the PSAs.

166.    IndyMac Federal and the FDIC have not indemnified MBIA, pursuant to Sections 3.03 and 3.04 of the Insurance Agreements, for the damages it has incurred as a result of IndyMac's failure to comply with its obligations under the PSAs, including interest, attorneys' and accountants' fees and costs and any other fees and expenses that MBIA has incurred.

167.    MBIA is entitled to damages for IndyMac Federal's and the FDIC's failure to comply with their obligations to provide MBIA with access to documents after the imposition of the FDIC receivership on July 11, 2008 in an amount to be determined at trial.   MBIA is further entitled to indemnification for damages it has incurred as a result of IndyMac's failure to comply with its obligations to provide MBIA with access to documents, including interest, attorneys' and accountants' fees and costs and any other fees and expenses that MBIA reasonably has incurred in an amount to be determined at trial.

168.    Because these claims relate to breaches of contractual obligations approved by IndyMac Federal and the FDIC after the imposition of the FDIC receivership of IndyMac Bank on July 11, 2008, such claims are administrative expenses of IndyMac Federal and entitled to priority payment over depositors and general creditor claims pursuant to 12 U.S.C. § 1821.

169.    MBIA asserted this claim in its Proof of Claim submission to the FDIC in connection with the FDIC's administrative claims process on June 17, 2009 and August 26, 2009.   The FDIC notified MBIA on December 10, 2009 that the FDIC declined to review

MBIA's claims.  Accordingly, this claim is ripe for determination by this Court pursuant to 12 U.S.C. § 1821(d)(6)(A).

**CLAIM V**
**BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING**

170.    MBIA repeats, re-alleges and incorporates each and every allegation contained in paragraphs 1 through 169.

171.    The Transaction Documents, including the Insurance Agreements, and the IndyMac PSAs, were at all times relevant hereto valid and enforceable agreements.

172.    MBIA has fully complied with all of its obligations related to the IndyMac Transactions.

173.    Under the Insurance Agreements and the IndyMac PSAs, IndyMac Federal and the FDIC were required to comply with the covenant or duty of good faith and fair dealing that is implied in all contracts.

174.    By approving the Insurance Agreements with MBIA and the IndyMac PSAs, which incorporated by reference the representations and warranties stated in the PSAs, IndyMac Federal and the FDIC agreed to act in good faith with respect to their use of discretion in connection with the IndyMac Transactions.

175.    IndyMac Federal and the FDIC breached their implied covenant or duty of good faith and fair dealing.  Among other things, IndyMac Federal and the FDIC breached their implied covenant or duty of good faith and fair dealing by undertaking discretionary actions in connection with the servicing of the mortgage loans for the IndyMac Transactions that had the effect of destroying the value of the IndyMac Transactions for MBIA.

176.    IndyMac Federal and the FDIC further breached the implied covenant or duty of good faith and fair dealing by improperly converting servicing proceeds payable to the trusts for the IndyMac Transactions.

177.    IndyMac Federal's and the FDIC's breaches of the implied covenant or duty of good faith and fair dealing deprived MBIA of its right to receive the full benefits of the Insurance Agreements by compelling MBIA to make payments on insurance claims that would not have arisen but for IndyMac Federal's and the FDIC's bad faith conduct.  Moreover, though IndyMac Federal and the FDIC deprived MBIA of the benefits of its contract, IndyMac Federal and the FDIC continued to receive revenues from servicing the mortgage loans for the IndyMac Transactions.

178.    As a result of IndyMac Federal's and the FDIC's material breach of the covenant of good faith and fair dealing implied in the Transaction Documents, MBIA has incurred, and will continue to incur, damages, including, without limitation, losses on mortgage loans, interest and reasonable attorneys' and accountants' fees and expenses.

179.    MBIA is entitled to damages as a result of IndyMac Federal's and the FDIC's failure to comply with the implied covenant or duty of good faith and fair dealing with respect to the IndyMac Transactions.  MBIA is further entitled to indemnification for damages it has incurred as a result of IndyMac's and the FDIC's failure to comply with their implied covenant or duty of good faith and fair dealing with respect to the IndyMac Transactions including interest, attorneys' and accountants' fees and costs and any other fees and expenses that MBIA has incurred.

180.    Because these claims relate to breaches of contractual obligations approved by IndyMac Federal and the FDIC after the imposition of the FDIC receivership of IndyMac Bank

on July 11, 2008, such claims are administrative expenses of IndyMac Federal and entitled to priority payment over depositors and general creditor claims pursuant to 12 U.S.C. § 1821.

181.    MBIA asserted this claim in its Proof of Claim submission to the FDIC in connection with the FDIC's administrative claims process on June 17, 2009 and August 26, 2009.  The FDIC notified MBIA on December 10, 2009 that the FDIC declined to review MBIA's claims.  Accordingly, this claim is ripe for determination by this Court pursuant to 12 U.S.C. § 1821(d)(6)(A).

### CLAIM VI
### (ADMINISTRATIVE PROCEDURES ACT – INJUNCTION)

182.    MBIA repeats, re-alleges and incorporates each and every allegation contained in paragraphs 1 through 181.

183.    The FDIC, as conservator and receiver of IndyMac Federal, and FDIC-Corporate are government agencies within the meaning of 5 U.S.C. § 701 *et seq.*

184.    As set forth above, in connection with the sale of assets of IndyMac Federal to OneWest, the FDIC as conservator and receiver of IndyMac Federal received approximately $1.5 billion as consideration from OneWest.

185.    The FDIC, as conservator and receiver of IndyMac Federal, is required, pursuant to FIRREA (12 U.S.C. § 1821) to determine the claims outstanding against IndyMac Federal and to pay any valid claims pursuant to the FIRREA and applicable law.  In connection with the FDIC's Statutory obligation and fiduciary duties, the FDIC, as conservator and receiver of IndyMac Federal, gave depositors, creditors and claimants of IndyMac Federal notice of an administrative claims process on May 28, 2009.

186.    Pursuant to FIRREA, the FDIC was required to review any claims submitted by the bar date of August 26, 2009 and determine whether to allow or disallow any such claims.

The FDIC was required to pay any valid claims against IndyMac Federal pursuant to the statutory priority scheme established by FIRREA, which sets forth that administrative claims are paid as a priority, followed by depositor claims and general creditor claims. FIRREA and other applicable law do not permit the FDIC to prioritize payments to FDIC-Corporate above payments for administrative expenses. See 12 U.S.C. § 1821.

187.    Notwithstanding the FDIC's clear statutory obligation to review claims asserted against IndyMac Federal and to pay claims pursuant to the statutory priority scheme established by FIRREA, the FDIC determined on December 10, 2009 to discontinue the review of claims asserted against IndyMac Federal, including MBIA's claim for administrative expenses, based on the FDIC Board of Directors' November 12 determination that no assets existed at IndyMac Federal to pay general creditor claims.

188.    The FDIC's December 10, 2009 notice reflects two alternatives – either of which constitutes a breach of the FDIC's statutory requirements in connection with the FDIC's role as conservator and receiver of IndyMac Federal. The first alternative is that IndyMac Federal, under the FDIC's receivership, retained the $1.5 billion paid by OneWest for IndyMac Federal's assets, and has since liquidated other assets, the proceeds from which it is holding in reserve to satisfy administrative expense claims, like MBIA's. If that is the case, then the FDIC's refusal to review MBIA's administrative expense claims constitutes an action by the FDIC outside its statutory authority since the FDIC has refused to even review, much less pay, valid administrative claims that are not the subject of the FDIC Board of Directors' November 12, 2009 determination.

189.    The second alternative, which is more likely, is that the FDIC, as conservator of IndyMac Federal, exceeded the statutory authority afforded to it under FIRREA, and transferred or otherwise dissipated the proceeds form the OneWest sale, and IndyMac Federal's other assets

without regard for MBIA's administrative expense claims.  Because FIRREA establishes that administrative expenses shall be paid as the highest priority in the statutory distribution, the FDIC's payments of claims without payment of MBIA's claims on a *pro rata* basis, exceeds the FDIC's statutory authority.   By accepting those payments, FDIC-Corporate exceeded its authority under FIRREA.

190.    The actions of the FDIC constitute final agency actions pursuant to 5 U.S.C. § 704.

191.    MBIA has suffered a legal wrong, or has otherwise been affected or aggrieved by the FDIC's refusal to properly review and pay MBIA's administrative claims, which are not affected by the FDIC Board of Directors' November 12, 2009 determination.

192.    Because the FDIC's actions exceeded the FDIC's statutory authority, MBIA's requested injunctive relief is not barred by 12 U.S.C. § 1821(j).

193.    Because MBIA's claim relates to the FDIC's violations of its statutory authority in connection with the FDIC's conduct of the administrative claims process, such claim does not constitute a claim against IndyMac Federal that must be asserted in the administrative claim process.  Accordingly, this claims is ripe for determination by this Court.

<u>**CLAIM VII**</u>
<u>**(DECLARATORY JUDGMENT – REPUDIATION OF INDS 2007-1 PSA)**</u>

194.    MBIA repeats, re-alleges and incorporates each and every allegation contained in paragraphs 1 through 193.

195.    On July 11, 2008, the FDIC created a "pass-through receivership" for IndyMac.

196.    In connection with the "pass-through receivership," the FDIC caused IndyMac Bank to transfer "liabilities, if any with respect to Qualified Financial Contracts" and "duties and obligations under any contract to which [IndyMac] provides mortgage servicing for others" to

IndyMac Federal as of July 11, 2008.  The FDIC did not provide any additional information to MBIA regarding the transfer of the contracts for the INDS 2007-1 Transaction in connection with the "pass-through receivership."

197.    Pursuant to the July 2008 P&A Agreement, the FDIC transferred IndyMac Bank's obligations in connection with the INDS 2007-1 Transaction to IndyMac Federal and the FDIC.

198.    On March 19, 2009, over 8 months later, MBIA received notice that the FDIC, as conservator for IndyMac Federal, purported to re-transfer the INDS 2007-1 PSA from IndyMac Federal to IndyMac Bank and that the FDIC, as receiver of IndyMac Bank, purported to repudiate the PSA.

199.    A justiciable controversy exists with respect to whether the FDIC repudiated the INDS 2007-1 PSA within a "reasonable period" pursuant to 12 U.S.C. § 1821(e)(2).

200.    MBIA is entitled under 28 U.S.C. § 2201 to a declaration that the FDIC failed to repudiate the INDS 2007-1 PSA in a "reasonable period."

201.    MBIA asserted this claim in its Proof of Claim submission to the FDIC in connection with the FDIC's administrative claims process on June 17, 2009.  The FDIC notified MBIA on December 10, 2009 that the FDIC declined to review MBIA's claims.  Accordingly, this claim is ripe for determination by this Court pursuant to 12 U.S.C. § 1821(d)(6)(A).

202.    The FDIC's repudiation of the INDS 2007-1 PSA outside the time provided by FIRREA exceeded the FDIC's statutory authority.

### CLAIM VIII
### (STATUTORY DAMAGES UNDER FIRREA – REPUDIATION OF INDS 2007-1 PSA)

203.    MBIA repeats, re-alleges and incorporates each and every allegation contained in paragraphs 1 through 202.

204.    On March 19, 2009, MBIA received notice that the FDIC, as conservator for IndyMac Federal, purported to re-transfer the INDS 2007-1 PSA from IndyMac Federal to IndyMac Bank and that the FDIC, as receiver of IndyMac Bank, purported to repudiate the PSA.

205.    The FDIC's purported repudiation of the PSA constitutes an anticipatory breach of the Insurance Agreement and the other Transaction Documents relating to the INDS 2007-1 Transaction.  The PSA, Insurance Agreement and Transaction Documents relating to the INDS 2007-1 Transaction are Qualified Financial Contracts.

206.    As a result of IndyMac's and the FDIC's purported repudiation of the PSA, MBIA has been damaged.  Specifically, MBIA has incurred damages as a result of IndyMac's and the FDIC's breaches of the PSA between July 11, 2008 and March 19, 2009, the date of the FDIC's purported repudiation of the PSA.  Further, MBIA has incurred damages relating to the process of engaging a party to replace IndyMac as seller and servicer in connection with the INDS 2007-1 Transaction.

207.    MBIA's damages are actual direct compensatory damages that have been directly and proximately caused by the FDIC's purported repudiation of the INDS 2007-1 Transaction.

208.    Pursuant to 12 U.S.C. § 1821(e)(3), MBIA is entitled to damages resulting from the FDIC's purported repudiation of the PSA.

209.    Because these claims relate to breaches of a Qualified Financial Contract purportedly repudiated after such contract was transferred to IndyMac Federal and the FDIC after the imposition of the FDIC receivership of IndyMac Bank on July 11, 2008, such claims are administrative expenses of IndyMac Federal and entitled to priority payment over depositors and general creditor claims pursuant to 12 U.S.C. § 1821.

210.    MBIA asserted this claim in its Proof of Claim submission to the FDIC in connection with the FDIC's administrative claims process on June 17, 2009.  The FDIC notified

MBIA on December 10, 2009 that the FDIC declined to review MBIA's claims. Accordingly, this claim is ripe for determination by this Court pursuant to 12 U.S.C. § 1821(d)(6)(A).

<strong><u>RELIEF DEMANDED</u></strong>

WHEREFORE, plaintiff MBIA Insurance Corporation demands judgment against the Federal Deposit Insurance Corporation as follows:

1.      With respect to Claim I, a judgment against IndyMac Federal and the FDIC, awarding damages for losses and liabilities incurred by MBIA, and that MBIA incurs, with respect to IndyMac Federal's and the FDIC's breaches of their contractual obligations, including, without limitation, interest, attorneys' and accountants' fees and costs and any other fees and expenses that MBIA reasonably has incurred in an amount to be determined at trial; and

2.      With respect to Claim II, a judgment against IndyMac Federal and the FDIC, awarding damages for losses and liabilities incurred by MBIA, and that MBIA incurs, with respect to IndyMac Federal's and the FDIC's breaches of their contractual obligations, including, without limitation, interest, attorneys' and accountants' fees and costs and any other fees and expenses that MBIA reasonably has incurred in an amount to be determined at trial; and

3.      With respect to Claim III, a judgment against IndyMac Federal and the FDIC, awarding damages for losses and liabilities incurred by MBIA, and that MBIA incurs, with respect to IndyMac Federal's and the FDIC's breaches of their contractual obligations, including, without limitation, interest, attorneys' and accountants' fees and costs and any other fees and expenses that MBIA reasonably has incurred in an amount to be determined at trial; and

4.      With respect to Claim IV, a judgment against IndyMac Federal and the FDIC, awarding damages for losses and liabilities incurred by MBIA, and that MBIA incurs, with respect to IndyMac Federal's and the FDIC's breaches of their contractual obligations, including,

without limitation, interest, attorneys' and accountants' fees and costs and any other fees and expenses that MBIA reasonably has incurred in an amount to be determined at trial; and

5.    With respect to Claim V, a judgment against IndyMac Federal and the FDIC, awarding damages for losses and liabilities incurred by MBIA, and that MBIA incurs, with respect to IndyMac Federal's and the FDIC's breaches of their implied duty of good faith and fair dealing, including, without limitation, interest, attorneys' and accountants' fees and costs and any other fees and expenses that MBIA reasonably has incurred in an amount to be determined at trial; and

6.    With respect to Claim VI, (a) an order declaring (i) that the FDIC's refusal to review claims against IndyMac Federal was unlawful pursuant to 5 U.S.C. § 706(2) and (ii) that any distribution of assets received from OneWest in connection with the sale of IndyMac Federal's assets was unlawful pursuant to 5 U.S.C. § 706(2), (b) an injunction requiring FDIC-Corporate to return any assets received from the FDIC as conservator or receiver of IndyMac Federal and (c) an injunction requiring the FDIC, as conservator and receiver of IndyMac Federal, to properly determine claims in compliance with FIRREA, including the claims asserted by MBIA.

7.    With respect to Claim VII, an order declaring that IndyMac Federal and the FDIC failed to repudiate IndyMac Federal's and the FDIC's contractual obligations in connection with the INDS 2007-1 Transaction within a "reasonable period" as required by FIRREA; and

8.    With respect to Claim VIII, a judgment against IndyMac Federal and the FDIC, awarding damages for losses and liabilities incurred by MBIA, and that MBIA incurs, with respect to IndyMac Federal's and the FDIC's purported repudiation of IndyMac Federal's and the FDIC's contractual obligations in connection with the INDS 2007-1 Transaction; and

9.    For such other and further relief as the Court may deem just and proper.

Dated:      February 8, 2010

CADWALADER, WICKERSHAM & TAFT LLP


By:  /s/ Geoffrey E. Gettinger
Geoffrey E. Gettinger
Bar No. 477533
David F. Williams
Bar No. 298380
700 Sixth Street, N.W.
Washington, DC 20001
Tel: (202) 862-2200
Fax: (202) 862-2400
geoffrey.gettinger@cwt.com
david.williams@cwt.com

Gregory M. Petrick*
Howard R. Hawkins, Jr.*
Jason Jurgens*
Mitchell E. Hochberg*
One World Financial Center
New York, New York 10281
Tel: (212) 504-6000
Fax: (212) 504-6666
gregory.petrick@cwt.com
howard.hawkins@cwt.com
jason.jurgens@cwt.com
mitchell.hochberg@cwt.com
*  Admitted *Pro Hac Vice*

*Attorneys for Plaintiff*
*MBIA Insurance Corporation*