## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

<table>
<tr><td>

MBIA INSURANCE CORPORATION,

    Plaintiff,

  v.

FEDERAL DEPOSIT INSURANCE
CORPORATION
(in its corporate capacity and as
conservator and receiver for
INDYMAC FEDERAL BANK, F.S.B.),

    Defendants.

</td><td>

)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)

</td><td>

Civil Action No. 09-01011 (ABJ)

</td></tr>
</table>

## <u>MEMORANDUM OPINION</u>

Plaintiff MBIA Insurance Corporation ("MBIA") has filed an amended complaint against the Federal Deposit Insurance Corporation ("FDIC") asserting claims arising from the failure of IndyMac Bank, F.S.B. ("IndyMac Bank" or "IndyMac") and its subsequent resolution by the FDIC. Defendant FDIC, in its capacity as receiver for IndyMac Federal Bank, F.S.B. ("FDIC Receiver"),[1] has moved to dismiss the amended complaint filed by MBIA [Dkt. #26]. In addition, defendant FDIC, in its corporate capacity ("FDIC Corporate"), has separately moved to dismiss the count against it in the amended complaint [Dkt. #25].

---

1  The first amended complaint names FDIC in its corporate capacity ("FDIC Corporate") as well as in its capacity as conservator ("FDIC Conservator") and receiver ("FDIC Receiver") of IndyMac Federal Bank, F.S.B. FDIC argues that any claims against IndyMac Federal or FDIC Conservator must be asserted against FDIC Receiver, but to the extent a separate response by FDIC Conservator is required, it requests that the Court deem FDIC Receiver's motion to dismiss to be filed on behalf of FDIC Conservator as well. *See* FDIC Receiver Mot. to Dismiss First Am. Compl. ("Rec. Mot. to Dismiss") at 1 n.1. Because the Court will dismiss all claims, it need not decide whether a separate response by FDIC Conservator is necessary and will deem FDIC Receiver's motion to dismiss to be filed on behalf of both FDIC Receiver and FDIC Conservator.

MBIA is one of the parties that played a critical role in IndyMac's securitization and sale of mortgage loans, and that incurred significant losses for which it has not been reimbursed by the now insolvent bank. In other words, MBIA is one of the bank's many unhappy creditors. It provided insurance policies protecting the investors in several transactions in which IndyMac securitized mortgage loans in 2006 and 2007. MBIA seeks to be indemnified for the losses it incurred when borrowers defaulted and the investors whose securities dropped in value made claims under the insurance policies. But the receivership has no assets to pay the bank's general creditors.

In this action, MBIA attempts to cast its claims as administrative expenses of the receivership and thereby gain priority over other creditors pursuant to the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), Pub. L. No. 101-73, 103 Stat. 183 (codified as amended in scattered sections of 12 U.S.C.). But the law does not support MBIA's approach, and the receivership otherwise lacks the means to satisfy MBIA's breach of contract claims. Therefore, and for the reasons set forth in more detail below, the Court will grant the motions to dismiss.

## BACKGROUND

IndyMac was in the business of offering loans to home owners and home buyers as well as acquiring mortgages that had been originated by other entities. Am. Compl. ¶ 23. IndyMac's practice was to sell those mortgage loans through securitization transactions. *Id*. ¶ 31.

Between December 2006 and March 2007, IndyMac was involved in the three particular securitization transactions at issue in this case (the "Transactions").[2]     *Id*. ¶¶ 32–35. In

---

2       The Transactions at issue are (1) the IndyMac Home Equity Mortgage Loan Asset-Backed Trust, Series INDS 2006-H4 (the "2006-H4 Transaction"), issued as of December 21, 2006; (2) the IndyMac Home Equity Mortgage Loan Asset-Backed Trust, Series INDS 2007-1

connection with each of the Transactions, MBIA and IndyMac entered into Insurance and Indemnity Agreements pursuant to which MBIA issued insurance policies (the "Policies") for the Transactions. *Id.* ¶ 36. The agreements are (1) an Insurance and Indemnity Agreement dated December 21, 2006 (the "2006-H4 Insurance Agreement"), (2) an Insurance and Indemnity Agreement dated February 14, 2007 (the "2007-1 Insurance Agreement"), and (3) an Insurance and Indemnity Agreement dated March 22, 2007 (the "2007-2 Insurance Agreement") (collectively, the "Insurance Agreements"). *Id.* Each Insurance Agreement incorporated by reference the representations and warranties made by the bank in the other "Transaction Documents." *Id.* ¶ 40. For the 2006-H4 Transaction, the Transaction Documents included a Master Loan Purchase Agreement ("Purchase Agreement") and a Sale and Servicing Agreement; for the 2007-1 and 2007-2 Transactions, the Transaction Documents included, among other documents, Pooling and Servicing Agreements (the Purchase Agreement, the Sale and Servicing Agreement, and the Pooling and Servicing Agreements are collectively referred to by plaintiff – and hereinafter by the Court – as the "PSAs"). *Id.* The PSAs set out IndyMac's obligations in its roles as seller and servicer of the loans.

The Policies issued by MBIA guaranteed that investors in the Transactions would receive the cash flows IndyMac had promised them even if significant defaults and other losses occurred on the mortgage loans underlying the Transactions. *Id.* ¶¶ 3, 38. IndyMac and MBIA each agreed to certain affirmative covenants in the Insurance Agreements, and IndyMac agreed to service the mortgage loans in compliance with the PSAs by collecting mortgage payments, determining whether a mortgage loan was in default, maximizing borrowers' compliance with

---

(the "2007-1 Transaction"), issued as of February 14, 2007; and (3) the IndyMac Home Equity Mortgage Loan Asset-Backed Trust, Series INDS 2007-2 (the "2007-2 Transaction"), issued as of March 22, 2007. Am. Compl. ¶¶ 3, 33–35.

their obligations on the loans, and remitting proceeds from the mortgage loans to the trusts for the IndyMac Transactions. *Id.* ¶¶ 54–56; *see also* Pl.'s Opp. to Mot. to Dismiss [Dkt. #11], Ex. 1 ("2006-H4 Insurance and Indemnity Agreement"), § 2.04.[3] As part of the Insurance Agreements, IndyMac also made representations and warranties to MBIA with respect to the quality of the mortgage loans. Am. Compl. ¶¶ 39–41; *see also* 2006-H4 Insurance and Indemnity Agreement § 2.01.

MBIA's claims are based on the Transaction Documents that embodied the three securitization Transactions, and an understanding of the chronology of the FDIC's involvement with IndyMac is critical to the resolution of those claims.

- July 11, 2008: The Office of Thrift Supervision ("OTS") determined that IndyMac was unlikely to pay its obligations or meet its depositors' demands, and that it was in an unsafe and unsound condition. Am. Compl. ¶ 46; *see also* Rec. Mot. to Dismiss Ex. 1, (OTS Order No. 2008-24, July 11, 2008). Therefore, it appointed the FDIC as receiver of IndyMac Bank ("Original FDIC Receiver"). The function of the Original FDIC Receiver was to transfer the IndyMac assets to a newly chartered bank as part of a "pass-through receivership." *See* Am. Compl. Ex. C. In a pass-through receivership, "all deposits, substantially all assets, and certain nondeposit liabilities of the original institution instantly 'pass[] through the receiver' to a newly chartered federal mutual association, subsequently known as the conservatorship." [4]

- July 11, 2008: On the same day, the OTS appointed the FDIC as conservator ("FDIC Conservator") of a newly chartered bank, IndyMac Federal Bank, F.S.B. ("IndyMac Federal").

- July 11, 2008: To effectuate the pass-through receivership, the FDIC executed an Amended and Restated Insured Deposit Purchase and Assumption Agreement ("P&A Agreement") and transferred certain of IndyMac's assets and liabilities to IndyMac Federal. Am. Compl. ¶¶ 48–49; *see also* Am. Compl. Ex. D (the P&A Agreement). The

---

3    Plaintiff attached the Insurance Agreements to its opposition to defendants' motion to dismiss the original complaint [#11], but did not attach those documents to any pleadings after it filed the amended complaint. But since the amended complaint repeatedly references the Insurance Agreements, the Court may refer to them in deciding defendants' motion to dismiss. *See Gustave-Schmidt v. Chao*, 226 F. Supp. 2d 191, 196 (D.D.C. 2002).

4    *Managing the Crisis: The FDIC and RTC Experience 1980-1994*, FDIC, 117 (Aug. 1998), http://www.fdic.gov/bank/historical/managing/history1-04.pdf.

liabilities assumed by IndyMac Federal included (1) "liabilities, if any with respect to Qualified Financial Contracts," ("QFCs")[5] and (2) "duties and obligations under any contract to which [IndyMac] provides mortgage servicing for others . . . ." Am. Compl. ¶ 4; P&A Agreement § 2.1(j)–(k). The P&A Agreement also contained a "put" provision that allowed IndyMac Federal to require the Original FDIC Receiver to repurchase certain assets or reassume certain liabilities. *Id.* § 3.6.

- October 14, 2008: MBIA submitted a proof of claim to the Original FDIC Receiver alleging that IndyMac breached contractual representations and warranties it made in connection with the Transactions prior to its closure on July 11, 2008. The claim contended that "the portfolios of mortgage loans that IndyMac included in the IndyMac transactions were of a fundamentally different quality and character than IndyMac represented to MBIA," and that there were "fundamental, material and consistent violations of IndyMac's purported underwriting guidelines . . . ." Compl. Ex. A [Dkt. #1-1] at 3–4; *see also* Compl. ¶¶ 64, 86, 96, 108, 119, 128, 139, 149.

- March 19, 2009: IndyMac Federal exercised its option under the "put" provision and required the Original FDIC Receiver to reacquire IndyMac's mortgage servicing rights and obligations under the PSA for the 2007-1 Transaction. Rec. Mot. to Dismiss Ex. 10, at 2–4 & Attach. A.

- March 19, 2009: The Original FDIC Receiver then exercised its rights under 12 U.S.C. § 1821(e)(1) to repudiate the PSA for the 2007-1 Transaction. Am. Compl. ¶ 72, Ex. E.

- March 19, 2009: Contemporaneously, FDIC Conservator sold substantially all of the assets of IndyMac Federal to another financial institution, OneWest. Am. Compl. ¶¶ 69–70. Under the P&A Agreement, any amount realized from the final resolution of IndyMac Federal was to be used first to pay in full all of IndyMac Federal's obligations, and the remaining proceeds from the sale, if any, were to be paid to the IndyMac receivership (*i.e.*, Original FDIC Receiver). *See* P&A Agreement § 7.2.

- March 19, 2009: On the date of the OneWest sale, FDIC Conservator was replaced by FDIC Receiver (as receiver for IndyMac Federal). Rec. Mot. to Dismiss Ex. 2.[6]

---

5    "The term 'qualified financial contract' means any securities contract, commodity contract, forward contract, repurchase agreement, swap agreement, and any similar agreement that the Corporation determines by regulation, resolution, or order to be a qualified financial contract for purposes of this paragraph." 12 U.S.C. § 1821(e)(8)(D)(i). The statute then defines each of these types of agreements. *See id.* 1821(e)(8)(D).

6    These steps are consistent with those of a typical pass-through receivership, where "[a]t the time the conservatorship [is] resolved, either through a sale or deposit payoff, the institution again [is] placed into a receivership (the second receivership)." FDIC, *supra* note 4, at 118; *see also Nasoordeen v. FDIC*, No. CV 08-05631 MMM (AJWx), 2010 WL 1135888, at *8 n.8 (C.D. Cal. Mar. 17, 2010) (same).

- April 1, 2009: FDIC notified MBIA that its first proof of claim, filed October 14, 2008, was disallowed.

- May 29, 2009: MBIA filed its first complaint in this action against IndyMac and Original FDIC Receiver. MBIA's original complaint, like its original proof of claim, related to "IndyMac's breach of the contractual representations and warranties made to MBIA, as well as IndyMac's negligent misrepresentations and fraud," in connection with the three Transactions. Compl. ¶ 2. The complaint sought damages for losses arising out of IndyMac's loan practices and alleged wrongful conduct prior to the takeover by the FDIC on July 11, 2008. *See, e.g.*, Compl. ¶¶ 63, 85, 95, 107, 118.

- June 16, 2009: MBIA submitted a proof of claim to FDIC as receiver of IndyMac and IndyMac Federal (*i.e.*, to Original FDIC Receiver and FDIC Receiver) related to the repudiated 2007-1 Transaction. Am. Compl. Ex. A.

- August 25, 2009: MBIA submitted a proof of claim to FDIC Receiver alleging that IndyMac Federal breached its contractual obligations in connection with all three Transactions.[7] Am. Compl. Ex. B.

- November 12, 2009: The FDIC Board of Directors determined that the "amount realized from the resolution of IndyMac Federal is insufficient to pay all of its liabilities, and therefore there will be no amount to pay to the IndyMac Bank receivership" (the "No Value Determination"). Am. Compl. ¶ 77. The Board of Directors also determined that "the assets of IndyMac Federal are insufficient to make any distribution on general unsecured claims and therefore, such claims, asserted or unasserted, will recover nothing and have no value." *Id.*

- December 10, 2009: FDIC, as receiver for IndyMac and IndyMac Federal, ceased reviewing MBIA's two outstanding proofs of claims on the basis of the No Value Determination. FDIC Receiver notified MBIA that the "payment of depositor claims is preferred over all other creditor claims including the non-depositor claims that [MBIA] filed. The Board of Directors of the FDIC has determined that the assets of both IndyMac Bank and IndyMac Federal . . . are insufficient to pay claims below the depositor class and that all non-depositor creditor claims have no value." Am. Compl. ¶ 79, Ex. C (Notice to MBIA, Dec. 10, 2009).

- February 8, 2010: MBIA amended its complaint to assert eight claims against FDIC Receiver, FDIC Conservator, and FDIC Corporate seeking damages as well as injunctive

---

7    In total, MBIA submitted three separate administrative proofs of claims to the FDIC, two of which it submitted to the FDIC in its capacity as conservator and receiver of IndyMac Federal related to breaches of contract. Those claims, from June 16 and August 25, 2009, form the basis of its amended complaint. Am. Compl. ¶ 12. MBIA is not pursuing the other proof of claim, submitted to the Original FDIC Receiver on October 14, 2008, as part of its amended complaint. *Id.*

and declaratory relief.  The amended complaint challenges the denial of the two proofs of claims that MBIA filed on June 17, 2009, and August 26, 2009, Am. Compl. ¶ 12, and it purports to seek damages arising out of alleged post-receivership contractual breaches by IndyMac Federal and the FDIC rather than the IndyMac pre-receivership conduct outlined in the original complaint.[8]

## THE AMENDED COMPLAINT

Counts I–V of the amended complaint allege that MBIA incurred losses when IndyMac

Federal, and FDIC in its capacity as conservator of IndyMac Federal, failed to perform servicing

and other duties that IndyMac had been obliged to perform under the terms of the Transaction

Documents.  Am. Compl. ¶¶ 89–181.  Specifically:

- Count I alleges that after July 11, 2008, IndyMac Federal and FDIC Conservator failed to properly service the loans underlying the Transactions, and that their failure led to

---

[8]      As FDIC Receiver suggests, there are reasons to be skeptical on this point.  For one thing, the amended complaint expressly asks for damages based on IndyMac Bank's loan practices and misrepresentations.  Paragraph 127 states: "MBIA is entitled to damages with respect to all mortgage loans in the IndyMac Transactions that fail to comply with the representations and warranties set forth in the IndyMac PSAs . . . ."  Am. Compl. ¶ 127.

The complaint also includes a number of allegations concerning the bank's pre-receivership conduct.  *See e.g.*, *id.* ¶ 45 ("MBIA's review of a selection of delinquent loans for INDS 2007-1 and INDS 2007-2 has revealed startling and previously unknown facts about the quality of the mortgage loans contributed to the IndyMac transactions . . . .  Of 418 delinquent or liquidated loans for INDS 2007-1 that were reviewed by MBIA, only 17 loans – less than 5% of the loans reviewed – were originated or acquired in material compliance with the representations and warranties with respect to IndyMac's underwriting guidelines and policies.  Even worse, of 297 loans for INDS 2007-2 that were reviewed by MBIA, only 3 loans – less  than 1% of the loans reviewed – were originated or acquired in material compliance with IndyMac Bank's representations and warranties with respect to its underwriting guidelines and policies."); *id.* ¶ 116 ("On May 23, 2008, MBIA sent notices (the 'Remedy Notices') to IndyMac Bank identifying numerous mortgage loans in the mortgage loan pools underlying the IndyMac Transactions that were in breach of one or more of IndyMac Bank's representations and warranties . . . ."); *id.* ¶ 117 ("For example, many of the mortgage loans were underwritten on the basis of 'stated incomes' that were clearly unreasonable for the circumstances of the individual borrower . . . .  In addition, the files for the mortgage loans lacked necessary documents . . . ."); *id.* ¶118 ("The Remedy Notices did not identify all non-compliant mortgage loans . . . .  MBIA has also identified a significant number of other mortgage loans included in the mortgage loan pools underlying the IndyMac Transactions that fail to comply with one or more of IndyMac Bank's representations and warranties.").  Thus a fair reading of the amended complaint reveals that even the revised version of the cause of action points the finger at IndyMac's non-complaint loans as the source of MBIA's losses.

insurance claims that defendants have failed to indemnify. *See* Am. Compl. ¶¶ 96, 102, 104, 106.

- Count II alleges that, under the terms of the Transaction Documents, IndyMac was obliged to repurchase loans put back to it by MBIA, that MBIA exercised its right to do so *while the bank was still a going concern*, and that those requests were still pending after the conservatorship began in July 2008. MBIA alleges that IndyMac Federal and the FDIC Conservator refused to repurchase the loans properly put back prior to the insolvency, and that they also refused to participate in the put-back process going forward. *See* Am. Compl. ¶ 113. But while Count II is entitled "Breach of contract and anticipatory breach of contract – put back process," the claim is more expansive. As part of its requested relief in Count II, MBIA seeks "damages with respect to all mortgage loans in the IndyMac Transactions that fail to comply with the representations and warranties set forth in the IndyMac PSAs." *Id.* ¶ 127. In other words, in Count II, MBIA explicitly seeks damages arising out of all of IndyMac's pre-receivership misrepresentations.[9]

- Count III alleges a breach of the servicing obligations for certain of the loans underlying the 2007-1 Transaction, which were covered by a "pool" insurance policy of which MBIA is a third-party beneficiary. *See* Am. Compl. ¶¶ 137, 144–49. MBIA seeks damages for the alleged failure of IndyMac Federal and the FDIC to comply with those obligations after the imposition of the conservatorship on July 11, 2008. *Id.* ¶ 149.

- Count IV, like Count II, arises out of requests made by MBIA to IndyMac under the Transaction Documents prior to the imposition of the conservatorship. Am. Compl. ¶ 155. It alleges that those pending requests for access to records were not fulfilled after the conservatorship was instituted, and that IndyMac Federal and FDIC Conservator refused to comply with such requests going forward. *Id.* ¶¶ 161–64.

---

9       In its original complaint, MBIA alleged that it was damaged by IndyMac's failure to comply with the put-back provisions, the loan breach remedy established in the Transaction Documents. In its amended complaint, MBIA claims that since IndyMac Bank had 90 days to respond to the put-back notice, and that period expired after FDIC Conservator had succeeded to the bank's obligations, the failure to repurchase bad loans was a contractual breach by the FDIC, and not the bank. *See* Am. Compl. ¶ 113. FDIC Receiver maintains that even if the conservator assumed the PSAs, any breach of the Transaction Documents occurred while IndyMac was still a going concern. It points out that the put-back procedure – the obligation to repurchase non-compliant loans – is simply a *remedy* for the bank's pre-receivership breaches for loans that were not issued in accordance with the representations and warranties. It argues that FDIC Conservator's refusal to participate in the procedure that had been created for the remediation of IndyMac's breaches does not give rise to a separate breach of contract claim against the FDIC; rather, any breach of contract was committed by IndyMac. While FDIC Receiver's argument has merit – even MBIA has repeatedly referred to the put-back process as a "remedy," *see, e.g.*, Am. Compl. ¶¶ 6, 8, 58 – the Court need not resolve the issue because it finds that MBIA is not entitled to administrative priority for any of its claims, even if they arose during the period of the conservatorship.

- Count V alleges a breach of the duty of good faith and fair dealing implied in IndyMac's Transaction Documents. Am. Compl. ¶¶ 173–76.

MBIA does not allege that IndyMac Federal was bound by the Transaction Documents simply by virtue of its status as IndyMac's successor. A breach of contract under those circumstances would give rise only to an ordinary claim for damages. Rather, for the breach of contract claims in Counts I through V, MBIA specifically asserts that the FDIC "approved" the agreements in question after its appointment as conservator or receiver under 12 U.S.C. § 1821(d)(20). Thus, according to plaintiff:

> Because these claims relate to breaches of contractual obligations approved by IndyMac Federal and the FDIC after the imposition of the FDIC Receivership of IndyMac Bank on July 11, 2008, such claims are administrative expenses of IndyMac Federal and entitled to priority payment over depositors and general creditor claims pursuant to 12 U.S.C. § 1821.

Am. Compl. ¶¶ 107, 129, 150, 168, 180. MBIA's first five damage claims are predicated solely on this theory.

Count VIII, the other damages claim, is somewhat different. It purports to seek the "actual, direct, compensatory damages" available under 12 U.S.C. §1821(e)(3) for FDIC Receiver's March 19, 2009 repudiation of the INDS 2007-1 PSA. MBIA alleges that as a result of the repudiation, it suffered damages flowing from IndyMac Federal's and the FDIC's breaches of the PSA that should be calculated as of the date of the appointment of the receiver on July 11, 2008.

The complaint also contains equitable claims. In Count VI, MBIA seeks injunctive relief against FDIC Corporate, FDIC Receiver, and FDIC Conservator under the Administrative Procedure Act ("APA"), 5 U.S.C. § 551, *et seq.* It asks the Court to order the FDIC to reverse its denial of MBIA's claims for the reasons set forth in the damages claims: that its losses are an

administrative expense of the receivership. The count also seeks a declaration that the distribution of assets received from OneWest in connection with the sale of IndyMac Federal was unlawful and an order directing FDIC Corporate to return any assets it received so that MBIA can be paid. Am. Compl. at 55. Count VII challenges FDIC Receiver's repudiation of the PSA for the INDS 2007-1 Transaction on the grounds that it did not occur within a "reasonable period." Am. Compl. ¶¶ 194–202.

In sum, MBIA's claims boil down to a single theory: that FDIC, as conservator for IndyMac Federal, specifically assumed the PSAs for the Transactions when it executed the P&A Agreement assuming assets and liabilities of the failed bank; that the alleged assumption of those contracts under the P&A Agreement on behalf of IndyMac Federal constituted the conservator's "execution or approval" of the PSAs for purposes of 12 U.S.C. § 1821(d)(20); and that, therefore, damages flowing from the conservator's alleged breaches of the PSAs – in particular the failure to participate in the loan breach remedy or "put-back process" – are administrative expenses of the receivership entitled to priority payment under section 1821(d)(11).

FDIC Receiver contends that the complaint is a transparent effort by the insurer to repackage its unrecoverable claims against IndyMac Bank – for losses incurred due to the bank's allegedly risky and reckless pre-receivership loan practices – into claims against the receiver itself. FDIC Receiver insists that MBIA's effort to re-characterize its claims must fail because even if IndyMac Federal and FDIC Conservator assumed the bank's obligations under the PSAs (which is by no means clear), that assumption did not constitute "approval" of the contracts by the FDIC under section 1821(d)(20) of the statute, and MBIA is therefore not entitled to priority over other creditors.

FDIC Receiver moved to dismiss MBIA's claims for monetary damages (Counts I–V and VIII) under Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction, and it moved to dismiss MBIA's claims for injunctive and declaratory relief (Counts VI–VII) under Rule 12(b)(6) for failure to state a claim. FDIC Corporate separately moved to dismiss MBIA's sole claim against it (Count VI) under Rule 12(b)(6) for failure to state a claim.

## STANDARD OF REVIEW

In evaluating a motion to dismiss under either Rule 12(b)(1) or 12(b)(6), the Court must "treat the complaint's factual allegations as true . . . and must grant plaintiff 'the benefit of all inferences that can be derived from the facts alleged.'" *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000), quoting *Schuler v. United States*, 617 F.2d 605, 608 (D.C. Cir. 1979) (internal citations omitted). Nevertheless, the Court need not accept inferences drawn by the plaintiff if those inferences are unsupported by facts alleged in the complaint, nor must the Court accept plaintiff's legal conclusions. *Browning v. Clinton,* 292 F.3d 235, 242 (D.C. Cir. 2002).

Under Rule 12(b)(1), plaintiff bears the burden of establishing jurisdiction by a preponderance of the evidence. *See Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561 (1992); *Shekoyan v. Sibly Int'l Corp.*, 217 F. Supp. 2d 59, 63 (D.D.C. 2002). Federal courts are courts of limited jurisdiction and the law presumes that "a cause lies outside this limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375 (1995); *see also Gen. Motors Corp. v. Envtl. Prot. Agency*, 363 F.3d 442, 448 (D.C. Cir. 2004) ("As a court of limited jurisdiction, we begin, and end, with an examination of our jurisdiction."). Because "subject-matter jurisdiction is an 'Art. III as well as a statutory requirement, [. . .] no action of the parties can confer subject-matter jurisdiction upon a federal court.'" *Akinseye v. District of Columbia*, 339 F.3d 970, 971

(D.C. Cir. 2003), quoting *Ins. Corp. of Ir., Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982).

When considering a jurisdictional challenge, unlike when deciding a motion to dismiss under Rule 12(b)(6), the court "is not limited to the allegations of the complaint . . . ." *Hohri v. United States*, 782 F.2d 227, 241 (D.C. Cir. 1986), *vacated on other grounds*, 482 U.S. 64 (1987). Rather, a court "may consider such materials outside the pleadings as it deems appropriate to resolve the question whether it has jurisdiction to hear the case." *Scolaro v. D.C. Bd. of Elections & Ethics*, 104 F. Supp. 2d 18, 22 (D.D.C. 2000); *see also Jerome Stevens Pharms., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005).

Meanwhile, "[t]o survive a [Rule 12(b)(6)] motion to dismiss a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, --- U.S. ---, 129 S. Ct. 1937, 1949 (2009) (internal quotation marks omitted); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible when the pleaded factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct." *Iqbal*, 129 S. Ct. at 1949. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* A pleading must offer more than "labels and conclusions" or a "formulaic recitation of the elements of a cause of action." *Id.*, quoting *Twombly*, 550 U.S. at 555. In ruling upon a motion to dismiss under Rule 12(b)(6), a court may ordinarily consider only "the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint, and matters about which the Court may take judicial notice." *Gustave-Schmidt v. Chao*, 226 F. Supp. 2d 191, 196 (D.D.C. 2002). Here, the amended complaint specifically references the Insurance Agreements, the PSAs, and the P&A Agreement,

which is also attached to the amended complaint as Exhibit D.  *See, e.g.*, Am. Compl. ¶¶ 36–38,

40–41, 48–50, Ex. D.

## ANALYSIS

### I.  MBIA's Damages Claims Must be Dismissed

Congress enacted FIRREA in 1989 in response to the crisis in the nation's banking and

savings and loan industries.  *See Sharpe v. FDIC*, 126 F.3d 1147, 1154 (9th Cir. 1997).  It allows

the FDIC "to act as receiver or conservator of a failed institution for the protection of depositors

and creditors," and it establishes a scheme for dealing with claims against the failed institution.

*Id.* (internal quotations and citations omitted).  Protection of depositors was the foremost goal to

be accomplished by the legislation.  *See Wells Fargo Bank, N.A. v. FDIC*, 367 F.3d 953, 954

(D.C. Cir. 2004) (noting how FIRREA was "designed to protect depositors").

The statute sets forth the priority in which claims are paid: "administrative expenses of

the receiver" must be fully satisfied before outstanding deposit liabilities, which must be satisfied

before general liabilities.  12 U.S.C. § 1821(d)(11)(A).[10]  MBIA has grounded its complaint on

---

10      12 U.S.C. § 1821(d)(11)(A) sets out the "order of authority" for payment of claims:

Subject to section 1815(e)(2)(C) of this title, amounts realized from the
liquidation or other resolution of any insured depository institution by any
receiver appointed for such institution shall be distributed to pay claims (other
than secured claims to the extent of any such security) in the following order of
priority:

(i) Administrative expenses of the receiver.

(ii) Any deposit liability of the institution.

(iii) Any other general or senior liability of the institution (which is not a liability
described in clause (iv) or (v)).

(iv) Any obligation subordinated to depositors or general creditors (which is not
an obligation described in clause (v)).

its contention that its "claims are administrative expenses of FDIC Conservator that, in accordance with 12 U.S.C. § 1821, must be treated as administrative expenses of FDIC Receiver and paid on a priority basis ahead of general unsecured creditor claims." Pl.'s Opp. to FDIC Receiver Mot. to Dismiss ("Pl.'s Opp. to Rec.") at 18. FDIC Receiver counters that MBIA's claims do not constitute "administrative expenses" of the receivership that are entitled to priority payment. If MBIA's claims are not entitled to administrative priority, then the No Value Determination forecloses MBIA's ability to recover any damages. Thus, this motion – and plaintiff's entire damages case – turns upon whether MBIA has properly categorized the damage claims in its amended complaint as administrative expenses of the receiver under FIRREA.[11]

As explained in more detail below, the Court finds that the facts alleged in the amended complaint do not support MBIA's legal conclusion that its claims are entitled to administrative priority. While the Court accepts as true the allegation that the insurer was forced to make substantial payments under the Policies as a result of IndyMac's loan practices, there is nothing about those circumstances that somehow transforms those losses into expenses of the receivership instituted to wind up the bank's affairs. MBIA's argument that the FDIC "approved" the Transaction agreements simply because the FDIC – in its capacity as the conservator of IndyMac Federal – did not repudiate them is not consistent with the language or

---

(v) Any obligation to shareholders or members arising as a result of their status as shareholders or members (including any depository institution holding company or any shareholder or creditor of such company).

11      At the hearing on the motions, plaintiff advanced the theory that the No Value Determination would not be a bar to recovery, even if its claims were not entitled to administrative priority, because under section 1821(m), FDIC Corporate is required to furnish a new depository institution with additional funds to cover its "losses." This is not alleged as a ground for relief in the complaint, and plaintiff did not advance this argument in its opposition to the motion to dismiss. For the reasons detailed in Section III(B) below, this newly-hatched theory does not alter the situation.

the intent of the statute. MBIA's argument also ignores the distinct roles that were played by the FDIC during different time periods. Consequently, the No Value Determination precludes MBIA from recovering on these claims in any meaningful way. The Court will therefore dismiss Counts I–V and VIII on prudential mootness grounds.

### A. MBIA's Claims Are Not Administrative Expenses

FIRREA requires that the "administrative expenses of the receiver" must be fully satisfied before liabilities for deposits and general unsecured creditors can be paid. 12 U.S.C. § 1821(d)(11)(A). In enacting this section, Congress observed that administrative expenses of the receiver are a narrowly drawn category limited to "ordinary and necessary expenses of the failed institution . . . , but only those that the receiver determines are necessary to maintain services and facilities to effect an orderly resolution of the institution." H.R. Rep. No. 103-213 (1993) (Conf. Rep.), *reprinted in* 1993 U.S.C.C.A.N. 1088, at 1125 (hereinafter "Conf. Report"). The FDIC regulations implement this understanding:

> The priority for administrative expenses of the receiver . . . shall include those necessary expenses incurred by the receiver in liquidating or otherwise resolving the affairs of a failed insured depository institution. Such expenses shall include pre-failure and post-failure obligations that the receiver determines are necessary and appropriate to facilitate the smooth and orderly liquidation or other resolution of the institution.

12 C.F.R. § 360.4 (2011). Examples of these expenses may include "the payment of the institution's last payroll, guard services, data processing services, utilities and expenses related to leased facilities." FDIC Receivership Rules, 60 Fed. Reg. 35,487-01, 35,487-01 (July 10, 1995) (to be codified at 12 CFR pt. 360). On the other hand, administrative expenses generally "do not include expenses such as severance pay claims, golden parachute claims and claims arising from contract repudiations." *Id.* While a bank and its successors may be contractually obligated to indemnify an insurance company for claims paid to investors in failed mortgages, such payments

are not necessary to the receiver's liquidation or resolution of the insolvent institution, and they can hardly be likened to a utility bill. So while MBIA may be a legitimate IndyMac creditor, its claims do not fall within the scope of administrative expenses that take priority over those of other general creditors.[12]

1. MBIA's claims do not arise out of the breach of an agreement "approved by" the receiver, so they are not administrative expenses under 12 U.S.C. § 1821(d)(20).

MBIA points to 12 U.S.C. § 1821(d)(20) as support for its claim that it is entitled to payment for administrative expenses. That subsection provides, in pertinent part:

> Notwithstanding any other provision of this subsection, any final and unappealable judgment for money damages entered against a receiver or conservator for an insured depository institution for the breach of an agreement *executed or approved* by such receiver or conservator *after the date of its appointment* shall be paid as an administrative expense . . . .

12 U.S.C. § 1821(d)(20) (2011) (emphasis added).

The contracts in question were not executed by the FDIC: they were entered into by the now insolvent IndyMac Bank. Moreover, the complaint does not allege that the FDIC expressly approved the Transaction Documents at any point after its appointment as IndyMac Federal's conservator or that it did so in its current capacity as the receiver. In the absence of such affirmative action, MBIA asks the Court to deem the contracts to be tacitly approved because they were not repudiated. The Court declines to do so. Plaintiff's concept of approval by omission does not comport with the plain language of the statutory provision and to interpret the clause in this manner would broaden administrative priority well beyond anything Congress appears to have intended.

---

12    Indeed, it would make little sense if the sophisticated entities that chose to play an active role in the securitization transactions backed by IndyMac loans and stood to gain if they succeeded could be able to leapfrog ahead of ordinary depositors to recoup their losses when they failed.

To establish FDIC Conservator's alleged approval of the breached contracts under this subsection, MBIA states that FDIC Conservator entered the P&A Agreement on July 11, 2008 in its capacity as conservator of the newly created IndyMac Federal. Am. Compl. ¶ 48. Pursuant to that agreement, IndyMac Federal, the "Assuming Bank" for which FDIC was conservator, expressly assumed certain liabilities from IndyMac, including (1) "liabilities, if any, with respect to Qualified Financial Contracts" and (2) "duties and obligations under any contract to which [IndyMac] provides mortgage servicing for others." *Id*. ¶¶ 48–51; P&A Agreement § 2.1(j)–(k). It also acquired as assets "qualified financial contracts" and "mortgage servicing rights and related contracts." P&A Agreement § 3.1(u). The amended complaint alleges that the PSAs and Insurance Agreements were covered by the P&A Agreement, Am. Compl. ¶¶ 49–51,[13] and that IndyMac Federal therefore assumed and succeeded to those agreements. Am. Compl. ¶¶ 52, 112.[14]

---

[13]    Plaintiff alleges in paragraph 209 that the PSAs are "qualified financial contracts" as that term is defined in section 1821(e)(8), and counsel for plaintiff took that position in oral argument. But those allegations are merely legal conclusions that the Court is not bound to accept as true, and neither party chose to illuminate this complicated issue further in its briefing. The Court will decline to wander down this path unescorted since, even if some or all of the Transaction Documents were "qualified financial contracts" that were assumed by IndyMac Federal and FDIC Conservator under paragraph 2.1(j) of the P&A Agreement, the Court finds that they were not "executed or approved" by the conservator under section 1821(d)(20), and that holding disposes of plaintiff's claims.

[14]    A review of the documents raises serious questions as to whether IndyMac Federal and FDIC Conservator assumed the Insurance Agreements under the cited provisions of the P&A Agreement. The Court is not certain whether the Insurance Agreements are "qualified financial contracts" under section 2.1(j) of the P&A Agreement, and they do not seem to be contracts "pursuant to which the Failed Bank provides mortgage servicing to others" under section 2.1(k), or "pursuant to which the Failed Bank holds mortgage servicing rights" under section 2.1(l). Perhaps because it anticipated these questions, MBIA claimed at oral argument that its complaint was not predicated on the Insurance Agreements between IndyMac Bank and MBIA at all, but rather that it was based solely on the PSAs (of which MBIA was a third party beneficiary).

        This assertion flies in the face of the multiple, unambiguous allegations in the amended complaint that specifically identify the Insurance Agreements as the source of FDIC's contractual obligations and – more significantly – the source of its obligation to indemnify

The P&A Agreement permitted the Assuming Bank, IndyMac Federal, to put certain assets or liabilities back to the FDIC in its capacity as the original receiver for IndyMac Bank. This was done for the PSA for one of the three Transactions at issue, but not the others. MBIA argues that since IndyMac Federal and FDIC Conservator failed to reject the other Transaction agreements, and FDIC Conservator failed to exercise its statutory right to repudiate the

---

MBIA for its losses. *See, e.g.*, Am. Compl. ¶¶ 105, 115, 126, 148, 166, 173. But whether or not MBIA's recent statements to the Court can be squared with the plain language of the amended complaint, it seems that at least as of the date of the hearing, MBIA has abandoned any claim that the FDIC assumed (and therefore "approved") the Insurance Agreements, or that they were breached.

This shift in the underlying framework for the claims raises its own set of complicated questions. If the PSAs are the sole source of relief, did IndyMac Federal and FDIC Conservator assume the PSAs under the P&A Agreement? Did they assume all of IndyMac's obligations or only its obligations as "Servicer" of the loans? Section 2.03(c) of the PSA establishes the "put back" process as the remedy for breaches of the representations and warranties that materially and adversely affect MBIA's interests in any mortgage loan, but in that section, it is the bank as "Seller" (as opposed to "Seller and Servicer") that covenants to cure the breach or substitute a loan, and it agrees to do so after receipt of written notice from a "party" to the PSA. *See* Pl.'s Opp. to Rec. Ex. 3 [Dkt. #29-4]. MBIA is not a party to the PSAs, but does that matter? Section 10.14(a) of the PSAs identifies MBIA as an express third party beneficiary of the agreement. *See id.* § 10.14(a). So do the PSAs, standing alone, provide MBIA with the put-back remedy?

In section 2.01(k) of the Insurance Agreements, IndyMac specifically incorporates the representations and warranties in the other Transaction Documents for the benefit of MBIA. That section of the Insurance Agreements also indicates that the remedy with respect to any defective mortgage loan shall be limited to the remedies specified in the related Transaction Document. So, even if the PSA does not expressly enable MBIA to put the bank on notice of defective loans, the Insurance Agreements specifically incorporate the put-back remedy set out in section 2.03(c) of the PSA as MBIA's remedy for non-conforming loans. And section 3.03 of the Insurance Agreements contains IndyMac's promise to reimburse MBIA for payments made under the Policy arising as a result of IndyMac's failure to comply with that loan breach remedy procedure. But there is no parallel promise of indemnification in the PSAs.

In sum, even if MBIA was entitled to put loans back to IndyMac under the PSAs alone, it is not at all clear to the Court that the PSAs accord MBIA a right to the damages sought in this action, *i.e.*, reimbursement for payments made under the Policies, attorneys' fees, etc. This means it is not clear what MBIA's decision to jettison the Insurance Agreement as the source of its claims does to the viability of those claims. But, as with other questions troubling the Court in this case – such as whether the PSAs are "qualified financial contracts," or whether IndyMac Federal assumed all of the seller obligations set forth in the PSAs – the Court need not get to the bottom of the issue in light of its conclusion that whatever contracts related to the Transactions may have been assumed, none were "executed or approved" by the FDIC such that damages for their breach could qualify as administrative expenses.

agreements under 12 U.S.C. §1821(e)(1),[15] FDIC Conservator "approved" those agreements as

that term is used in 12 U.S.C. § 1821(d)(20). Am. Compl. ¶¶ 4, 51, 60. In other words, MBIA

construes IndyMac Federal's assumption under the P&A Agreement of IndyMac's pre-existing

obligations as the conservator's "approval" of those obligations under subsection 1821(d)(20).

MBIA cites no authority for this sweeping interpretation of FIRREA. In the Court's

view, reading section 1821(d) to transform all general creditor claims based upon unrepudiated

obligations of the failed bank into administrative expenses of the receiver would be contrary to

both the language and intent of the statute.

The Court is bound to look first at the language of the statute. It is a well-recognized

canon of statutory interpretation that where Congress has expressed its will in "reasonably plain

terms, 'that language must ordinarily be regarded as conclusive.'" *Griffin v. Oceanic*

---

15      12 U.S.C. §1821(e)(1) provides, in pertinent part:

(1) Authority to repudiate contracts

In addition to any other rights a conservator or receiver may have, the conservator
or receiver for any insured depository institution may disaffirm or repudiate any
contract or lease --

(A) to which such institution is a party;

(B) the performance of which the conservator or receiver, in the conservator's or
receiver's discretion, determines to be burdensome; and

(C) the disaffirmance or repudiation of which the conservator or receiver
determines, in the conservator's or receiver's discretion, will promote the orderly
administration of the institution's affairs.

(2) Timing of repudiation

The conservator or receiver appointed for any insured depository institution in
accordance with subsection (c) of this section shall determine whether or not to
exercise the rights of repudiation under this subsection within a reasonable period
following such appointment.

*Contractors, Inc.*, 458 U.S. 564, 570 (1982), quoting *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108 (1980). In this instance, Congress used affirmative language to identify the steps that a conservator or receiver must take with respect to a contract before a judgment for damages for its breach can be considered to be an administrative expense: it must be a contract that the conservator or receiver has executed or "approved." But there is no suggestion in this case that the FDIC took any steps to formally sanction the Transaction agreements in general, or the PSAs or Insurance Agreements in particular. *See* Black's Law Dictionary 118 (9th ed. 2009) (defining "approve" as to "give formal sanction to; to confirm authoritatively"); Oxford English Dictionary, OED Online (last visited Oct. 5 2011) (defining "approve" as to "confirm authoritatively; to sanction").

Furthermore, Congress chose the words "executed or approved" for section 1821(d)(2) and did not go on to include contracts "assumed" or "not repudiated." It could easily have done so, because it utilized the word "assume" in multiple other sections of the statute, and it talked about repudiation in the very next section: 1821(e). *See Russello v. United States*, 464 U.S. 16, 23 (1983) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (internal citations omitted); *see also* N. Singer & J. Singer, 2A Sutherland Statutes and Statutory Construction 228–29 (7th ed. 2007) ("[W]here the legislature has employed a term in one place and excluded it in another, it should not be implied where excluded."). Indeed, section 1821(d)(20) is titled "Treatment of claims arising from breach of contracts executed by the receiver or conservator," while section 1821(e) is called "Provisions relating to contracts entered into *before* appointment of conservator or receiver," 12 U.S.C. § 1821(e) (emphasis added). Reading these subsections *in pari materia*, it

appears that Congress meant something more specific by the word "approved" than simply non-repudiation. *See Motion Picture Ass'n of Am., Inc. v. FCC*, 309 F.3d 796, 801 (D.C. Cir. 2002) ("Statutory provisions *in pari materia* normally are construed together to discern their meaning . . . [and] individual sections of a single statute should be construed together.") (internal quotations and citations omitted).

MBIA's theory also ignores the particular function performed by the conservator under the statute. A conservator is empowered "to take such action as may be [] necessary to put the insured depository institution in a sound and solvent condition [] and appropriate to carry on the business of the institution and preserve and conserve the assets and property of the institution." 12 U.S.C. § 1821(d)(2)(D). "The conservator's mission is to conserve assets which often involves continuing an ongoing business. The receiver's mission is to shut a business down and sell off its assets." *Resolution Trust Corp. v. United Trust Fund, Inc.*, 57 F.3d 1025, 1033 (11th Cir. 1995). As a result, "[a] receiver and conservator consider different interests when making the strategic decision whether or not to repudiate a [contract]." *Id.*; *see also Resolution Trust Corp. v. Cheshire Mgmt. Co.*, 18 F.3d 330, 336 (6th Cir. 1994) ("[W]hen the [FDIC] handles an institution as a conservator, it continues to operate the bank as a going concern and hence pays obligations under contract when due and in cash. This is in contrast to its receivership role which is aimed at liquidating the institution."). Adopting MBIA's theory would require the conservator to repudiate the many liabilities it takes on in a purchase and assumption agreement immediately, or risk that they automatically convert to administrative expenses. This would put the conservator "in the untenable position of trying to operate the business as an ongoing concern with one hand, while at the same time calculating the . . . repudiation issue as if it were shutting

the business down." *Resolution Trust Corp. v. CedarMinn Bldg. Ltd.*, 956 F.2d 1446, 1454 (8th Cir. 1992).

More important, treating claims as administrative expenses based simply on the conservator's inaction would be contrary to the clear system of priorities set out in the statute. *See* 12 U.S.C. § 1821(d)(11)(A). MBIA concedes its contracts cannot be differentiated from the many others that were assumed, so adopting its theory would turn the preference provision on its head. In particular, it would elevate all of the bank's contractors and general creditors ahead of its depositors, a result that is inconsistent with the purpose of the clear depositor preference provision that was added to the statute in 1993. *See* Conference Report, 1993 US.C.C.A.N. at 1125 (describing how the National Depositor Preference Amendment of 1993, Pub. L. 103-66, § 3001(a), 107 Stat. 312, 336–37, which amended the statutory distribution scheme of section 1821(d)(11)(A), was designed to "increase the amount of the distribution to depositors of failed institutions" by ensuring that deposit liabilities take precedence over general creditor claims).[16] *See also K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988) ("In ascertaining the plain meaning of the statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole."); *U.S. Nat. Bank of Or. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 455 (1993) (noting that courts "must not be guided by a single

_____

16      Accepting MBIA's contention that all contracts assumed under the P&A Agreement were "approved" by the conservator for distribution priorities purposes would not only overwhelm and frustrate the priority system by moving all of the bank's contractors to the top, but it would lead to anomalous results. For example, among the liabilities assumed by FDIC Conservator in the P&A Agreement are "assumed deposits." P&A Agreement § 2.1(a). An "assumed deposit," as that term is defined by the P&A Agreement, would qualify as a "deposit liability of the institution" pursuant to 12 U.S.C. section 1821(d)(11)(A). *See* 12 U.S.C. § 1813(l) (2011) (defining "deposit"); *see also* P&A Agreement Art. I (cross-referencing section 1813(l)). Under MBIA's non-repudiation theory, these deposit liabilities would convert to administrative expenses if FDIC Conservator failed to repudiate them. But under section 1821(d)(11)(A) deposit liabilities cannot qualify as administrative expenses because they fall within their own category of liabilities subordinate to administrative expenses.

sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy"); *Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*, 574 F.3d 748, 771 (D.C. Cir. 2009) ("[T]he words of a statute must be read in their context and with a view to their place in the overall statutory scheme."), quoting *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989); N. Singer & J. Singer, 2A Sutherland Statutes and Statutory Construction 189–90 (7th ed. 2007). Given these considerations, the Court concludes that the wholesale assumption of a bank's ongoing contracts at the outset of a conservatorship cannot suffice to transform all of those contracts into the narrow category of conservatorship expenses given priority when the bank is liquidated.

The mere fact that the conservator and receiver are entitled to repudiate a contract under section 1821(e) does not mean that the failure to do so converts the liabilities for a breach of that contract into an administrative expense. Repudiation permits the conservator or receiver to reject pre-existing contracts and entitles the counterparties to those contracts to seek specific relief. *See* 12 U.S.C. § 1821(e)(1), (e)(3); *Battista v. FDIC*, 195 F.3d 1113, 1116–19 (9th Cir. 1999) (noting that "[r]epudiation gives rise to an ordinary contract claim for damages" and finding that such damages are not entitled to the same priority as administrative claims). FIRREA limits most claims for repudiated contracts to "actual direct compensatory damages" relating back to the date of appointment of the conservator or receiver. 12 U.S.C. § 1821(e)(3). For non-repudiated contracts, by contrast, the relief sought by a counterparty alleging a breach would not be so limited but would still be subject to the FIRREA distribution scheme.[17] Therefore, when a

---

17      In *Deutsche Bank Nat'l Trust Co. v. FDIC*, No. CV 09-3852 GAF (FFMx), 2011 WL 1225796 (C.D. Cal. Jan. 7, 2011), a bank sued IndyMac and the FDIC in several capacities related to the IndyMac receivership. The court originally held that the plaintiff's post-receivership breach of contract claims fell outside the section 1821(d)(11) distribution scheme. It therefore concluded that those claims were not moot even in light of the No Value Determination. On reconsideration, however, the court held that the "claims for post-

23

contract is not repudiated while the bank is in receivership, the counterparty would only be entitled to administrative priority if the contract at issue had been "executed or approved" under section 1821(d)(20).[18]

### 2. Any partial performance of the Transaction Agreements after formation of IndyMac Federal did not constitute "approval" of the contracts under §1821(d)(20).

MBIA alleges that IndyMac Federal and FDIC Conservator partially performed IndyMac Federal's contractual obligations, and that they accepted fees for the servicing of mortgage loans during the period of the conservatorship between July 2008 and March 2009. Am. Compl. ¶ 62. MBIA argues that this fact further demonstrates the conservator's "approval" of the Transaction contracts. Pl.'s Opp. to Rec. at 3, 20–22. The Court disagrees for the reasons already set forth concerning the plain language of the statute. Congress could have said that a claim for damages for the breach of any contract approved, executed, or *performed by* the conservator qualifies as an administrative expense, but it did not do so.

---

receivership breach of pre-receivership contracts *are* subject to the § 1821(d)(11) distribution priority." *Deutsche Bank Nat'l Trust Co. v. FDIC*, No. CV 09-3852 GAF (FFMx), slip op. at 14 (C.D. Cal. filed June 28, 2011). Thus the court also recognized that the only claim against the receiver that would not be moot would be a cause of action "for post-failure breach of contract to the extent that it is based on the alleged breach of contracts that [the receiver] 'executed or approved.'" *Id.* at 17.

18      Section 1821(d)(11)(A) lists only administrative expenses of the "receiver," as opposed to the "the receiver or conservator," as receiving priority payment. Accordingly, FDIC Receiver argues that even if MBIA's claims did qualify as administrative expenses of FDIC Conservator, they did not automatically become administrative expenses of FDIC Receiver for purposes of section (d)(11). *See* Rec. Mot. to Dismiss at 23–25. But this interpretation would not permit a party to obtain the damages for the conservator's breach of a contract it executed that are clearly contemplated by section 1821(d)(20), and it seems at odds with the position FDIC Receiver took in the Deutsche Bank / IndyMac litigation that it has succeeded the conservator and is the proper party in the case. *See* Stipulation to Substitute the FDIC as Receiver for IndyMac Federal Bank, F.S.B. in Place of the FDIC as Conservator for IndyMac Federal Bank, F.S.B., *Deutsche Bank Nat'l Trust Co. v. FDIC*, No. 09-3852 GAF (FFMx) (C.D. Cal. Sept. 14, 2009). But the Court need not decide this issue because it finds that the contracts were not "approved" by the conservator in any event.

In sum, MBIA fails to allege that FDIC Conservator – or FDIC Receiver – executed or approved the agreements at issue pursuant to section 1821(d)(20). Therefore, despite MBIA's conclusory statements to the contrary, the Court finds that MBIA has not alleged facts sufficient to demonstrate that its claims qualify as administrative expenses under subsection 1821(d)(20).[19]

3. MBIA's claims are not entitled to administrative priority under 12 U.S.C. § 1821(e)(7).

MBIA also points to 12 U.S.C. § 1821(e)(7) as support that its claims are entitled to administrative priority. That section applies to "contracts for services between any person and any depository institution" for which FDIC is conservator or receiver. 12 U.S.C. § 1821(e)(7)(A). It "function[s] to guarantee payment under existing service contracts to those individuals who perform services for a failed, and liquidating, institution." *McAllister v. Resolution Trust Corp.*, 201 F.3d 570, 579 (5th Cir 2000). If, after its appointment, "the conservator or receiver accepts performance by the other person" of services under a contract,

---

[19]    Another court in this district has also addressed a motion to dismiss claims brought against the FDIC related to the IndyMac receivership. In *Landwehr v. FDIC*, 734 F. Supp. 2d 161 (D.D.C. 2010), the FDIC moved to dismiss claims brought by former IndyMac employees against the receiver for lack of jurisdiction based on prudential mootness in light of the No Value Determination. The plaintiffs alleged that their claims were not simply those of general creditors but were entitled to priority payment, so they were not bound by the No Value Determination. *Id.* at 165. Because the FDIC failed to offer reasons why the plaintiffs were not entitled to higher priority payment above general creditors, the court denied the motion to dismiss without prejudice. *Id.* at 165–67.

The court's opinion in *Landwehr* is inapplicable to this case for two reasons. First, the court in *Landwehr* has allowed the FDIC to renew its motion to dismiss and provide support for its argument – as it already has done here – that the plaintiffs' claims are not entitled to priority payment under FIRREA. That renewed motion is still pending before the court. *See* Renewed Motion to Dismiss the Third Amended Complaint Against the FDIC, as Receiver for IndyMac Bank, F.S.B. and Receiver for IndyMac Federal Bank, F.S.S., No. 09-cv-0716 (D.D.C. Sept. 20, 2010), ECF No. 74. Moreover, the employees' claims were based not only on pre-receivership contractual arrangements with the bank, but on representations made to them by the FDIC when it was running the bank and on the FDIC's conduct in taking steps to collect on loans IndyMac had made to the employees. *Landwehr*, 734 F. Supp. 2d at 164–66. So the *Landwehr* plaintiffs allege not only successor liability but post-receivership conduct by the receiver itself.

payment for those services shall be treated as an administrative expense. 12 U.S.C.§ 1821(e)(7)(B). MBIA argues that this demonstrates Congress's intent that counterparties to contracts with the FDIC shall be protected from non-payment. Pl.'s Opp. to Rec. at 24–25.

But MBIA's attempt to fit the Insurance Agreements and PSAs into this provision is unavailing. Even if one were to conclude that the Insurance Agreements or PSAs are each a "contract for services," the complaint does not allege that FDIC Conservator accepted performance of services under a contract with MBIA. What it alleges is that IndyMac Federal and FDIC Conservator agreed to provide services themselves. *See* Am. Compl. ¶¶ 52–67. "[A] receiver is obliged to pay for services as administrative expenses . . . only where the receiver has actually accepted performance of services subsequent to appointment, but prior to the repudiation of any existing service contracts." *McAllister*, 201 F.3d at 579. In the absence of any factual allegations to support a claim that IndyMac Federal or FDIC Conservator accepted performance of services under a service contract, the complaint does not state a plausible claim under 12 U.S.C. § 1821(e)(7).

### 4. MBIA's repudiation claims in Count VIII are not administrative expenses of FDIC Conservator.

In Count VIII, MBIA alleges that it is entitled to actual direct compensatory damages arising out of the repudiation of the 2007-1 Transaction. It claims that "these claims relate to breaches of a Qualified Financial Contract purportedly repudiated after such contract was transferred to IndyMac Federal . . . on July 11, 2008." Am. Compl. ¶ 209. But damages arising from repudiation are generally not entitled to administrative priority, and MBIA provides no authority for the proposition that they should be. *See* 60 Fed. Reg. 35,487-01; *Battista*, 195 F.3d at 1119 ("[C]laims for damages arising from contract repudiation under § 1821(e) . . . are not entitled to the same priority as administrative claims."). Thus, even if MBIA is correct that the

repudiated contract was a qualified financial contract, that would govern the date as of which the damages are to be calculated under section 1821(e)(3), but it would not alter the place those claims must take in line – as general unsecured creditors. Thus, the Court finds that claims arising from MBIA's repudiation of the 2007-1 Transaction – regardless of whether the contract at issue is a QFC – are not entitled to administrative priority.[20]

In conclusion, for the reasons stated above, the Court finds that MBIA's claims for monetary damages (Counts I–V, VIII) do not plead facts sufficient to demonstrate they are entitled to priority as administrative expenses of FDIC Conservator or FDIC Receiver.[21]

### B. Prudential Mootness Favors Dismissal

Having established that MBIA's claims do not qualify as administrative expenses, the Court now considers whether those claims must be dismissed as moot.

---

[20]     Moreover, MBIA's assertion that its Count VIII damages – flowing from a repudiated contract – qualify as administrative expenses is at odds with its argument that the damages in Counts I–V should also be classified as administrative expenses. MBIA's sole justification for classifying their damages claims in Counts I–V as administrative expenses is that those contracts were *not* repudiated. Yet when it comes to this claim, MBIA asserts that its damages qualify as administrative expenses because the Transaction Documents *were* repudiated. MBIA cannot have it both ways, and its logical inconsistencies suggest that its position is driven more by a need to shoe horn its claims into the administrative expense category than any guiding principle.

[21]     FDIC Receiver made its own determination that MBIA's claims should be treated as general creditor claims and not administrative expenses entitled to priority payment. Am. Compl. Ex. C. While acknowledging that MBIA is entitled to *de novo* review of its claims by this Court, FDIC Receiver argues that its determination is entitled to deference. Rec. Reply at 3. "[B]ecause the FDIC is charged with administering this highly detailed regulatory scheme, [courts] may resort to its 'body of experience and informed judgment' for guidance to the extent that its position is persuasive." *Wells Fargo Bank, N.A. v. FDIC*, 310 F.3d 202, 208 (D.C. Cir. 2002), quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944); *see also Bank of N.Y. v. FDIC*, 453 F. Supp. 2d 82, 94–99 (D.D.C. 2006) (applying *Skidmore* deference to FDIC interpretation of FIRREA provisions). FDIC Receiver's letter disallowing MBIA's claims is cursory, *see* Am. Compl. Ex. C, however, and therefore entitled to limited deference. That said, because the Court agrees with FDIC Receiver's determination and the reasoning in its briefs, as described above, the Court need not address the degree of deference that should be afforded to FDIC Receiver under these circumstances.

Federal courts lack subject matter jurisdiction to hear claims that are moot. *United States v. Phillip Morris USA, Inc.*, 566 F.3d 1095, 1135 (D.C. Cir. 2009). The D.C. Circuit recognizes two varieties of mootness: Article III mootness and prudential mootness. Under Article III of the United States Constitution, federal courts only have jurisdiction to adjudicate actual "cases" or "controversies." U.S. Const. art. III, § 2, cl. 1. Prudential mootness, "[t]he cousin of the mootness doctrine, in its strict Article III sense, is a melange of doctrines relating to the court's discretion in matters of remedy and judicial administration." *Chamber of Commerce v. U.S. Dep't of Energy*, 627 F.2d 289, 291 (D.C. Cir. 1980).

Assuming the truth of the facts alleged in the amended complaint, MBIA could plausibly be entitled to damages for breach of the non-repudiated contracts by the conservator and damages stemming from the repudiated contract under section 1821(e)(3). Even though the No Value Determination means that MBIA cannot recover monetary damages, it can be paid with a receiver's certificate in the amount of their recovery. *See Battista*, 195 F.3d at 1116 ("There is no question that the FDIC may pay creditors with receiver's certificates instead of with cash."). Thus, there remains a technical case or controversy and Article III mootness does not apply.

However, prudential mootness is appropriate where "a controversy, not actually moot, is so attenuated that considerations of prudence and comity for coordinate branches of government counsel the court to stay its hand, and to withhold relief it has the power to grant." *Chamber of Commerce*, 627 F.2d at 291; *see also Penthouse Int'l, Ltd. v. Meese*, 939 F.2d 1011, 1019 (D.C. Cir. 1991) ("Where it is so unlikely that the court's grant of [remedy] will actually relieve the injury, the doctrine of prudential mootness – a facet of equity – comes into play."). The D.C. Circuit has stated that the primary test is whether a favorable judgment "will provide a real measure of redress." *Foretich v. United States*, 351 F.3d 1198, 1216 (D.C. Cir. 2003).

Here, there is no real measure of redress available to MBIA even if it prevails on its claims. The No Value Determination forecloses that possibility for general unsecured creditors – the class to which MBIA properly belongs. *See* 12 U.S.C. § 1821(i)(2) (setting the maximum liability of FDIC in any capacity as the amount equal to the amount the claimant would have received if it liquidated the bank's assets and liabilities); *Heinrich v. Valley View Dev.*, 474 F.3d 609, 615 (9th Cir. 2007) (dismissing claims against FDIC as receiver where no assets remained in receivership to satisfy the plaintiff's claims, rendering the claims moot); *FDIC v. Kooyomjian*, 220 F.3d 10, 15 (1st Cir. 2000) (holding that claims against the FDIC as receiver failed to satisfy the case or controversy requirement where "[t]he FDIC's worthlessness determination . . . preclude[d] any relief for [claimants] even i[f] they were successful . . . and obtained favorable judgment"); *281-300 Joint Venture v. Onion*, 938 F.2d 35, 38 (5th Cir. 1991) (dismissing "on prudential grounds" where "there will never be any assets with which to satisfy a judgment"); *Boone v. IndyMac Bank, F.S.B.*, No. CV 09-10750 SJO (CWx), 2010 WL 7405439, at *3 (C.D. Cal. Dec. 14, 2010) ("Because any legal relief available to Plaintiff would be a general unsecured claim, the Worthlessness Determination prevents this Court from effectively remedying Plaintiff's legal claims as no funds are available to pay such claims."). It follows that litigation would produce nothing for plaintiff beyond a certificate worth no more than the paper on which it is printed. Thus, considerations of prudence, judicial efficiency and comity weigh against issuing a decision that would be largely advisory.

Therefore, the Court will dismiss MBIA's claims for monetary damages (Counts I–V, VIII) as prudentially moot.[22]

---

22      MBIA's APA claim (Count VI) simply contests FDIC Receiver's decision to cease reviewing MBIA's administrative claims in light of the No Value Determination. Am. Compl.

## II. Declaratory and Injunctive Relief are Unavailable

MBIA also seeks declaratory and injunctive relief in Counts VI and VII. Count VI alleges that FDIC improperly disallowed its claims based on the No Value Determination. MBIA seeks an injunction against FDIC Corporate, FDIC Receiver, and FDIC Conservator under the APA, requiring FDIC Conservator or FDIC Receiver to properly determine its administrative claims in compliance with FIRREA. Am. Compl. at 54. In Count VII, MBIA alleges that it received notice eight months after the P&A Agreement that FDIC Conservator re-transferred the PSA for the 2007-1 Transaction to Original FDIC Receiver, and that Original FDIC Receiver repudiated the PSA. *Id.* ¶ 198. MBIA seeks a declaration under 28 U.S.C. § 2201 that FDIC failed to repudiate the 2007-1 Transaction PSA in a "reasonable period" pursuant to 12 U.S.C. § 1821(e)(2).[23] *Id.*

FDIC Receiver argues that 12 U.S.C. § 1821(j) bars the Court from granting the declaratory or injunctive relief that MBIA seeks in Counts VI and VII. The Court agrees.

Section 1821(j) prevents courts from "tak[ing] any action, except at the request of the Board of Directors by regulation or order, to restrain or affect the exercise of powers or functions of the Corporation as a conservator or a receiver." 12 U.S.C. § 1821(j). The D.C. Circuit and other circuits have held that section 1821(j) precludes granting declaratory and injunctive relief where such relief would interfere with the receiver's management of the estate. *See Freeman v. FDIC*, 56 F.3d 1394, 1399 (D.C. Cir. 1995) ("Section 1821(j) does indeed effect a sweeping ouster of the court's power to grant equitable remedies [against FDIC Receiver]."); *Nat'l Trust*

---

¶¶ 79–81. In other words, the amended complaint does not challenge the validity of the No Value Determination itself but merely claims that it does not apply to MBIA's claims. *Id.* ¶ 80.

23      Under section 1821(e)(2), the "conservator or receiver . . . shall determine whether or not to exercise the rights of repudiation under this subsection within a reasonable period following [its] appointment." 12 U.S.C. § 1821(e)(2).

*for Historic Pres. in the U.S. v. FDIC*, 995 F.2d 238, 240–41 (D.C. Cir. 2003) (holding that section 1821(j) bars suit for injunctive relief where the FDIC acts in accordance with the powers granted to it by Congress), *aff'd on reh'g*, 21 F.3d 469 (1994); *Courtney v. Halleran*, 485 F.3d 942, 946 (7th Cir. 2007) ("[S]ection 1821(j) squarely precludes granting declaratory, injunctive, or other equitable relief where such relief would interfere with the receiver's management of the estate . . . ."); *Boone*, 2010 WL 7405439, at *4 ("12 U.S.C. § 1821(j) prohibits judicial interference with the FDIC's performance of its statutory duties and has been widely held to prohibit courts from granting equitable remedies against the FDIC as Receiver.").

Section 1821(j) does not, however, bar injunctive or declaratory relief "when the FDIC has acted or proposes to act beyond, or contrary to, its statutorily prescribed, constitutionally permitted, powers or functions." *Nat'l Trust for Historic Pres.*, 995 F.2d at 240. In an attempt to circumvent the general statutory bar, MBIA relies on this exception and claims that the FDIC exceeded its statutory authority. Am. Compl. ¶ 192. With respect to Count VI, MBIA alleges that "IndyMac Federal, under FDIC's receivership, retained the $1.5 billion paid by OneWest for IndyMac Federal's assets, and has since liquidated other assets, the proceeds from which it is holding in reserve to satisfy administrative expense claims, like MBIA's." *Id*. ¶ 188. Thus, MBIA alleges that "FDIC's refusal to review MBIA's administrative expense claims constitutes an action by the FDIC outside its statutory authority since the FDIC has refused to even review, much less pay, valid administrative claims . . . ." *Id.* Alternatively, MBIA alleges that FDIC Conservator "exceeded its statutory authority afforded to it under FIRREA, and transferred or otherwise dissipated the proceeds form [sic] the OneWest sale, and IndyMac Federal's other assets without regard for MBIA's administrative expense claims." *Id*. ¶ 189. Thus, at bottom,

the only "illegality" alleged in Count VI is FDIC's failure to consider MBIA's claims as an administrative expense.

With respect to Count VII, MBIA argues FDIC exceeded its statutory authority by repudiating the 2007-11 Transaction PSA "outside the time provided by FIRREA." *Id*. ¶ 202. But MBIA's allegations all fall well within the FDIC's powers or functions under FIRREA to dispose of the IndyMac assets and process administrative claims. *See, e.g.*, 12 U.S.C. § 1821(d)(2)–(3); *see also Nat'l Trust for Historic Pres.*, 995 F. 2d at 240 ("In disposing of the assets of a bank, the FDIC is performing a routine 'receivership' function that § 1821(j) unequivocally removes from judicial restraint."); *Ward v. Resolution Trust Corp.*, 996 F.2d 99, 103 (5th Cir. 1993) ("When the [FDIC] determines the method, terms and conditions of the disposition of assets, it is indisputably exercising its discretion and judgment in administering the affairs of a failed or troubled financial institution through liquidation of receivership assets.").

In seeking injunctive or declaratory relief, it is not enough for MBIA to allege that FDIC came to the wrong conclusion in processing its claims, or that repudiation on a different schedule would have been preferable. The FDIC's exercise of its "powers may not be restrained by any court, regardless of the claimant's likelihood of success on the merits of his underlying claims." *Freeman*, 56 F.3d at 1398–99. In essence, MBIA "fails (or refuses) to recognize the difference between the exercise of a function or power that is clearly outside the statutory authority of the [FDIC] on the one hand, and improperly or even unlawfully exercising a function or power that is clearly authorized by statute on the other." *Ward*, 996 F.2d at 103. Only the former type of act could possibly subject FDIC to an injunction. *Id.*

With respect to Count VI, FDIC Receiver was well within its statutory authority in disposing of the receivership assets and deciding MBIA's administrative claims. FDIC Receiver

declined to process MBIA's claims any further in light of its conclusion that MBIA's claims were not entitled to administrative priority and because of the No Value Determination. This was perfectly appropriate and so injunctive relief is not an available remedy. *See* 12 U.S.C. § 1821(d)(5)(D)(i) ("The receiver may disallow any portion of any claim by a creditor or claim of security, preference, or priority which is not proved to the satisfaction of the receiver."); *Halleran*, 485 F.3d at 946 (rejecting plaintiff's argument that "a private party is entitled to an injunction against the FDIC when the agency fails properly to implement the distribution priorities of § 1821(d)(11), notwithstanding the anti-injunction provision of FIRREA"). Moreover, even if plaintiff was entitled to seek declaratory relief, the Court has already ruled that it is MBIA, and not the FDIC, that is misinterpreting the statute on the administrative expense issue.

Similarly, with respect to Count VII, FDIC Conservator and FDIC Receiver undoubtedly have the right to wield the "powerful tool" of repudiation under FIRREA. *CedarMinn Bldg. Ltd.*, 956 F.2d at 1451; *see also Bank of N.Y. v. FDIC*, 453 F. Supp. 2d 82, 92 (D.D.C. 2006) (describing how the power to repudiate is among the FDIC's "broad powers to resolve the affairs of a failed depository institution"). FDIC was acting within its statutory authority under section 1821(e) in repudiating the 2007-1 Transaction PSA. *Gross v. Bell Sav. Bank*, 974 F.2d 403, 408 (3d Cir. 1992) (holding that section 1821(j) cannot be overcome so long as the receiver "is colorably acting within [his] enumerated powers"). Thus, plaintiff is limited to its claim for damages. Because the Court finds that the FDIC was acting within its enumerated power, neither injunctive nor declaratory relief is available.

Therefore, the Court will dismiss Counts VI and VII for failure to state a claim upon which relief can be granted because the relief is barred by section 1821(j).

III.    **The Claim Against FDIC Corporate Must be Dismissed**

   A.  **Section 1821(d)(10)(B) bars the relief MBIA seeks**

In Count VI, plaintiff seeks an injunction against FDIC Corporate, ordering it to return any assets it received from the receivership.  Am. Compl. ¶ 54.  FDIC Corporate separately moved to dismiss this single claim against it, arguing that 12 U.S.C. § 1821(d)(10)(B) bars relief. The Court agrees.

MBIA alleges that FDIC Conservator or FDIC Receiver paid FDIC Corporate "in satisfaction of certain contractual obligations owed to FDIC-Corporate that arose in connection with the chartering of IndyMac Federal." *Id*. ¶ 85.  It claims that by accepting those payments, FDIC Corporate "exceeded its authority under FIRREA" because the funds were not used instead to satisfy MBIA's claims.  *Id*. ¶ 189.  Thus, MBIA premises FDIC Corporate's liability on its flawed theory that its own unpaid claims qualify as administrative expenses as opposed to general unsecured creditor claims.

In response, FDIC Corporate argues that 12 U.S.C. section 1821(d)(10)(B) bars relief. That section provides:

> The receiver may, in the receiver's sole discretion, pay dividends on proved claims at any time, and *no liability shall attach to the Corporation* (in such Corporation's corporate capacity or as receiver), by reason of any such payment, for failure to pay dividends to a claimant whose claim is not proved at the time of any such payment.

12 U.S.C. § 1821(d)(10)(B) (emphasis added).  The plain language of this provision bars an action against FDIC Corporate for payment on proved claims by FDIC Receiver.  This language undoubtedly includes payment for proved claims by FDIC Corporate.

In its amended complaint MBIA simply alleges that FDIC Receiver paid FDIC Corporate for "certain contractual obligations owed to FDIC-Corporate," and that if those payments are administrative expenses, "the FDIC exceeded its authority under FIRREA . . . to ensure that all

34

parties holding administrative expense claims received a pro rata portion of whatever funds were available to satisfy such claims." *Id.* ¶¶ 85, 86. This claim fails in light of this Court's ruling that MBIA's claims are not administrative expenses. Moreover, plaintiff's claim that "FDIC was obligated to treat MBIA's claims and the obligations to FDIC-Corporate *equally* and distribute payment on a pro rata basis if there were insufficient funds to cover both MBIA's claims and FDIC-Corporate obligations," *id.* ¶ 14 (emphasis added), is contrary to section 1821(d)(10)(B).

MBIA alternatively alleges that "[i]In the event the FDIC, in its capacity as receiver or conservator of IndyMac Federal, treated IndyMac Federal's obligations to FDIC-Corporate as payment for anything other than an administrative expense, then the FDIC also exceeded its authority under FIRREA. As an administrative expense . . . MBIA's claims were to be satisfied by IndyMac Federal on a priority basis, ahead of other claims." *Id.* ¶ 87; *see also id.* ¶ 189. This claimed basis for a judgment against FDIC Corporate also depends upon the administrative expense theory rejected by the Court. Furthermore, by merely hinting in paragraph 87 at the "sheer possibility" that FDIC Corporate has acted unlawfully, MBIA falls short of the pleading requirement under Rule 12(b)(6). *Iqbal*, 129 S. Ct. at 1949. Because MBIA's allegations do not include any facts to suggest FDIC Corporate was improperly paid for claims that were not "proved claims," section 1821(d)(10)(B) bars MBIA from recovering against FDIC Corporate.[24]

Therefore, under the facts alleged in MBIA's amended complaint, Count VI must be dismissed as against FDIC Corporate for failure to state a claim.[25]

---

[24] Perhaps recognizing this fatal flaw, MBIA seeks to shift the burden to FDIC Corporate in its opposition to FDIC Corporate's motion to dismiss by arguing that FDIC Corporate "accepted a preferential payment that does not appear to have been a 'proved claim.'" Pl.'s Opp. to FDIC Corporate Mot. to Dismiss at 11. But nothing in the amended complaint supports this bald assertion.

[25] FDIC Corporate also argues that MBIA cannot bring its claim under the APA because there is no "final agency action" that can be challenged. But the Court need not address that

**B.  Section 1821(m) does not entitle MBIA to recover from FDIC Corporate**

In opposition to FDIC Corporate's motion, MBIA identified an alternative theory of recovery from those set out in the amended complaint, and it argues that 12 U.S.C. § 1821(m) requires FDIC Corporate to reimburse it for its losses.[26]  Pl.'s Opp. to Rec. at 27, citing 12 U.S.C. § 1821(m)(11)–(13).  That section provides that if FDIC forms a new depository institution when an insured bank fails, the FDIC, in its corporate capacity, shall provide the new federally chartered bank with an amount equal to the estimated insured deposits that are in default, "plus the estimated amount of the expenses of operating" the new bank.  12 U.S.C. § 1821(m)(11)(A).  If the new bank, "during the period it continues its status as such, sustains any losses with respect to which it is not effectively protected except by reason of being an insured depository institution," then FDIC Corporate "shall furnish to it additional funds in the amounts of such losses."  *Id.* § 1821(m)(13).  MBIA argues that this requirement that FDIC Corporate cover the new bank's "losses . . . should include damages arising from the conservator's breach of contractual obligations."  Pl.'s Opp. to Rec. at 27.

This argument fails for several reasons.  First, the statute makes clear that the FDIC Corporate's obligation to pay the new institution for losses extends only "during the period" of the conservatorship.  12 U.S.C. § 1821(m)(13).  Here, the conservatorship ceased to exist on March 19, 2009.  MBIA's suggestion that the statute creates an open-ended obligation to pay for

---

issue here because it finds that the claim against FDIC Corporate is barred by 12 U.S.C. § 1821(d)(1)(B).

26      At oral argument, MBIA asserted for the first time that even if the Court finds its damages claims are not entitled to priority payment as administrative expenses, it is still entitled to payment under section 1821(m).  Following that reasoning, MBIA would have the Court find that section 1821(m) requires FDIC Corporate to pay all of its monetary damages claims even though its amended complaint only named FDIC Corporate as a defendant in Count VI, the claim for injunctive relief.  The Court need not resolve this discrepancy because it finds that section 1821(m) provides MBIA no right to relief on any of its claims.

the conservatorship's "losses" beyond the time it ceases to exist is inconsistent with the plain language of the statute.  Also, MBIA's theory – that this provision obligates FDIC Corporate to provide the new institution with funds to satisfy all of the insolvent bank's creditors' claims – strains the interpretation of the word "losses" well beyond its ordinary meaning.  MBIA's reading is also inconsistent with section 1821(i)(2), which explicitly limits the liability of the FDIC – acting in any capacity – for claims against the receiver to the assets of the receivership. Finally, as FDIC Receiver pointed out at oral argument, it is not clear that section 1821(m) gives third parties a private right of action against FDIC Corporate.  In short, MBIA's claimed damages are not "losses" of IndyMac Federal under section 1821(m), but they are – as MBIA repeatedly alleges, *see, e.g.*, Am. Compl. ¶¶ 78, 108 – simply "claims" presented to FDIC Receiver for payment under the FIRREA distribution scheme.  The Court therefore finds that section 1821(m) does not apply in this case.

## CONCLUSION

For the foregoing reasons, the Court will grant both FDIC Corporate and FDIC Receiver's motions to dismiss.  Counts I–V and VIII will be dismissed with respect to all defendants pursuant to Rule 12(b)(1) for lack of subject matter jurisdiction.  Counts VI and VII will be dismissed with respect to all defendants pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted.  A separate order will issue.

AMY BERMAN JACKSON
United States District Judge

DATE: October 6, 2011